271. As the head of DMI, PRINCE MOHAMMED knew or should have known of these and other activities and acted as an aider and abettor and material sponsor of AL QAEDA, BIN LADEN, and international terrorism.

272. PRINCE ABDULLAH was born in 1923 and is the son of former King Faisal. His brothers include Defendant PRINCE TURKI and Defendant PRINCE MOHAMMED.

273. PRINCE ABDULLAH AL FAISAL, a former official of the Saudi Ministry of Interior, was Minister of Health between 1949 and 1950. He is Chairman of the Arabian Establishment for Trade and Shipping Ltd, Qassim Cement Company and owner of ALFAISALIAH GROUP. He is also Chairman of the board of trustees of the King Faisal Foundation.

274. ALFAISALIAH GROUP (a/k/a Al Faisal Group Holding Co.) (or "AFG") is based in Riyadh, Saudi Arabia. Its main shareholder is PRINCE ABDULLAH. Its Chairman is MOHAMMED ABDULLAH AL FAISAL, PRINCE ABDULLAH AL FAISAL's son.

275. ALFAISALIAH GROUP was reorganized in 2001 with PRINCE ABDULLAH holding 97.5% of the shares, and businessman MOHAMMED BIN ABDULRAHMAN AL ARIEFY, President, owning 2.5 percent of the shares. The company at that time changed its name to AL FAISAL GROUP HOLDING CO., a successor in interest to ALFAISALIAH GROUP.

276. Founded in 1970, the ALFAISALIAH GROUP is a large commercial conglomerate with 3,000 employees and thirteen subsidiaries involved in five business

sectors (Food & Beverages, Petrochemicals & Plastics, Entertainment & Multimedia, Consumer Electronics, and High Tech & Information Technology). ALFAISALIAH GROUP is the representative agent in Saudi Arabia of several international companies, including Sony, Hewlett Packard, MegaStar, Columbia Tristar, 20th Century Fox, Motorola, Toshiba and Danone. Its main subsidiaries include Modern Electronic Establishment, Modern Petrochemicals Establishment, Al Safi Diary Establishment, Al Faisalia Agricultural Establishment, Al Faisalia Real Estate Establishment and Al Faisalia Computer & Communication Services Establishment. ALFAISALIAH GROUP maintains branches in Jeddah, Al Khobar, Khamis Mushait, Madinah, Qassim, Arar and Tabuk.

277. According to FBI records, September 11, 2001, hijacker HANI SALEH H. HANJOUR (a/k/a Hani Saleh Hanjour, Hani Saleh, Hani Hanjour) is a Saudi national from the city of Taif, Saudi Arabia. Hanour was one of the hijackers on American Airlines flight 77 that crashed into the Pentagon on September 11, 2001. His brother Abdulrahman Saleh Hanjour harbored him in Tucson, Arizona, in the months preceding the September 11, 2001 attacks.

278. The two Hanjour brothers and another AL QAEDA suspect in the attacks, Abdal Monem Zelitny, had a registered address in Taif, Saudi Arabia, under the name of Alfaisaliah, P.O. Box 1717, Taif, Saudi Arabia. The name and address are the branch office of Alfaisaliah Group in Taif, a subsidiary of the Riyadh based holding company. As detailed above, Alfaisaliah is owned and controlled by PRINCE ABDULLAH AL FAISAL, son of King Faisal, and for whom, terrorist financier ZOUAYDI has worked as an accountant in Jeddah, Saudi Arabia.

279. One of PRINCE ABDULLAH'S accountants in Jeddah, Saudi Arabia was Defendant MUHAMMED GALEB KALAJE ZOUAYDI, (a/k/a Abu Talha) (or "ZOUAYDI") convicted in Spain for financing AL QAEDA operations in Europe. ZOUAYDI set up Spanish companies established during the time he was staying in Saudi Arabia and working for PRINCE ABDULLAH, between 1996 and 2000. ZOUAYDI laundered Saudi money through Spain to an AL QAEDA cell in Germany.

280. Evidence from eye witnesses indicates that ZOUAYDI was present in offices of PRINCE ABDULLAH in Jeddah. ZOUAYDI was also recognized in the offices of Dr. Bakhsh with Abdul Rahman Taha Bakhsh, brother of businessman ABDULLAH TAHA BAKHSH, former director of Zakat and Income Tax at the Saudi Ministry of Finance. Both brothers are members of the board of Trading Engineering & Contracting Corp. (Traco), based in Jeddah, Saudi Arabia.

281. Evidence recovered by the Spanish authorities shows that MUHAMMED GALEB KALAJE ZOUAYDI, a Syrian born businessman, along with several associates in Spain and Europe, funneled money from the Saudi-based company, Mushayt for Trading Establishment (or "Mushayt"), through Spanish corporations to entities and individuals known to be associated with the AL QAEDA terrorist organization in Europe. PRINCE ABDULLAH is implicated in these financial transactions of material support to AL QAEDA, as is PRINCE TURKI.

282. According to Spanish authorities, Mushayt received funds and donations from other companies and individuals in Saudi Arabia that were funneled to AL QAEDA through Spain. This fraudulent scheme provided material, financial support to the

GLOBAL RELIEF FOUNDATION in Spain, to ABDUL FATTAH ZAMMAR and MAMOUN DARKAZANLI in Germany, who maintained the bank accounts of hijacker MOHAMED ATTA and other members of the Hamburg AL QAEDA cell. These co-conspirators (ZAMMAR and DARKAZANLI) are awaiting trial in Germany on charges of providing financial and logistical support to the organization of the September 11, 2001 attacks.

283. GHASOUB AL ABRASH GHALYOUN (a/k/a Abu Musab), an associate of ZOUAYDI's in Spain, was observed filming future targets of AL QAEDA in the United States. In his videotapes, Spanish authorities found pictures of the World Trade Center taken on August 9, 1997.

284. PRINCE NAYEF is Saudi Minister of Interior and heads the Saudi Committee for relief to Afghans, which supervises the activities of Defendant AL-HARAMAIN FOUNDATION whose sponsorship of terrorism is detailed *infra*. The Minister of Interior, by function, controls the activities of Islamic Charities and is empowered to verify their legality and conduct.

285. PRINCE NAYEF is the Chairman of the Saudi Arabian Committee for Support of the Intifada al Quds. According to documents captured by the Government of Israel in the Palestinian territories during operation Defensive Shield, this committee knowingly transferred large sums of money to the families of Hamas terrorists who had executed murderous attacks against Israelis. PRINCE NAIF, along with others in Saudi Arabia, supports suicide martyrs.

286. PRINCE NAYEF has engaged in a pattern of conduct that aids, abets, and materially sponsors international terrorism and AL QAEDA. As with PRINCE SULTAN and PRINCE TURKI, PRINCE NAYEF has engaged in material support, including but not limited to monetary payoffs, to OSAMA BIN LADEN's AL QAEDA.

287. Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI (or "al Turki") is a Saudi and the former rector of the University of Riyadh (1994), former minister of Waqf and Islamic Affairs until 2000, and advisor to KING FAHD. AL TURKI is also Secretary General of the MUSLIM WORLD LEAGUE.

288. Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI is a counselor to the government of Saudi Arabia and was in contact with AL QAEDA financier ZOUAYDI. AL TURKI acted as Saudi Minister of Islamic Affairs for many years and was in a position where he knew or should have known about the reach of international terrorism and AL QAEDA. AL TURKI later became a shareholder in the front organization known as Promociones which bought real estate but did no actual construction work, although listing itself as a construction company. Instead, that company made direct payments to AL QAEDA cells.

289. On October 10, 1999, AL TURKI and ZOUAYDI, a senior AL QAEDA financier for Europe, agreed to participate as business partners in a construction project in Madrid, Spain. A contract was written by ZOUAYDI'S Company in Spain stating that both parties will finance 50% of the project. The incomes would be split 70/30 between AL TURKI and ZOUAYDI.

290. ZOUAYDI was part of an international terrorist movement for global jihad which encompassed the AL QAEDA network. This network channeled money directly to the perpetrators of September 11, 2001.

291. Several faxes in support of this enterprise, scheme and conspiracy were sent by ZOUAYDI to AL TURKI. As a guaranty for the Spanish company, ZOUAYDI sent a check of 191 million Pesetas on September 15, 1999 to AL TURKI as beneficiary from Banco Sabadell in Madrid. In one fax sent on October 15, 1999, ZOUAYDI asked AL TURKI to send the money through AL RAJHI BANK (which hold his accounts in Saudi Arabia). On October 22, 1999, a fax was sent to AL TURKI by Prol & Asociados law firm in Madrid referring to a telephone conversation with someone acting on behalf of AL TURKI, named Waleed O Houssainy, about a project of AL TURKI to buy 100% of ZOUAYDI's Spanish company.

292. On February 4, 2000, ZOUAYDI sent a fax to AL TURKI, referring to him as "advisor to KING FAHD." In his declarations to the Spanish judge on April 26, 2002, ZOUAYDI refered to AL TURKI as "advisor to KING FAHD." AL TURKI's representative, Waleed Al Husseini, is the manager of a major Saudi company owned by the prominent shareholders.

293. THE SAUDI HIGH COMMISSION, (a/k/a the Saudi High Relief Commission) (or "SHC") was founded in 1993 by PRINCE SALMAN IBN ABDUL AZIZ (or "PRINCE SALMAN"), the Mayor of Riyadh and a son of King Fahd, and a prime supporter of the charity. Hailed as the largest fundraising effort in the Arab and Muslim

world, the SAUDI HIGH COMMISSION claims to have spent more than $600 million in aid to Bosnian Muslims impoverished by the country's recent civil war.

294. Despite the Saudi commission's generous efforts in Bosnia, it has been widely criticized by aid agencies and Bosnian intellectuals for importing the extreme form of Saudi Islam, Wahhabism, which is alien to the more moderate, secular form of Islam found in Bosnia. Bosnian officials claim that the Wahhabis' intolerant and anti-Western form of Islam contradicts and offends Bosnian tradition and undermines the country's rich and diverse religious heritage.

295. On October 21, 2001, five Algerians were arrested in Bosnia Herzegovina on criminal charges of international terrorism following a threat to the United States embassy. The incident resulted in the five day closure of the United States and British embassies for what both embassies called "a credible security threat." The plot was discovered when United States intelligence intercepted a telephone conversation between two of the accomplices about the mission. During this telephone conversation, one of the terrorists said, "American interests would be jeopardized within 48 hours."

296. This group of Algerians is suspected to be a part of the AL QAEDA network. The NATO Secretary-General, George Robertson, stated that at least one of the five had "direct links with AL QAEDA and BIN LADEN." The leader of the group, BENSAYAH BELKACEM, has been identified as a top AL QAEDA lieutenant. In October, 2001, BELKACEM was arrested at his apartment in Zenica, Bosnia, where authorities found phony passports and a mobile telephone listing for ABU ZUBADAH,

AL QAEDA's third-in-command. According to phone transcripts, BELKACEM was also in phone contact with an AL QAEDA military commander ABU AL-MAID.

297. One of the six Algerian terror suspects, Sabir Lamar, worked for the SAUDI HIGH COMMISSION as an Arabic language teacher. Sabir Lamar fought in Afghanistan with the Mujahideen. He is married to the daughter of a former local employee at the United States embassy in Sarajevo and is believed to have had keys to the building, in which photographs and other information were available.

298. In October, 2001, United States forces raided the Sarajevo branch of the SAUDI HIGH COMMISSION of Bosnia and Herzegovina and found computer hard drives with photographs of the World Trade Center before and after its collapse as well as photos of United States embassies in Kenya and Tanzania and the USS Cole. Additionally, United States forces discovered files on pesticides and crop dusters, information about how to make fake State Department badges as well as photographs and maps of Washington, with government buildings marked. About $100,000 worth of local currency was found in a safe, as well as anti-Semitic and anti-United States computer material geared toward children.

299. The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance analyzed the documents seized from the offices of the SAUDI HIGH COMMISSION and described the organization as a front for radical and terrorism-related activities:

> Members of the SFOR have on premises of the SAUDI HIGH COMMISSION Relief for Bosnia and Herzegovina confiscated some documentation for which it can be

> claimed with certainty that it does not belong in the scope of work of a humanitarian organization (various photographs of the World Trade Center, sketches of military bases, certain photographs of military ships, civil airplanes, certain specially protected facilities, and other).

300. In October 2001, a Bosnian spokesman announced that between 100,000 DM and 200,000 DM in cash were also seized in the offices of the Saudi High Commission. The SAUDI HIGH COMMISSION used 24 vehicles with diplomatic plates to transport members and material inside Bosnia Herzegovina.

301. PRINCE SALMAN was named Chairman of the General Donation Committee for Afghanistan (a/k/a Afghan Jihad Support Committee) in 1980 and has a history of funding Islamic extremism. In 1981, the General Donation Committee for Afghanistan gave $39 million dollars to aid the Afghan Mujahideen. PRINCE SALMAN stated the donation was made to "our Afghan brothers."

302. In 1999, PRINCE SALMAN made a donation of $400,000 during a fund-raising event organized for Bosnia Herzegovina and Chechnya by Defendants INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTHS, and AL-HARAMAIN FOUNDATION.

303. A letter seized by the Israeli Defense Forces during Operation Defensive Shield, further evidenced the involvement of PRINCE SALMAN in financing terrorist organizations. The letter dated December 30, 2000, was issued by the Embassy of the State of Palestine in Riyadh to PRINCE SALMAN IBN ABDUL AZIZ, Chairman of the Popular Committees for Support of the Palestinian Fighters. The Palestinian ambassador expresses the concern of Yasser Arafat regarding funding of radical organizations.

> I wish to inform you that [Yasser Arafat] called me and asked to convey his request to mediate and intervene and express his opinion about what is happening in our homeland. The Saudi committee responsible for transferring contributions to beneficiaries is sending large sums to radical committees and associations, including the Islamic Association which belongs to Hamas, the Al-Salah Association, and brothers belonging to the Jihad in all areas. This has a bad affect on the domestic situation and also strengthens these brothers and thus has a bad impact on everybody.

304. Given its level of financing, the SAUDI HIGH COMMISSION does not provide adequate financial aid to the needy. The SAUDI HIGH COMMISSION was functioning at least until February 2001, when the announcement was made that the organization provided in a nine-year period a total of $560,900,000 in donations. Since at least year 2000, funds sent to help Bosnia Herzegovina were diverted for terrorist activities and not charity. For instance, in September 2000, PRINCE SALMAN was alerted by a letter from the Bosnian association "Mothers of Srebrenica and Podrinje" in which it was clearly claimed that the SAUDI HIGH COMMISSION in Bosnia Herzegovina did not provide charitable assistance.

305. This Bosnian association stated that while PRINCE SALMAN announced that 200 million DM were collected in only one day after Srebrenica's fall in July 1995, none of Saudi assistance reached the Srebrenica people.

306. PRINCE SALMAN knowingly failed to take appropriate actions regarding the management and use of funds of the SAUDI HIGH COMMISSION in Bosnia Herzegovina, as proven by the evidence of non-charitable work discovered in the raids conducted in the Sarajevo office of the organization less than one year later.

307. United States investigative forces are currently reviewing suspicious financial records of the SAUDI HIGH COMMISSION. SAUDI HIGH COMMISSION financial records fail to account for $41 million dollars.

308. ABDUL AZIZ AL IBRAHIM (or "AL IBRAHIM") is a Saudi citizen and the brother-in-law of KING FAHD of Saudi Arabia. His sister, Jawhara, is the second wife of KING FAHD.

309. In 1989 ABDUL AZIZ AL IBRAHIM acquired a portion of the Marina Del Rey real estate venture in Los Angeles, through various offshore companies. American authorities discovered a loan of $132 million that was granted to AL IBRAHIM at the end of 1989 by BCCI AL IBRAHIM was one of BCCI's leading loan beneficiaries.

310. Apart from being a lead investor in Marina del Rey, AL IBRAHIM real estate assets have included Ritz-Carlton hotels in New York, Washington and Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills high above Bel-Air and largely vacant land near Disney World in Florida. Ritz-Carlton hotels decided in 1997 to pull back their name from the facilities by terminating management agreements after they became controlled by Al Anwa USA, a company owned by ABDUL AZIZ AL IBRAHIM.

311. The registered President of Al Anwa USA is TAREK AYOUBI, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc, MDR Hotel and NY Overnight Inc, all based at the same address in Marina Del Rey.

312. Al Anwa holding is AL ANWA FOR CONTRACTING ESTABLISHMENT (a/k/a Al Anwae Trading and Contracting Establishment, a/k/a Anwae

Contracting Est) a construction company owned by ABDUL AZIZ AL IBRAHIM. It is a shareholder, along with Defendant DALLAH AL BARAKA (Chaired by Defendant SALEH ABDULLAH KAMEL), of the National Environmental Preservation Co Ltd in Jubail, Saudi Arabia.

313. In 1991 with another brother, Walid, Defendant SALEH ABDULLAH KAMEL and ABDUL AZIZ AL IBRAHIM created the leading Arab television satellite service, Middle East Broadcasting Corp (or "MBC"), which purchased the press agency United Press International (or "UPI") in 1992.

314. In 1990, AZIZ AL IBRAHIM created the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION whose official stated aim is humanitarian assistance. The organization is present in Kenya, Bosnia, Chechnya, South America and Southern Asia. The Foundation has built mosques in Dusseldorf, Gibraltar, Milan and Moscow.

315. The organization's branch in Nairobi in Kenya was associated with OSAMA BIN LADEN's network according to the FBI's investigation into the attacks against the American embassies on August 7, 1998.

316. In September 1998, the Kenyan government canceled the registration of five Islamic relief agencies for allegedly supporting terrorism including Defendant AL-HARAMAIN FOUNDATION, HELP AFRICAN PEOPLE, THE ISLAMIC RELIEF ORGANIZATION, THE IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION, and MERCY RELIEF INTERNATIONAL. The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief agencies.

317. The decision was announced by the Kenyan government's NGO coordinator who declared that:

> Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered . . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyan's lives . . . They had been found to be working against the interests of Kenyans in terms of security.

318. After several organizations appealed this decision, Kenya's High Court blocked the de-registration of four of the five non-governmental organizations. THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, MUSLIM WORLD LEAGUE, AL-HARAMAIN FOUNDATION, and MERCY INTERNATIONAL RELIEF AGENCY can however, still operate pending an appeal. Only the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION did not ask the court for an appeal.

319. In a study paper dated October 1999, called "The New Azerbaijan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh", Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION as one of those which provided help to OSAMA BIN LADEN.

> The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of SUDAN. The key organizations are . . . Al Ibrahim Foundation. Very little is known about this Baku-

> based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects.

320. Upon information and belief, IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION was funding the ISLAMIC MOVEMENT OF UZBEKISTAN (or "IMU"), an affiliate of AL QAEDA, whose leaders met OSAMA BIN LADEN in 1999 in Kandahar, Afghanistan. The IMU received $270,000 dollars from the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION.

321. In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION, WORLD YOUTH ISLAMIC ASSEMBLY and ISLAMIC RESCUE ORGANIZATION - had taken part in setting up these bases.

322. During an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia, attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was to instruct to religious matters. One of the courses was based upon a study in sharia disciplines, published by IBRAHIM BIN ABDUL AZIZ AL IBRAHIM, which emphasized (quote):

> Armed struggle in the name of Allah, for his word to be above all else. . . . Sacrifice your life in witness of Allah's religion.

323. According to a document summarizing the seminar "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

324. The seminar took place in the Middle Urals Kaziat Muslim community, where in 1995 Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI created a Joint Committee for Islamic Action and Studies with representatives from Defendants MUSLIM WORLD LEAGUE, IIRO, WAMY, along with the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION.

325. The role of certain Saudis in the sponsorship of AL QAEDA is evidenced in the AL QAEDA organization's own words. Confiscated AL QAEDA documents state that among all the Muslim governments in the world, the government of Saudia Arabia is the only representative model Islamic government, the greatest center of Islam as AL QAEDA moves to expel the Jews and Christians from Arab lands through mass murder.

326. BIN LADEN is referred to in AL QAEDA documents as the billionaire merchant prince and the beloved member of Saudi Arabia's billionaire family who has been supported by the bin Laden family to aim the Kalishnikov at super power America.

327. Information found in the possession of AL QAEDA terrorists indicates that financial support of international terrorism by wealthy Saudis is designed to undermine moderate Arab regimes and movements while providing support for Saudi legitimacy as the strict guardians of Mecca and Medina.

328. These acts described herein constitute a pattern of conduct in sponsoring and promoting radicals and international terrorism generally, as well as AL QAEDA and OSAMA BIN LADEN, specifically. The participation of certain Saudi nationals in the sponsoring and promotion of terrorism is widely known. As USA Today reported back in 1999:

> More than a year after the U.S. Embassy bombings in East Africa, prominent businessmen in Saudi Arabia continue to transfer tens of millions of dollars to bank accounts linked to indicted terrorist OSAMA BIN LADEN, senior U.S. intelligence officials told USA Today.
>
> The money transfers, which began more than five years ago, have been used to finance several terrorist acts by bin Laden, including the attempted assassination in 1995 of Egyptian President Hosni Mubarak in Ethiopia, the officials said.
>
> Secretary of State Madeleine Albright is expected to raise the issue with PRINCE SULTAN, the Saudi defense minister, during his visit to Washington next week. Saudi Arabia, the main U.S. ally in the Persian Gulf, has pledged to fight terrorism.
>
> According to a Saudi government audit acquired by U.S. intelligence, five of Saudi Arabia's top businessmen ordered the National Commercial Bank (NCB), the kingdom's largest, to transfer personal funds, along with $3 million diverted from a Saudi pension fund, to New York and London banks.
>
> The money was deposited into the accounts of Islamic charities that serve as fronts for bin Laden.
>
> The businessmen are paying bin Laden "protection money" to stave off attacks on their businesses in Saudi Arabia.

329. Certain members of the Saudi Royal family and related persons overtly and covertly aid, abet, and materially support the IIRO and other charities, despite their roles in terrorist financing. Certain members of the Saudi Royal family, along with other wealthy Saudi supporters, contributed to the IIRO and related charities as a way to support AL QAEDA without suffering from the social (and legal) ramifications that such contributions bring. The IIRO received funds which were passed on to terrorists in part from the Zakat payments from individuals and companies in the kingdom of Saudi Arabia. The Saudi Royal family members own substantial assets in the United States of America, and do substantial business in the United States of America, the profits of which in part, are used to fund international terrorist acts, including those which led to the murderous attacks of September 11, 2001.

330. As the 2002 Report on terrorist financing by the independent task force of the Council on Foreign Relations pointed out: "it is worth stating unambiguously what official U.S. government spokespersons have not: [F]or years, individuals and charities based in Saudi Arabia have been the most important source of funds for AL QAEDA; and for years, Saudi officials have turned a blind eye to this problem." The report goes on to note that this is hardly surprising given that the Saudis possess the greatest concentration of wealth in the area.

**SAUDI BIN LADEN GROUP**

331. THE SAUDI BIN LADEN GROUP (or "SBG"), also known as the BIN LADEN CORPORATION, is an expansive global conglomerate.

332. THE SAUDI BIN LADEN GROUP's website details its history in the following manner:

> The history of bin Laden began in 1931 when Mohammed bin Laden founded the company. From its humble beginnings as a general contractor, the company has grown and prospered in parallel with the growth and prosperity of the Kingdom of Saudi Arabia. Over the years the company has been entrusted with many major construction projects, projects that helped the Kingdom to develop its resources and expand its infrastructure.

333. THE SAUDI BIN LADEN GROUP is based in Jeddah, Saudi Arabia. The group founded in 1931, is a privately held company wholly owned by the descendants of Mohammed Awad Bin Laden, father of OSAMA BIN LADEN. The international conglomerate is active in the areas of construction, engineering, real estate, distribution, telecommunications and publishing. Construction accounts for more than half of SBG's gross revenue.

334. SBG or its predecessor in interest, was the first private contractor in Saudi Arabia. SBG's status as an organization makes it exempt from publishing its financial records. For several years, it was the official and exclusive contractor of the holy sites of Mecca and Medina.

335. SAUDI BIN LADEN GROUP is run by BAKR M BIN LADEN, son of Mohammed Bin Laden . Family member Salem Bin Laden ran the group until his accidental death in 1998. SBG's board of directors include SALEH GAZAZ, MOHAMMED BAHARETH, ABDULLAH BIN SAID, MOHAMMED NUR RAHIMI,

TAREK M. BIN LADEN, and BIN LADEN. Until recently, the SAUDI BIN LADEN GROUP had an address in Rockville, Maryland.

336. OSAMA BIN LADEN used SBG support and assistance to build necessary infrastructure in Afghanistan as he did in SUDAN. In the introduction of his Declaration of War against the Americans in 1996, OSAMA BIN LADEN admitted this family support:

> Then in 1979, just after he graduated from King Abdul Aziz University in Afghanistan, and the Mujahideen put out an international plea for help, Usama bin Laden responded by packing himself and several of his family's bulldozers off to Afghanistan.

337. The SAUDI BIN LADEN GROUP provided material support and financing to OSAMA BIN LADEN in Afghanistan, as reported by the United States State Department:

> Under Al-Qaeda auspices, Bin Laden imported bulldozers and other heavy equipment to cut roads, tunnels, hospitals, and storage depots Afghanistan's mountainous terrain to move and shelter fighters and supplies.
>
> His [OSAMA BIN LADEN] father backed the Afghan struggle and helped fund it, so when Bin Laden decided to join up, his family responded enthusiastically.

338. After the Soviets withdrew from Afghanistan in 1989, OSAMA BIN LADEN returned to work in the SAUDI BIN LADEN GROUP's Jeddah-based construction business. He continued to support militant Islamic Groups until his departure to SUDAN 1991. After his relocation to SUDAN the same year, OSAMA BIN LADEN

maintained close relationships with the SAUDI BIN LADEN GROUP and they remained his sponsor.

> The relationships between OSAMA BIN LADEN and his family continued, despite claims to the contrary. Dr. Saad Al Fagih, Saudi dissident living in London, and former Afghan combatant, who kept close relationship with OSAMA BIN LADEN for many years, stated in 1994: There's a very interesting thing in Islamic structure of the family: you are obliged to support your family members. Even if they are distant members. If it's a cousin or a niece or a nephew, especially a brother, you have to support them if you are a capable person. And the people feel sinful if they don't let this money go to its real owner, in this case, OSAMA BIN LADEN.

339. The notion that OSAMA BIN LADEN had been somehow "disowned" by the BIN LADEN's family is not supported by the facts or by the realities of Islamic culture. In a 1997 interview, OSAMA BIN LADEN revealed that on nine different occasions, his mother, uncle and brothers had visited him in Khartoum in Sudan even though he had been exiled. The SAUDI BIN LADEN GROUP provided OSAMA BIN LADEN financial assistance and engineering support in Sudanese construction projects. Various sources confirmed that the SUDANESE CONSTRUCTION COMPANY set up by OSAMA BIN LADEN, AL-HIJRA FOR CONSTRUCTION AND DEVELOPMENT, was a subsidiary of the SAUDI BIN LADEN GROUP. This information is confirmed by an Intelligence Newsletter:

> These are Wadi al Aqiq, an agricultural company with an investment arm; Al Timar Al Mubarikah, a sugar concern; Al Hijra a building and public works company . . . an affiliate of the powerful Saudi group headed Bin Laden's father.

340. In SUDAN, OSAMA BIN LADEN participated in the construction of the Tahaddi road and the Port Sudan Airport. The SAUDI BIN LADEN GROUP provided support and contributions to these public works through two subsidiaries. The Public Buildings and Airports Division of the SAUDI BIN LADEN GROUP participated in the construction of the Port Sudan Airport, and the MOHAMED BIN LADEN ORGANIZATION (of SBG) provided technical assistance on the road construction in the Sudan with OSAMA BIN LADEN. The SAUDI BIN LADEN GROUP confirmed publicly these two collaborations:

> Over the years the Division has undertaken various challenging projects, large and medium scale, including complete airports and roads. . . . The projects executed include . . . Port SUDAN Airport. SBG's skills . . . has been recognised and utilized in the United Arab Emirates, Jordan, Yemen and SUDAN.

341. The agreement for the construction of an airport in Port Sudan was between the Sudanese Government and the SAUDI BIN LADEN INTERNATIONAL COMPANY. In 1993, OSAMA BIN LADEN stated that he was involved in the construction of the road linking Khartoum to Port Sudan with some of former Afghan fighters who became part of AL QAEDA.

342. Relationships between the three entities: OSAMA BIN LADEN, the Republic of SUDAN, and the SAUDI BIN LADEN GROUP were stressed during the inauguration ceremony of the Port Sudan airport:

> Meanwhile, OSAMA BIN LADEN, was the first guest invited to attend the inauguration of the new Port SUDAN Airport. He sat in the front row and was the guest of honor in this ceremony. It was a group of Bin Laden's companies

> that carried out the project of the new and modern airport
> that cost huge amounts of money.

343. Moreover, while OSAMA BIN LADEN was constructing the Tahaddi Road with SAUDI BIN LADEN GROUP's technical assistance, his own company, AL-HIJRA, was headed by Muslim activists. The testimony of Jamal Ahmed Al-Fadl during the 2001 trial of the 1998 African Embassy Bombings further revealed the nature of AL-HIJRA executives in SUDAN:

> Q. Do you know who ran the Al-Hijra Company while it was in the Sudan?
> A. At the time, few people. The first one Dr. Sharif al Din Ali-Mukhtar.
> Q. Who else?
> A. Abu Hassan al Sudani, and Abu Hamman Al Saudi, Abu Rida Suri and Abu Hajer.

344. Other AL-HIJRA agents, officers, or executives were directly involved in AL QAEDA and terrorist operations. MAMDOUH MAHMUD SALIM, an AL QAEDA co-conspirator, was on the AL-HIJRA board of directors and is a founding member of AL QAEDA.

345. The SAUDI BIN LADEN GROUP sheltered and directly supported operatives of the AL QAEDA terrorist organization. Mohammad Jamal Khalifa is a key figure in the network of OSAMA BIN LADEN and has been implicated as a central AL QAEDA figure in several international terrorist plots. Yet KHALIFA was taken in by a branch of SAUDI BIN LADEN GROUP, the MOHAMMED BIN LADEN ORGANIZATION, headed by OSAMA BIN LADEN's brothers. The address listed on KHALIFA's visa application was the Mohammed Bin Laden Organization in Jeddah, Saudi Arabia.

346. The MOHAMMED BIN LADEN ORGANIZATION is a wholly-owned subsidiary of the SAUDI BIN LADEN GROUP. The board members include SALEH GAZAZ, MOHAMED BAHARETH, ABDULLAH BIN SAID, MOHAMED NUR RAHIMI, BAKR M. BIN LADEN, TAREK M. BIN LADEN, OMAR M. BIN LADEN, and YESLAM M. BIN LADEN.

347. In the early 1990s, TAREK BIN LADEN served as the general supervisor of the IIRO, a charity that has aided and abetted and materially supported AL QAEDA and international terrorism *(supra)*. During this time, IIRO was rapidly becoming AL QAEDA's foremost charity used as a means to transfer funds, personnel, and other means of material support.

348. According to an Arabic publication, TAREK BIN LADEN had a prominent role in 1990 at the IIRO:

> Tarek bin Laden has been a member of the IIRO in MWL for ten years. He has been working quietly for the orphans and the immigrants in the Islamic world. In the past two years the operation of IIRO has grown thanks to the support of the Saudi Royal family. Tarek says that the IIRO relies on donations of the Saudi people and some donations from the Islamic world.

349. OSAMA BIN LADEN's name is still listed in the SAUDI BIN LADEN GROUP's corporate records.

**MUWAFFAQ-BLESSED RELIEF; AL-QADI AND BIN MAHFOUZ**

350. One month after the September 11, 2001 attacks, on October 12, 2001, with Executive Order 13224, President George W. Bush designated Saudi businessman YASSIN AL-QADI as a terrorist entity and sponsor for financially supporting AL

QAEDA. As stated in a United States Department of Treasury Press Release on October 12, 2001:

> Yassin al-Qadi (heads) the Saudi-based Muwafaq (or "Blessed Relief") Foundation, an AL QAEDA front that transfers millions of dollars from wealthy Saudi businessmen to bin Laden.

351. YASSIN AL-QADI is a United States designated terrorist and Director of GLOBAL DIAMOND RESOURCES, based in Nevada. Along with YASSIN AL-QADI, serving on the board of directors are representatives of the BIN LADEN family who invested in GLOBAL DIAMOND RESOURCES. YASSIN AL-QADI was introduced to GLOBAL DIAMOND RESOURCE's Chairman by an executive at the SAUDI BIN LADEN GROUP. In regards to the company's decision to let AL-QADI join as an investor, the Chairman said, "I relied on the representations of the BIN LADEN family. They vouched for him."

352. Defendant MUWAFFAQ (or "BLESSED RELIEF") was registered in the Channel Islands in 1992 but run from Jeddah, Saudi Arabia. The BLESSED RELIEF charity had an international presence with offices in Europe, Ethiopia, Pakistan, SUDAN, Somalia and a post office box in the United States. BLESSED RELIEF purported to conduct traditional relief work such as the distribution of food, clothing and medical equipment to victims of war or famine. MUWAFFAQ-BLESSED RELIEF was endowed by Defendant KHALID BIN SALIM BIN MAHFOUZ, the AL QAEDA financier, and run by YASSIN AL-QADI. KHALID BIN SALIM BIN MAHFOUZ's son, ABDUL

RAHMAN KHALID BIN SALIM BIN MAHFOUZ, is also a director of the BLESSED RELIEF charity.

353. YASSIN AL-QADI ran BLESSED RELIEF from 1992 until approximately 1997 with $15 to $20 million of his own money, along with contributions from other wealthy associates and according to a June 1998 U.S. Justice Department report, sent $820,000 to buy weapons for HAMAS. Millions of dollars have been transferred to OSAMA BIN LADEN and AL QAEDA through BLESSED RELIEF. During the 1990s an audit of the Defendant NATIONAL COMMERCIAL BANK OF SAUDI ARABIA in the mid-1990s, which was then run by KHALID BIN SALIM BIN MAHFOUZ, revealed the transfer of $3 million for OSAMA BIN LADEN that was moved from the accounts of wealthy Saudi businessmen to BLESSED RELIEF.

354. In a 1995 interview, OSAMA BIN LADEN identified BLESSED RELIEF's place in his support network, "The bin-Laden Establishment's aid covers 13 countries . . . this aid comes in particular from the SAUDI HIGH COMMISSION ." OSAMA BIN LADEN went on to list a number of the Human Concern International Society's branches, including the BLESSED RELIEF SOCIETY.

355. YASSIN AL-QADI incorporated the United States branch of BLESSED RELIEF in Delaware in 1992, along with Talal M. M. Badkook and Dr. Mohaman Ali Elgari. BLESSED RELIEF in the United States was also used as an AL QAEDA front used by wealthy Saudis and others to funnel money to OSAMA BIN LADEN's terrorist network.

356. YASSIN ABDULLAH AL-QADI is the Vice President of the Saudi Arabian company M.M. Badkook Co. for Catering & Trading, owned by his partner in BLESSED RELIEF, and Talal Mohammed Badkook. Talal Badkook is also a member of the Al-Mustaqbal group along with SALEH MOHAMED BIN LADEN, son of Mohammed Bin Laden , and ABDULLAH SALEH KAMEL, son of SALEH KAMEL and the Chairman of the Dallah al-Baraka.

357. YASSIN AL-QADI is the Chairman of the National Management Consultancy Center (or "NMCC") in Jeddah, Saudi Arabia. The NMCC lists an address in Jeddah, Saudi Arabia, which is the same address listed on BLESSED RELIEF's Delaware corporate records.

**AL-RAJHI BANK**

358. Officially founded in 1987, Defendant AL-RAJHI BANKING & INVESTMENT CORPORATION, (or "AL-RAJHI BANK") has a network of nearly 400 branch offices throughout Saudi Arabia and manages seventeen subsidiaries across the world. Defendant SULAIMAN ABDULAZIZ AL-RAJHI is the Managing Director of AL-RAJHI BANKING & INVESTMENT CORPORATION and Defendant SALEH ABDULAZIZ AL-RAJHI is the Chairman.

359. The AL-RAJHI BANKING & INVESTMENT CORPORATION is the primary bank for a number of charities that serve as AL QAEDA front groups. AL-HARAMAIN ISLAMIC FOUNDATION, THE MUSLIM WORLD LEAGUE ("MWL"), and the IIRO all funnel terrorism financing and support through the AL-RAJHI BANKING & INVESTMENT CORPORATION financial system. One of the American Airlines

Flight 11 hijackers, ABDULAZIZ AL-OMARI, held an account with AL-RAJHI BANKING & INVESTMENT CORPORATION.

360. Defendant SULAIMAN ABDUL AZIZ AL-RAJHI has a history of financially supporting AL QAEDA terrorists. SULAIMAN ABDUL AZIZ AL-RAJHI managed the defendant NATIONAL COMMERCIAL BANK (*infra*) budget of the SAUDI JOINT RELIEF COMMITTEE. The AL-RAJHI family is also the primary financier of the SAAR FOUNDATION NETWORK (*infra*) and, as such, is implicated by the SAAR Network's sponsorship of terrorism and OSAMA BIN LADEN. SALEH ABDULAZIZ AL-RAJHI has been closely linked to OSAMA BIN LADEN's personal secretary and convicted terrorist, WADIH EL-HAGE. When the Kenyan house of OSAMA BIN LADEN's personal secretary, WADIH EL-HAGE, was raided in 1997, information regarding SALEH ABDULAZIZ AL-RAJHI was discovered. WADIH EL-HAGE is an AL QAEDA member who was convicted for the 1998 United States Embassy bombings in Kenya and Tanzania.

361. Co-conspirators, agents, aiders and abettors of the AL-RAJHI banking scheme to fund or otherwise materially support terrorism include: SULAIMAN ABDUL AZIZ AL-RAJHI, SALEH AL-RAJHI, ABDULLAH SULAIMAN AL-RAJHI, and KHALID SULAIMAN AL-RAJHI. All of these Defendants do business in and have a significant business presence in the United States, including but not limited to, through AL-WATANIA POULTRY, one of the World's largest poultry businesses, and through Defendants MAR-JAC POULTRY, INC., MAR-JAC INVESTMENTS, INC. and PIEDMONT POULTRY. They are also material sponsors of international terrorism.

**NATIONAL COMMERCIAL BANK AND BIN MAHFOUZ**

362. The defendant NATIONAL COMMERCIAL BANK (or "NCB") was founded in 1950 by SALIM BIN MAHFOUZ. Defendant KHALID BIN SALIM BIN MAHFOUZ was born in Hadramaut, Yemen, on September 12, 1928. KHALID BIN SALIM BIN MAHFOUZ is the son of SALIM BIN MAHFOUZ, who emigrated to Saudi Arabia in or about 1930. The NATIONAL COMMERCIAL BANK ("NCB") was the first commercial bank of Saudi Arabia, based in Jeddah. After SALIM BIN MAHFOUZ's death in 1986, his son KHALID BIN MAHFOUZ became President and CEO of the NATIONAL COMMERCIAL BANK and remained in that position until 1999, becoming its principal shareholder with control over more than 50% of the bank's capital. The NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. in London, SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City through which it operates an international banking enterprise.

363. The NATIONAL COMMERCIAL BANK was implicated between 1986 and 1990 in the fraudulent schemes and practices of the Bank of Credit and Commerce International (or "BCCI" scandal). NCB Chairman KHALID BIN SALIM BIN MAHFOUZ became Chief Operating Officer and major shareholder of BCCI. A 1992 United States Senate Report on the BCCI scheme detailed the role of NCB in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism. The NCB was used by OSAMA BIN LADEN and AL QAEDA as a financial arm, operating as a financial conduit for OSAMA BIN LADEN's operations. As a former CIA counter-terrorism expert explained in October 2001:

> How does the AL QAEDA organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Much of the money is paid as 'protection' to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the NATIONAL COMMERCIAL BANK, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism. Now, it appears, that these wealthy individuals are siphoning off funds from their worldwide enterprises in creative and imaginative ways.

364. The BIN MAHFOUZ family businesses are organized through a series of "holding" companies, including a conglomerate, Saudi Economic and Development Company LLC (Sedco), founded in 1976 and based in Jeddah, and the petroleum company which is chaired by KHALID BIN MAHFOUZ's son.

365. Between 1986 and 1990, KHALID BIN SALIM BIN MAHFOUZ was Chief Operating Officer of the Bank of Credit and Commerce International (BCCI). After several fraudulent practices were discovered, KHALID BIN SALIM BIN MAHFOUZ was indicted on July 1, 1992, on charges of participation in a Scheme to Defraud in the First Degree in violation of New York Penal Law § 190.65, in connection with certain acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleged a series of misrepresentations, sham loans, and fraudulent conduct in failing to disclose the status of his interest in BCCI.

366. Under KHALID BIN SALIM BIN MAHFOUZ, BCCI was also implicated in supporting international terrorism, as reported by the United States Senate:

> In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization.

367. The 1992 Senate investigative Report detailed the initial involvement of BCCI in terrorism financial supporting terrorism:

> BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

368. A bank audit of the defendant NATIONAL COMMERCIAL BANK conducted in 1998 revealed that over a 10 year period $74 million dollars was funneled by its Zakat Committee to the IIRO, headed by OSAMA BIN LADEN's brother-in-law.

369. The defendant NCB audit report also stressed various irregularities due to "unreported expenses and loans." It states that "without knowledge of the Zakat Committee, NCB Directors established over the years credit and loans facilities for several charitable organizations, along with banking facilities that were not reviewed by the Committee." Direct donations were received through NCB facilities to the Red Crescent Saudi Committee, IIRO and the MUWAFFAQ Foundation. NATIONAL COMMERCIAL

BANK, its agents and employees knew or should have known they were materially sponsoring, aiding and abetting AL QAEDA, OSAMA BIN LADEN, and international terrorism.

370. The NCB audit report reflects a $3 million dollar transfer to MUWAFFAQ-BLESSED RELIEF FOUNDATION. KHALID BIN SALIM BIN MAHFOUZ was dismissed from the NCB in 1999 soon after the release of the bank's audit report and placed under arrest. Former CIA Director James Woolsey testified before the Senate Judiciary Committee that, along with the financial ties to and support of OSAMA BIN LADEN, KHALID BIN SALIM BIN MAHFOUZ was OSAMA BIN LADEN's brother-in-law by virtue of BIN LADEN's marriage to bin MAHFOUZ's sister Kaleda Khalid bin Mahfouz set up various charity organizations around the world since 1991. Every one of these foundations were linked to AL QAEDA and involved in the financing and material sponsorship of OSAMA BIN LADEN's international terrorist operations.

371. KHALED BIN MAHFOUZ is linked to BIN LADEN through several financial and charitable organizations, including, INTERNATIONAL DEVELOPMENT FOUNDATION, SAUDI SUDANESE BANK and AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY and NATIONAL COMMERCIAL BANK.

372. The BIN MAHFOUZ family controlled the NATIONAL COMMERCIAL BANK in Saudi Arabia, until 1999 when the Saudi Government bought the majority of its ownership. Upon information and belief that bank has financed the operations of BIN

LADEN and reports from Saudi Arabia's NATIONAL COMMERCIAL BANK show that in 1998 MUWAFFAQ provided BIN LADEN with $3 million.

373. MOHAMMED SALIM BIN MAHFOUZ (Khaled's brother) is the founder of SAUDI SUDANESE BANK in Khartoum, Sudan, which in the early 1990s, shared an address in the SUDAN with the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO), which upon information and belief was a recruiting facility for AL QAEDA . The London IIRO branch shares an address with the INTERNATIONAL DEVELOPMENT FOUNDATION, an organization also believed to be designed to support activities of BIN LADEN and also established by MOHAMMED SALIM BIN MAHFOUZ.

374. ABDULRAHMAN KHALED BIN MAHFOUZ (brother to Khaled) served on the board of directors of MUWAFFAQ FOUNDATION.

375. SALEH SALIM BIN MAHFOUZ managed the AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY, upon information and belief, a company directly linked to BIN LADEN.

376. Upon information and belief, KHALID BIN MAHFOUZ, is also linked to the SAAR FOUNDATION and its related charities. Offices of the SAAR FOUNDATION, a Saudi financed entity in Herndon, Virginia were searched by Treasury Department investigators in March 2002. SAAR shares a mailing addresses with many Islamic organizations with overlapping offices, donors, directors and significantly, overlapping goals. Many of the organizations whose offices were searched along with SAAR, have

been listed by the U.S. Treasury Department as having links to BIN LADEN or sponsoring terrorism.

377. JAMAL BARZINJI, of WORLD ASSEMBLY OF MUSLIM YOUTH ("WAMY") with an office in Herndon, Virginia was also a target of the Treasury Department raids. The president of WAMY is ABDULA BIN LADEN, younger brother to OSAMA BIN LADEN. The U.S. Government has frozen the assets of WAMY and BARZINJI because of their role in funneling money to AL QAEDA .

378. SAAR provided the bulk of the operating expenses of the INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT ("IIIT") which in turn financed to two Florida charitable organizations accused of being cells for Islamic Jihad in Florida. IIIT is directed by Taha Al Alwani, an Iraqi who also founded the MUSLIM WORLD LEAGUE, another group who's assets were also frozen by the U.S. Government because of its links to terror. The MUSLIM WORLD LEAGUE is funded in part, by Saudi government officials.

**DAR AL MAAL AL ISLAMI**

379. DAR AL MAAL AL ISLAMI (or "House of Islamic Money" or "DMI") is the registered name for DMI Administrative Services SA. The company is headquartered in Cointrin, Switzerland. DMI Administrative Services SA replaced DAR AL MAAL AL ISLAMI on February 5, 2002, and is its successor in interest. DMI activities started July 29, 1981. Until 1983, DMI was operated under M. IBRAHIM KAMEL's chairmanship. On October 17, 1983, PRINCE MOHAMMED AL FAISAL AL SAUD became CEO. Under PRINCE MOHAMMED AL FAISAL AL SAUD's chairmanship, DMI developed

banking, investment and insurance activities in approximately twenty offices around the world. DMI operates broadly in Islamic countries, and investments are conducted strictly under Islamic rules. DMI's actions and breach of duty have aided, abetted and provided material sponsorship of the spread of international terrorism and AL QAEDA:

> The $3.5 billion DMI Trust, whose slogan is "Allah is the purveyor of success," was founded 20 years ago to foster the spread of Islamic banking across the Muslim world. Its 12-member board of directors includes Haydar Mohamed bin Laden, a half-brother of OSAMA BIN LADEN.

380. DMI is currently chaired by ABDULKARIM KHALED UUSUF ABDULLA who replaced PRINCE MOHAMED AL-FAISAL AL-SAUD in early 2002. DMI has involved itself in AL QAEDA financing through several of its subsidiaries, including but not limited to, Islamic Investment Bank of the Gulf, FAISAL ISLAMIC BANK, TADAMON ISLAMIC BANK, and AL SHAMAL ISLAMIC BANK in the Sudan.

381. DMI owns 100% of ISLAMIC INVESTMENT COMPANY OF THE GULF. PRINCE MOHAMED chairs ISLAMIC INVESTMENT COMPANY OF THE GULF. OSAMA BIN LADEN's brother, HAYDAR MOHAMED BIN LADEN, was a director of the company. ISLAMIC INVESTMENT COMPANY OF THE GULF (Bahrain) EC is the main shareholder of FAISAL ISLAMIC BANK OF SUDAN, chaired by PRINCE MOHAMED.

**<u>BENEVOLENCE INTERNATIONAL FOUNDATION, INC. AND BATTERJEE</u>**

382. BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF") was a Saudi based charity set up by BATTERJEE, chairman of the AL SHAMAL ISLAMIC

BANK. Upon information and belief, BATTERJEE befriended BIN LADEN during the Afghan-Soviet War.

383. The U.S. State Department reported that BIN LADEN capitalized the AL SHAMAL ISLAMIC BANK with a $50 million investment. BIN LADEN and companies he set up in the early 1990's, maintain accounts at the AL SHAMAL ISLAMIC BANK. According to U.S. officials, the bank has been used as a conduit for funds to AL QAEDA terrorists along with the charity BATTERJEE created, BENEVOLENCE INTERNATIONAL FOUNDATION.

384. BIF has a branch in Illinois that purports to provide assistance to Muslim orphanages and hospitals in the United States and abroad, particularly in Bosnia. The current chief executive of BIF is ENAAM M. ARNANOUT. BATTERJEE remains a director of BIF according to documents filed with the Illinois Secretary of State. Arnanout was arrested in May, 2002 on charges he perjured himself by denying links with BIN LADEN and AL QAEDA.

385. The organization is also known as "al Bir al Dawalia," which translated from Arabic means "Benevolence International." It was originally founded in the 1980's by a BATTERJEE , who was an associate of OSAMA BIN LADEN. Defendant ADEL ABDUL JALIL BATTERJEE later transferred control of the organization to the current Chief Executive Officer ENAAM M. ARNANOUT (or "ARNANOUT"). Defendant ENAAM ARNANOUT has been affiliated with BIF since at least 1992, and was criminally indicted for his role in sponsoring AL QAEDA through diversion of charitable funds to sponsor AL QAEDA.

386. BATTERJEE has investments across a number of different industries including commercial, property, medical, industrial, and contracting. This business is done primarily through the family's business, the BATTERJEE Group, but also through other investments and businesses. Recent attempts to locate BATTERJEE in Saudi Arabia have failed and it is currently believed that he may be in the SUDAN.

387. BATTERJEE originally met ARNANOUT in 1987 when ARNANOUT was teenager studying Islam in Pakistan. BATTERJEE appointed ARNANOUT as the head of the Bosnian branch in the early 1990s. According to BENEVOLENCE INTERNATIONAL FOUNDATION's 1992 articles of incorporation, ADEL BATTERJEE is one of the three founders of BIF in the United States. In 1993, the Saudi Government closed BATTERJEE 's charity al-Bir at the same time it was closing other organizations for ties to terrorism. Following this closing, BATTERJEE moved the BIF headquarters to Chicago, Illinois and brought ARNANOUT in from Bosnia to run the organization. BATTERJEE officially transferred control of the organization to ENAAM ARNANOUT on September 15, 1997, and ARNANOUT assumed the Executive Director position.

388. ADEL BATTERJEE's name does not readily appear in any BENEVOLENCE INTERNATIONAL FOUNDATION corporate records after 1994, yet he continued funding the foundation. On February 12, 2002, the United States Government recorded a telephone conversation with the then jailed CEO of BIF, ENAAM ARNANOUT, with his brother Hisham in Saudi Arabia. During this conversation, ARNANOUT discusses "Abu Sulafa" with his brother. The United States government has

identified the name "Abu Sulafa" as an alias for ADEL BATTERJEE. Using BATTERJEE's alias, ARNANOUT stated that BATTERJEE has been sending money to BENEVOLENCE INTERNATIONAL FOUNDATION's branches.

389. One Justice Department AL QAEDA expert suggested that this telephone conversation may further elucidate BATTERJEE's role as the source of the "mysterious set of wire transfers" that contributed $30,000 to $40,000 to BIF each month. Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation.

390. Evidence introduced in the criminal trial of the Embassy bombers (known as *United States v. Usama Bin Laden, et al.*, Case Number S98 Cr. 1023), United States District Court, Southern District of New York, and gathered in the related investigation, demonstrated that AL QAEDA sought and received a substantial amount of financial support from numerous international sources for the procurement of equipment (including weapons and communication equipment), recruitment, training, transportation, and lodging, among other support and expenses. In addition, AL QAEDA terrorists received training in how to avoid law enforcement and intelligence scrutiny and to travel surreptitiously. They were also taught to avoid putting matters in writing. AL QAEDA members have held positions with BIF and this charity is one of the organizations utilized by AL QAEDA.

391. Once money was withdrawn from the bank accounts of relief organizations, its use by AL QAEDA can be virtually untraceable. According to an affidavit of Special Agent Robert Walker of the FBI, an AL QAEDA witness explained that the money would

almost always be withdrawn in cash, and the relief organizations from whose account the money was taken would generate paperwork which indicated that all the money was being used for charitable purposes such as building mosques or schools, or providing clothing for the poor. According to this affidavit, only a portion of the money withdrawn was actually used for the purposes stated by the relief organizations. The remaining funds were provided to AL QAEDA for whatever use AL QAEDA deemed necessary. This is consistent with evidence adduced at the 1995 trial in the Southern District of New York of persons convicted of seditious conspiracy involving the 1993 plot to attack various buildings in New York and with the overall evidence. AL QAEDA operatives and supporters have also smuggled money into the United States.

392. On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country. The documents recovered included documents establishing direct communication between ENAAM ARNANOUT and OSAMA BIN LADEN and others in the late 1980's and early 1990's. The documents included a disk found at BIF's office in Bosnia which included scanned images of these documents.

393. On December 16, 1994, Defendant MOHAMAD JAMAL KHALIFA, while traveling with the aforementioned Bayazid, was detained in San Francisco by American officials. At the time, KHALIFA had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as BENEVOLENCE INTERNATIONAL CORPORATION (or "BIC") and the INTERNATIONAL ISLAMIC RELIEF

ORGANIZATION (or "IIRO"). At the time of his travel, KHALIFA had been convicted in absentia in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan. Two of the principal participants in the bombing were Jordanians who had spent time with KHALIFA in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. KHALIFA was then retried – and acquitted – after his extradition from San Francisco to Jordan following the December 1994 stop. At his Jordanian trial, KHALIFA admitted to the Jordanian authorities that he had known the bombers and had sent them money.

394. KHALIFA, alias "Abu Baraa," is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002. On or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephone contact with a telephone number in Saudi Arabia used by KHALIFA.

395. Financial records obtained from Citibank indicate that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560.

396. A folder recovered in another BIF search in December 2001, indicated handwritten notations in Arabic which included the statements:

> Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands.
> Steeds of war projects.

397. The reference to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the

utmost of your power, including steeds of war, to strike terror into the hearts of the enemies . . . ."

398. On April 21, 1999, evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the Seattle Times concerning smallpox as a biological terrorism weapon. The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of smallpox in any country.

399. BIF claims to be a charitable organization but in fact is engaged in the support of various persons and groups involved in military and international terrorist activity.

400. ENAAM ARNANOUT has a relationship with OSAMA BIN LADEN and many of his key associates dating back more than a decade, as evidenced by cooperating witnesses and seized documents. BIF is an organization that AL QAEDA has used for logistical support, including the movement of money to fund international terrorist operations. Various persons involved in terrorist activities, specifically including persons trying to obtain chemical and nuclear weapons on behalf of AL QAEDA have had contacts with BENEVOLENCE INTERNATIONAL FOUNDATION offices and personnel.

401. BENEVOLENCE INTERNATIONAL FOUNDATION has had direct dealings with representatives of the Chechen insurgents as well as Hezb e Islami, a military group operating at various times in Afghanistan and Azerbaijan. BENEVOLENCE

INTERNATIONAL FOUNDATION made efforts to provide the Chechen mujahideen with money, an X-ray machine, and anti-mine boots, among other material support.

402. On December 14, 2001, searches were conducted of the offices of BENEVOLENCE INTERNATIONAL FOUNDATION in Palos Hills, Illinois, and in Newark, New Jersey, along with the home of its chief executive officer, ENAAM M. ARNANOUT, removing materials from each place. According to a government witness, ENAAM M. ARNANOUT was planning in March 2002, to leave for Jeddah, Saudi Arabia.

403. Also on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking BENEVOLENCE INTERNATIONAL FOUNDATION's assets and records, pending further investigation into BIF's ties to terrorists. ENAAM M. ARNANOUT, Chairman of BENEVOLENCE INTERNATIONAL FOUNDATION, has a relationship with OSAMA BIN LADEN and key associates dating back more than a decade. The BENEVOLENCE INTERNATIONAL FOUNDATION is used by AL QAEDA for logistical support: terrorists attempting to obtain chemical and nuclear weapons on behalf of AL QAEDA have contacts with the BENEVOLENCE INTERNATIONAL FOUNDATION and its office personnel; and BENEVOLENCE INTERNATIONAL FOUNDATION has had direct dealings with AL QAEDA operatives, providing them with military and financial support. Defendant ARNANOUT has been criminally indicted for his role in the September 11, 2001 attacks due to his sponsorship of AL QAEDA.

404. In the latter part of the 1980's, an AL QAEDA organization known as "mekhtab al khidemat" (the "services office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States. The organization was operated principally by Sheik Abdullah Azzam and OSAMA BIN LADEN for purposes including the providing of logistical support to the mujahideen (fighters) in Afghanistan.

405. In the mid to late 1980s, Defendant ENAAM ARNANOUT, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for mekhtab al khidemat and LBI to provide assistance to various mujahideen including those under the command of OSAMA BIN LADEN.

406. Within that same time frame, Defendant ARNANOUT served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of OSAMA BIN LADEN. Defendant ARNANOUT distributed resources, including weapons, at the direction of OSAMA BIN LADEN and others.

407. Defendant ARNANOUT and his co-conspirators fraudulently solicited and obtained funds from charitable donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

408. Defendant BIF and ARNANOUT and co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

409. Defendant ARNANOUT and BIF co-conspirators kept secret from governments and the general public, including a significant number of donors, facts about Defendant ARNANOUT's relationship with organizations engaging in violence, including AL QAEDA and OSAMA BIN LADEN.

410. Defendant BIF and ARNANOUT and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of unlawful activities and material support to organizations engaged in violent activities, in violation of Title 18, United States Code, Section 2339A; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activities. Defendant BIF and ARNANOUT and co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the

intent to promote the carrying on of a specified unlawful activity, namely, the material support to organizations involved in violent terrorist activities.

411. Defendant BIF and ARNANOUT and co-conspirators agreed to provide and attempt to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including AL QAEDA, and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used in preparation for and in carrying out acts of international terrorism violation of Title 18, United States Code, Section 2339A.

412. Defendant BIF and ARNANOUT and co-conspirators corruptly endeavored to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations.

413. BIF and ARNANOUT engaged in a conspiracy, the method and means of the conspiracy included the following, among other illegal activities.

414. In or about 1992, Defendant ARNANOUT assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by GULBUDDIN HEKMATYAR and HEZB-E- ISLAMI.

415. Sometime in 1993 or thereafter, members of the international terrorist conspiracy caused the production of videotapes depicting fighters in Bosnia-Herzegovina and eulogizing dead fighters, including AL QAEDA members and soliciting donations to support international terrorism.

416. On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujahideen in Baku, Azerbaijan.

417. In or about November 1995, Defendant ARNANOUT and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen. Defendant ARNANOUT and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians.

418. In or about May 1998, BIF and ARNANOUT facilitated the travel of an influential founding member of the AL QAEDA network, MAMDOUH MAHMUD SALIM (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF.

419. In the latter part of the 1990's, with Defendant ARNANOUT's knowledge, SAIF AL ISLAM EL MASRY (a/k/a Abu Islam el Masry), a member of AL QAEDA's majalis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF.

420. Between June 2000 and September 2001, BIF caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland to BIF's checking account in the United States. Those funds were commingled in BIF's checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas.

421. In or about October 2001, Defendant ARNANOUT relayed to the BIF founder ADEL BATTERJEE in Saudi Arabia via telephone ARNANOUT's concern that ARNANOUT was under scrutiny of the United States government and in particular the fact that Defendant ARNANOUT had been searched at the airport upon his return to the United States.

422. In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant ARNANOUT spoke via telephone to ADEL BATTERJEE in Saudi Arabia, and BATTERJEE requested Defendant ARNANOUT to relocate with his family to Saudi Arabia.

423. Beginning at a time unknown through in or about March 2002, Defendant ARNANOUT, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning OSAMA BIN LADEN and AL QAEDA, including:

> i. a chart of an organization involved in military activity headed by OSAMA BIN LADEN;
>
> ii. notes summarizing several meetings during which AL QAEDA was formed in Afghanistan in August 1988 (indicating that Osama BinLaden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective AL QAEDA members to AL QAEDA ;
>
> iii. notes reflecting the commencement of AL QAEDA 's "work" on or about September 10, 1988;
>
> iv. personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which

contained the true names and aliases and military experience of the trainees;

v. a list of wealthy sponsors from Saudi Arabia including references to OSAMA BIN LADEN and ADEL BATTERJEE, the founder of the BIF Enterprise;

vi. various documents reflecting Defendant ARNANOUT's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

vii. various documents in a separate folder reflecting Defendant ARNANOUT's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

viii. various newspaper articles including a 1988 article with a photograph depicting OSAMA BIN LADEN, Defendant ARNANOUT, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning OSAMA BIN LADEN's threats against the United States and the State Department's 1997 list of designated terrorist organizations; and

ix. a handwritten organizational chart placing Defendant ARNANOUT at the top of a jihad organization involved with weapons.

424. In or about late 2001 and early 2002, while the BIF Enterprise continued to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, Defendant ARNANOUT falsely and publicly stated that he did not know OSAMA BIN LADEN personally, that Defendant ARNANOUT never fought against the Soviet Union, that Defendant ARNANOUT was never at the al Masada camp.

425. On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the United States Department of the Treasury, BIF and Defendant ARNANOUT submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings."

426. On or about April 15, 2002, ARNANOUT spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

427. ENAAM M. ARNANOUT conspired with others to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including AL QAEDA, and persons engaged in violent confrontations and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they be used in preparation for and in carrying out acts of international terrorism.

428. Defendant ARNANOUT and other members of the BIF conspiracy agreed to transfer by wire funds from BIF's checking accounts to bank accounts in various locations, including New Jersey and accounts outside the United States, which involved the proceeds of specified unlawful activities.

429. ENAAM M. ARNANOUT transferring by wire approximately $4,000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing

that the property involved in the transaction represented the proceeds were to be used by terrorists.

430. Co-conspirators, aiders and abettors of the BENEVOLENCE INTERNATIONAL FOUNDATION (a/k/a al-Birr al-Dawalia), include Defendants: BENEVOLENCE INTERNATIONAL FOUNDATION – U.S.A. (Main Office), BENEVOLENCE INTERNATIONAL FOUNDATION – U.S.A. (East Coast Office), BENEVOLENCE INTERNATIONAL FOUNDATION – Canada, Syed Suleman Ahmer, ENAAM MAHMOUD ARNANOUT (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), MAZIN M.H. BAHARETH, SHAHIR ABDULRAOOF BATTERJEE, ADEL BATTERJEE, ZAHIR H. KAZMI, MUZAFFAR KHAN, SOLIMAN J. KHUDEIRA, and JAMAL NYRABEH, all located, doing business or registered to do business in the United States

431. ARNANOUT initially denied knowing BIN LADEN, but a March 19, 2002, police raid at Bosnian offices and homes related to BIF, uncovered photographs of ARNANOUT with a rifle in his hands and BIN LADEN at his side at what appeared to be an AL QAEDA training facility. Documents found in the raid detail a relationship between ARNANOUT and BIN LADEN going back 15 years. Both BIF and ARNANOUT have had their assets frozen and are believed, by the United States Department of Justice, to be AL QAEDA co-conspirators.

432. A former AL QAEDA member informed the FBI that BIF is used by AL QAEDA for logistical support. Additionally terrorists attempting to obtain chemical and

nuclear weapons on behalf of AL QAEDA had direct contacts with BIF and BIF employees and listed the Illinois BIF offices as their residence.

433. Terrorists who had direct contact with BIF include: M A M D O U H MAHMUD SALIM, an IRAQI who established links between AL QAEDA and groups in IRAQ, SUDAN and Lebanon. He was a key BIN LADEN aide who tried to obtain nuclear and chemical weapons for AL QAEDA. He was arrested in the 1998 AL QAEDA Embassy bombings and was at one time listed as a BIF director. Other terrorists linked to BIF include: MOHAMED BAYAZID, who also assisted AL QAEDA attempts to acquire nuclear material; MOHAMAD JAMAL KHALIFA, BIN LADEN's brother-in-law who has been linked to the 1993 World Trade Center bombing and the disrupted plot to bomb 12 American airliners in 1995; and WALI KHAN AMIN SHAH who was convicted for his participation in the plot to bomb American airliners.

434. Upon information and belief, BIF assisted these and other AL QAEDA terrorists with housing, travel documents and/or funding in the United States and abroad. AL QAEDA members were given jobs with the Foundation and used the charity to transfer money to AL QAEDA members.

435. Using unidentified witnesses who are former AL QAEDA members or terrorists currently in U.S. custody, and documents seized in the raids on the group's offices in Chicago and Bosnia, the U.S. Justice Department has detailed links between BENEVOLENCE INTERNATIONAL and AL QAEDA.

436. Federal agents stated that BIN LADEN and AL QAEDA members withdrew funds to support terrorist activities from bank accounts held by the charity and

that BIF accounts in offices around the world provided a cover for the movement of terror funds.

437. The WORLD ASSEMBLY OF MUSLIM YOUTH (or "WAMY") and the BENEVOLENCE INTERNATIONAL FOUNDATION (BIF) are tightly connected organizations that share the same leadership and work together on a number of joint projects. ADEL ABDUL JALIL BATTERJEE was the Secretary General of WAMY at the time he founded the AL QAEDA front organization BIF in the United States. Outside of BATTERJEE's role, the two organizations WAMY and BIF have also cooperated in joint-publishing of literature and film that bears both of their logos.

438. BATTERJEE commissioned the writing of a biography specifically about OSAMA BIN LADEN and the origins of the AL QAEDA network in Arabic. This biography, *The Arab Volunteers in Afghanistan*, was jointly published in 1991 by the BENEVOLENCE INTERNATIONAL FOUNDATION and the WORLD ASSEMBLY OF MUSLIM YOUTH. The book details OSAMA BIN LADEN's life, including the creation of BIN LADEN's terrorist network, AL QAEDA. On the back cover is a written statement that expresses the ideology of the book, "This is the jihad in Afghanistan. What we see now, it is a blessed river. The Arab people are the people that feed the jihad river." *Arab volunteers in Afghanistan.*

439. The conspirators of the first World Trade Center bombing in February 1993 had in their possession several terrorist training manuals when they were caught. Ahmad Ajaj had in his possession an AL QAEDA manual that detailed how to be an effective terrorist, teaching proper ways to make bombs and remain covert. It was found in an

envelope that had both the WAMY and Lajnat al-Birr logos on it. Ajaj has been convicted for participating in the first World Trade Center attack.

440. KHALID AL-FAWAZ, a senior AL QAEDA leader currently imprisoned in The United Kingdom, had the same manual as Ajaj except for updates that included more recent AL QAEDA knowledge. AL-FAWAZ ran OSAMA BIN LADEN's public relations organization the Advice and Reformation Committee in London and masterminded the 1998 United States Embassy bombings, for which he was indicted by the United States government. That someone of AL-FAWAZ' stature in AL QAEDA possessed manuals that were distributed by WAMY is indicative of the shared ideology and cooperation between WAMY and AL QAEDA.

441. Another manual found in Ahmed Ajaj's possession was hate literature against Americans, Christians, and Jews. This encyclopedia, which glorified the hijacking of busses and the killing of innocent civilians in Israel, was published by WAMY.

## INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

442. The INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (or "IIRO") has materially supported terror around the globe, including OSAMA BIN LADEN and AL QAEDA . IIRO's office in the Philippines is headed by OSAMA BIN LADEN's brother-in-law, Defendant MOHAMMED JAMAL KHALIFA and has acted as a center of terrorist financing and training activity – across the globe. IIRO then evolved into a vast independent terrorist machine – funding, recruiting and aiding and abetting AL QAEDA members around the globe. IIRO was involved with the plot to assassinate

former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

443. The IIRO sister organization, INTERNATIONAL RELIEF ORGANIZATION (or "IRO"), sends money back and forth with IIRO. IIRO sends money to other organizations that sponsor terror. Another IIRO sister company, the SUCCESS FOUNDATION, sends money back and forth with the IIRO and IRO. The SUCCESS FOUNDATION also sends money to other organizations who sponsor terror.

444. Several employees of the MUSLIM WORLD LEAGUE ("MWL"), IIRO's parent organization, have explicitly worked with AL QAEDA. OSAMA BIN LADEN's associates from Afghanistan infiltrated and propagated MWL offices around the world. The Rabita Trust, another branch of the MWL, had its assets frozen as a Specially Designated Global Terrorist Entity (or "SDGT") of the United States Treasury. WA'EL JULAIDAN, as Secretary General of the Rabita Trust and MWL office in Peshawar, Pakistan has repeatedly aided and abetted terrorists. Julaidan has been branded a SDGT by the United States Treasury Department and his assets have been frozen. The Treasury Department described Julaidan as follows at his designation as a terrorist entity:

> Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaydah, have acknowledged Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network.

445. ABDURAHMAN ALAMOUDI, the Secretary of the SUCCESS FOUNDATION, has openly stated his support for HAMAS and HEZBOLLAH, both

designated terrorist organizations. ALAMOUDI is the President of the AMERICAN MUSLIM FOUNDATION (or "AMF"), which receives thousands of dollars from the SUCCESS FOUNDATION, as stated on the income tax Form 990s for the SUCCESS FOUNDATION. MOHAMMED OMEISH, President of the United States branches of IIRO and IRO, as well as their sister organization the United States-based SUCCESS FOUNDATION, is also Vice-President of the AMERICAN MUSLIM FOUNDATION.

446. ADNAN BASHA, IIRO's Secretary-General, wrote "The major finance is coming from the generous people of Saudi Arabia, KING FAHD, and the royal family." ARAFAT EL-ASHI, head of IIRO's Canadian branch, testified in the trial of MAHMOUD JABALLAH that IIRO and el MWL were intimately connected to and funded by certain Saudi Arabian interests. ARAFAT-ASHI stated in his testimony in the JABALLAH trial that as a IIRO and MWL employee, he considered himself an employee of the Saudi government.

447. According to the account of MOHAMMED BAYAZID, AL QAEDA member and associate of OSAMA BIN LADEN, the MWL opened an office in Pakistan for the use of the founders of AL QAEDA. The MWL initially was funded by OSAMA BIN LADEN, then the government of Saudi Arabia took over the funding. According to the Arabic periodical publication *Rose Al-Yusuf*, the IIRO is firmly entrenched with OSAMA BIN LADEN's AL QAEDA oganization. As one example, the IIRO supported an AL QAEDA guest house in Egypt.

448. MOHAMAD KHALIFA, as the head of IIRO, used the organization to collect and launder money for AL QAEDA operations. IIRO funded the terrorist AL

QAEDA groups Moro Islamic Liberation Front (or "MILF") and the KHALID BIN MAHFOUZ (or "ASG"). A former Abu Sayyaf member stated: "Less than 30% of the IIRO funds went to legitimate public works, the rest going toward the purchase of weapons." MOHAMAD KHALIFA's branch of the IIRO served as a base to plan and finance AL QAEDA and international terrorism.

449. IIRO built its office in Khartoum, SUDAN in the same residential neighborhood as OSAMA BIN LADEN's personal office, according to the testimony of a former AL QAEDA member, Jamal Ahmed Mohammed Al-Fadl. IIRO also built its Khartoum office near the office of BENEVOLENCE INTERNATIONAL FOUNDATION, another AL QAEDA front, and in the same residential neighborhood where OSAMA BIN LADEN had his personal office.

450. The IIRO was implicated in the bombing of the United States Embassies in Kenya and Tanzania in 1998. Kenya deregistered the IIRO after the bombing. IIRO Tanzania was reportedly working with AL QAEDA immediately before the United States Embassy bombing. IIRO went on to plot to destroy United States Consulates in India in 1999.

451. According to Canadian intelligence documents, IIRO funded al-Jihad. MAHMOUD JABALLAH, an Islamic al-Jihad member tried in Canada, was an IIRO employee. Egyptian al-Jihad, led by AL QAEDA's second-in-command, Ayman al-Zawahiri, is a branch of AL QAEDA . As an employee of IIRO Canada, MOHAMMED KHATIB founded the Canadian branch of Benevolence International Foundation.

452. IIRO works with numerous other AL QAEDA affiliated charities. IIRO shares the same address in THE UNITED KINGDOM AS THE INTERNATIONAL DEVELOPMENT FOUNDATION (or "IDF"), a charity affiliated with Defendant KHALID BIN MAFOUZ, a senior AL QAEDA financier (*supra*). The SUCCESS FOUNDATION, IIRO's namesake, is also funded by KHALID BIN MAFOUZ. IIRO aids and abets the SAUDI JOINT RELIEF COMMITTEE, an AL QAEDA charity in Bosnia and elsewhere. IIRO, through KHALIFA, sponsors, aids and abets BENEVOLENCE INTERNATIONAL FOUNDATION, the AL QAEDA charity front. IIRO provides funding for other alleged humanitarian organizations that have materially sponsored, aided and abetted and conspired with AL QAEDA: GLOBAL RELIEF FOUNDATION (or "GRF"), TAIBAH INTERNATIONAL, ISLAMIC AFRICAN RELIEF AGENCY, WORLD ASSEMBLY OF MUSLIM YOUTH (or "WAMY").

453. MOHAMMED OMEISH is Vice President of AMERICAN MUSLIM FOUNDATION which according to its tax form 990, filed in 1999, gave money to TARIK HAMDI. HAMDI helped OSAMA BIN LADEN get a satellite phone and other electronic equipment which was used to coordinate acts of international terrorism.

454. After September 11, 2001, IIRO's offices in Virginia were raided by the FBI as a result of AL QAEDA sponsorship. One of the September 11, 2001, hijackers claimed to be going to work for IIRO's Fazeh Ahed. IIRO also extensively funded the TALIBAN regime. As stated by Dr. ADAN BASHA, Secretary-General of IIRO, the IIRO donated more than Sixty Million ($60,000,000) dollars to the TALIBAN Regime. The TALIBAN Regime was a known material sponsor, aider and abettor of AL QAEDA

terrorists. After September 11, 2001, Pakistan deported 89 Arab aid workers from the IIRO and other organizations because they were aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting AL QAEDA .

455. SANABIL AL-KHAIR was created to manage the IIRO's financial assets. IIRO's website states, "It [IIRO] has established an endowment fund (Sanabil Al-Khair) which will be used to generate a stable income to finance its various activities." The SANABIL AL-KHAIR was incorporated in the United States under two different names: The SANA-BELL, INC. and SANABEL AL-KHEER, INC. Their corporate records indicate the same address as IIRO in Herndon, Virginia.

456. Additional co-conspirators, material sponsors and/or aiders and abettors and members of the terrorist enterprise of the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION include Defendants: SUCCESS FOUNDATION, INC., MOHAMED S. OMEISH, ABDURAHMAN AL-AMOUDI, KHALED NOURI, SULAIMAN AL-ALI, ABDULLAH M. AL-MAHDI, TAREQ M. AL-SWAIDAN, ABDUL AL-MOSLAH, SALAH BADAHDH, ABDULLAH BIN SALEH AL OBAID, HASSAN A.A. BAHFZALLAH, and M. YAQUB MIRZA, all located, doing business or registered to do business in the United States.

## THE MUSLIM WORLD LEAGUE

457. The MUSLIM WORLD LEAGUE ("MWL") was founded in 1962 in Saudi Arabia, to "disseminate Islamic Dawah and expound the teachings of Islam." The MWL