is the parent organization of the charity IIRO. MWL uses the IIRO as an operational arm to perform many of its charitable activities.

458. The MWL is an organization funded, supported, and financed by persons or entities of Saudi Arabia. According to the testimony of Arafat al-Asahi, a MWL representative in Canada:

> Q. During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government has any concern whatsoever with respect to your office?
>
> A. Let me tell you one thing. The Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please.
>
> Q. I will. Thank you. When you say you work for the Government of Saudi Arabia, are you also paid by that government?
>
> A. I am paid by my organization which is funded by the government. Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project. Do you get this point?
>
> Q. Yes.
>
> A. Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia.
>
> Q. Is the Muslim World League the type or organization that would actually have physical offices in countries throughout the world?

> A. Of course. I said in the beginning that we have over 30 offices all over the world? One is here; one is in Washington, D.C. They are spread all over, in Europe, in Asia.
>
> Q. When you speak of an office that is an IIRO office, that counts as a Muslim World League office as well?
>
> A. What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League.

459. The MWL has at least two offices in the United States. The New York City office is currently active, while its main office in Herndon, Virginia, was the target of federal raids in early March 2002. Its officers at the Virginia office are President Abdullah bin SALEH AL-OBAID, Vice President Hassan A. A. Bahafzallah, and Secretary/Treasurer YAQUB M. MIRZA.

460. ABDULLAH AL-OBAID, President of the United States branch of MWL, and former Secretary-General of the organization, also runs one of the AL-RAJHI family's largest corporations, AL-WATANIA. ADULLAH AL-OBAID also served as Secretary-General of the RABITA TRUST.

461. YAQUB MIRZA, the secretary and treasurer of the MWL in the United States, is the financial mastermind of the SAAR Network (founded by the Al-Rajhi family). YAQUB MIRZA'S house was raided in March, 2002 by federal authorities investigating his alleged connections to AL QAEDA and September 11, 2001.

462. The MWL has numerous connections with AL QAEDA operatives. MOHAMMED BAYAZID, an AL QAEDA operative who fought alongside OSAMA

BIN LADEN and the other Mujahideen in Afghanistan (and has been implicated in a plot to get nuclear materials for AL QAEDA), described how Defendant MOHAMMED JAMAL KHALIFA, OSAMA BIN LADEN's brother-in-law, opened a MWL office in Pakistan for the use of the founders of AL QAEDA :

> Brother Jamal KHALIFA (Abu-l-Bara) was the one who started the educational project, both in the interior of Afghanistan and abroad. Thanks to Dr. Abdullah Azzam's efforts he succeeded in getting the approval of the Muslim World League to open an office for the League in Peshawar as an umbrella under which the brothers could work and move in Pakistan freely.

463. WA'EL JULAIDAN, whom the United States Treasury Department named as "one of the founders of AL QAEDA ," headed the MWL in Peshawar, Pakistan and also served as the Director General of the defendant RABITA TRUST. JULAIDAN has had his assets frozen by the United States Treasury Department which characterized JULAIDAN as having "directed organizations that have provided financial and logistical support to al-Qa'ida". WA'EL JULAIDAN operated MWL offices that served in the early days of AL QAEDA to attract and train holy warriors from around the world for the war in Afghanistan. He had contact with bin Laden lieutenant, defendants AYMAN AL ZAWAHIRI and ABU ZUBAYDA.

464. WADIH EL-HAGE, convicted for his role in the 1998 United States Embassy bombings in Africa, stated at his trial that he worked at the MWL in Peshawar, Pakistan in the 1980s. It was while working at the MWL that EL-HAGE met Abdullah Azzam, the mentor of OSAMA BIN LADEN, and a co-founder of AL QAEDA .

465. Ihab Ali, another AL QAEDA operative in prison in the United States on perjury charges, also went to work for the MWL in 1987. Ihab Ali played a large role in the embassy bombings, facilitating communication between OSAMA BIN LADEN and other AL QAEDA members and also piloting OSAMA BIN LADEN's personal jet. In 1993, Ihab Ali took flight lessons at the Airman Flight School in Norman, Oklahoma—the same school ZACARIAS MOUSSAOUI attended and which MOHAMMED ATTA scouted as a possibility for his flight training.

466. According to the grand jury, Ihab Ali did not disclose the extent to which his pilot training and international travels concerned efforts to assist in AL QAEDA 's terrorist activities.

467. In conjunction with the attempted assassination of Egyptian President Hosni Mubarak in 1995, one of the would-be assassins admitted: "The Muslim World League bought our travel tickets and gave us spending money before we arrived at the [OSAMA BIN LADEN's] farm in Suba region in southern SUDAN."

468. Co-conspirators, aiders and abettors of the MWL include Defendants: Rabita Al-alam Al-islami, a/k/a Islamic World League, ABDULLAH BIN SALEH AL-OBAID, HASSAN A.A. BAHAFZALLAH, AND YAQUB M. MIRZA, all located, doing business or registered to do business in the United States.

## THE SAAR FOUNDATION

469. The SAAR Foundation was named after SULAIMAN ABDUL AZIZ AL-RAJHI, head of the Saudi Arabian AL-RAJHI family, and was formed in the 1970s by a

group of Muslim scholars and scientists from the Middle East and Asia. SAAR was incorporated in Herndon, Virginia as a 501c(3) non-profit organization on July 29, 1983, and dissolved as of December 28, 2000. The Saudi Arabian AL-RAJHI family is the foundation's biggest donor. The SAAR Network financially supports terrorism and its main contributors, the AL-RAJHI Family, has a long history of supporting terrorism.

470. Virginia Secretary of State corporate records indicate that there are more than one hundred affiliated organizations registered or doing business at just one of SAAR's addresses in Herndon, Virginia. Most of these organizations do not maintain a physical presence at that address, or elsewhere. The SAAR Foundation and network is a sophisticated arrangement of non-profit and for-profit organizations that serve as front-groups for extremist Islamic terrorist organizations.

471. On March 20-21, 2002, the offices of many SAAR Network organizations, along with the residences of their top executives, were raided by the joint terrorism task-force, Operation Greenquest. Operation Greenquest was created after September 11, 2001, by the United States Treasury Department as a new multi-agency financial enforcement initiative bringing the full scope of the U.S. Government's financial expertise to bear against sources of terrorist funding. According to the search warrants issued at nearly twenty locations, the SAAR Network was raided for "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . AL QAEDA as well as individual terrorists . . . (including) OSAMA BIN LADEN."

472. The SAAR Foundation reported revenues of over $1.7 billion for the year 1998, which represents more than any other United States charity has ever generated. The

SAAR Foundation and its affiliated charities keep a low profile in that they do not conduct fundraising events or publicly reach out to potential donors like most charities.

473. On November 7, 2001, Bank al-Taqwa *(infra)* was first designated by President George W. Bush's Executive Order as a Specially Designated Global Terrorist Entity and the United States Department of Treasury and its assets were frozen. Two SAAR network executives, Samir Salah and Ibrahim Hassabella, were both former executives at Bank al-Taqwa. Two other executives in the SAAR Network, Jamal Barzinji and Hisham al-Talib, worked for Youssef M. Nada *(infra)*, the head of Bank al-Taqwa who also had his assets frozen. The SAAR network links with Youssef Nada include that SULAIMAN AL-RAJHI was on the Board of Directors at YOUSSEF NADA's AKIDA BANK in the Bahamas. People associated with the SAAR Foundation and its network were also implicated in the United States Embassy terrorist bombings in Kenya and Tanzania.

474. The SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of AL QAEDA and international terror. These organizations are closely inter-twined with Defendants IIRO, MWL and their related "charities." The connections between the AL-RAJHI family, the SAAR network, and the terrorist front-groups extends past the financial network to a repetitious pattern of overlapping officers. The United States branches of the MWL and its subsidiaries are a part of the SAAR Network. The MWL and SAAR share officers and addresses. Both play an intermediary role between wealthy Saudi financiers and terrorist groups.

475. Co-conspirators, material sponsors, and/or aiders and abettors of the SAAR network include Defendants: ABU SULAYMAN, AHMED TOTONJI, HISHAM AL-TALIB, IQBAL YUNUS, JAMAL BARZINJI, M. OMAR ASHRAF, MOHAMMED JAGHLIT, MUHAMMAD ASHRAF, TAHA JABER AL-ALWANI, TARIK HAMDI, YAQUB MIRZA, SHERIF SEDKY, AFRICAN MUSLIM AGENCY, ARADI, INC., GROVE CORPORATE, INC., HERITAGE EDUCATION TRUST, INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT, MAR-JAC INVESTMENTS, INC., MAR-JAC POULTRY, INC., MENA CORPORATION, RESTON INVESTMENTS, INC., SAAR INTERNATIONAL, SAFA TRUST, STERLING CHARITABLE GIFT FUND, STERLING MANAGEMENT GROUP, INC., and YORK FOUNDATION, all located doing business or registered to do business in the United States.

**AL BARAKA INVESTMENT AND DEVELOPMENT CORP.**

476. AL BARAKA INVESTMENT & DEVELOPMENT CORPORATION (or "AL BARAKA"), a wholly owned subsidiary of DALLAH ALBARAKA GROUP LLC (or "DALLAH ALBARAKA"), is based in Jeddah, Saudi Arabia. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries. Most of them are known as or registered as "al Baraka Bank." United States assets include AL BARAKA Bancorp Inc. in Chicago, Illinois, and AL BARAKA Bancorp Inc. in Houston, Texas.

477. A memo from the Russia Federation's Security Service details the AL BARAKA Bank's role in funding Defendant AL-HARAMAIN:

> On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to

the personal foreign accounts of field commanders, including Khattab and Basayef.

478. AL BARAKA provided OSAMA BIN LADEN with financial infrastructures in SUDAN beginning in 1983. For example, the use of AL BARAKA Bank by AL-HARAMAIN was confirmed by a statement from AL-HARAMAIN chairman, AQUEEL AL-AQUEEL, who declared that the charity maintained accounts at AL BARAKA Bank in Saudi Arabia.

479. AL BARAKA INVESTMENT & DEVELOPMENT is mostly present in the Sudanese banking sector, through assets held in Algharb Islamic Bank, AL SHAMAL ISLAMIC BANK, FAISAL ISLAMIC BANK, SUDANESE ISLAMIC BANK and TADAMON ISLAMIC BANK. AL BARAKA is also affiliated with the National Development Bank in SUDAN.

480. Defendant SALEH ABDULLAH KAMEL was born in Makkah, Saudi Arabia, in 1941. After being the adviser to the Saudi Minister of Finance, in 1969 he founded Dallah Albaraka Group LLC, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

481. Dallah Albaraka Group LLC, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services and financial activities. The group includes twenty-three banks in Arab and Islamic countries, in addition to several investment and financial companies.

482. Dallah Albaraka Group LLC's portfolio includes a wholly owned subsidiary specializing in aviation-services, Dallah Avco Trans-Arabia Co Ltd. The company was formed in 1975 and is based in Jeddah, Saudi Arabia.

483. OMAR AL BAYOUMI, a Saudi national, was Assistant to the Director of Finance for an AL BARAKA company, Dallah Avco, a position he gave as a reference in an application for admission to Case Western Reserve University in Cleveland, Ohio in 1998.

484. On May 5, 1998, OMAR AL BAYOUMI registered a fictitious company name called Masjed al Madinah al Munawarah (a/k/a Masjid al Madinah al Munawarah) based in San Diego, California. In March 25, 1999 a mosque was registered in the State of Pennsylvania under the name of Masjid al Madinah al Munawarah, Inc.

485. Two of the hijackers on September 11, 2001, of American Airlines Flight 77, NAWAF AL HAZMI and KHALID AL MIHDHAR, received funding from OMAR AL BAYOUMI who paid their house rent in San Diego. OMAR AL BAYOUMI is listed as a suspect wanted by the FBI in connection with the September 11, 2001 attacks.

486. Dallah Albaraka Group LLC's financial arm is AL BARAKA Investment & Development (or "ABID"), a wholly owned subsidiary based in Jeddah, Saudi Arabia.

487. SALEH ABDULLAH KAMEL, Chairman of Dallah AL BARAKA and AL BARAKA Bank, was one of the three founding members of AL SHAMAL ISLAMIC BANK. SALEH ABDULLAH KAMEL founded the bank in 1983, along with a Sudanese company, AL SHAMAL INVESTMENT AND DEVELOPMENT, and the Government

of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of HASSAN AL-TURABI.

488. The practice and policy of Dallah Albaraka Group LLC and AL BARAKA Bank is to provide financial support and material assistance to international terrorist organizations including AL QAEDA.

489. In 1998, AL AQSA ISLAMIC BANK was established with $20 million in capital. The main shareholders were Dallah AL BARAKA Group LLC and the Jordan Islamic Bank. Jordan Islamic Bank, a Dallah al-Baraka LLC subsidiary, owns 14 percent of AL-AQSA ISLAMIC BANK. SALEH ABDULLAH KAMEL acknowledged that Dallah AL-BARAKA Group LLC owns another twelve percent directly.

490. Since 1998, Israel has refused to approve the bank, citing its obvious ties with known terrorists. At the beginning of 2001, several antiterrorist authorities from Israel visited Citibank's headquarters in New York to warn its directors of the nature of the bank's activities with respect to international terrorism.

491. AL BARAKA provided support to the "charity" AL-HARAMAIN operations and helped transfer funds for OSAMA BIN LADEN operations, as reported by the Bosnian Intelligence Agency (Agency for Investigation and Documentation – AID) in a memorandum titled "Some illegal activities of humanitarian organizations investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina (FbiH)":

> Records available for 1998 show a flow of money into the so-called "operating" account of the HO [Humanitarian Organization] at the Deposit Bank, Sarajevo, from the "main" account, sent from Saudi Arabia via the Deutsche

> Bank and the Albaraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million].

492. Al Baraka Turkish Finance House, an AL BARAKA branch in Turkey, is a subsidiary of Dallah AL BARAKA Group LLC.

493. A Bosnian Intelligence memo regarding the activities of AL-HARAMAIN states the following:

> Given all the above security factors, we believe that the clear lack of any concrete humanitarian projects indicates that the existence of this HO [Humanitarian Organization] was a fictitious cover . . .

494. The report establishes AL-HARAMAIN's role in financing and assisting OSAMA BIN LADEN's operations.

> [t]he Saudi HO [Humanitarian Organization] al-Haramain, . . . has acted as a channel for financing the activities of terrorist organizations. . . . According to available intelligence, the Sarajevo office assisted the terrorist organization Gama al Islamija, while members of bin Laden's el Itihad al Islamija (AIAI) terrorist groups were employed at the Somalia offices, which also financed their operations.

**AL-HARAMAIN**

495. The Saudi Arabian-based AL-HARAMAIN ISLAMIC FOUNDATION INC. (or "AL-HARAMAIN") is a private charitable organization that is supposed to provide a variety of humanitarian services for Muslims worldwide. Established in Riyadh in 1992, AL-HARAMAIN quickly developed a vast network of offices and representatives that now spans over fifty countries, including the United States. AL-HARAMAIN raises

most of its funds from Saudi Arabia where it oversees the distribution of its resources across the world.

496. Although AL-HARAMAIN operates these branches in many branches but are still controlled primarily from AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, AQEEL AL-AQEEL and MANSOUR AL-KADI, both reside in Riyadh, Saudi Arabia where they run all of AL-HARAMAIN worldwide. Defendant AL-HARAMAIN ISLAMIC FOUNDATION, INC., is a Saudi charity front that has exploited its non-profit status for the benefit of OSAMA BIN LADEN and his terrorist network AL QAEDA, in the furtherance of international terrorism. In doing so, AL-HARAMAIN has developed an extensive worldwide network. Many of AL-HARAMAIN's foreign branches have been exposed for providing direct and material support to AL QAEDA. The United States State Department has designated two of AL-HARAMAIN's branches located in Bosnia and Somalia, as terrorist entities and frozen the assets of both. The leaders of AL-HARAMAIN have direct links to AL QAEDA.

497. In December of 1999, AL-HARAMAIN conducted a joint fundraising event with a known AL QAEDA front, the Defendant INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO) and the WORLD ASSEMBLY OF MUSLIM YOUTH (WAMY) in Riyadh, Saudi Arabia. AL-HARAMAIN and its co-conspirators also solicit and operate widely in the United States.

498. Co-conspirators, aiders and abettors of the AL-HARAMAIN ISLAMIC FOUNDATION doing business or registered to do business in the United States include

Defendants: AL HARAMAIN FOUNDATION; AL HARAMAIN ISLAMIC FOUNDATION, INC.; AQEEL ABDUL-AZEEL AL-AQEEL; MANSOUR AL-KADI, SOLIMAN H.S. AL-BUTHE; and PEROUZ SEDA GHATY.

**AL-HARAMAIN'S HUMANITARIAN EFFORTS**
**USED TO CONCEAL SUPPORT FOR AL QAEDA**

499. AL-HARAMAIN's self-titled "Most Important Aims" include relief work in areas of the world where Muslims are deprived. An unwritten, though no less important, aim of AL-HARAMAIN is providing assistance to OSAMA BIN LADEN's AL QAEDA.

500. Intelligence officials throughout the world have acknowledged that AL-HARAMAIN exploited its non-profit status by providing secret aid to terrorist groups. In referring to AL-HARAMAIN in a speech given on March 11, 2002, United States Treasury Secretary Paul O'Neill, stated:

> Few deceits are more reprehensible than the act of collecting charity from well-intentioned donors, and then diverting those funds to support hatred and cruelty. As I said during my visit to the Gulf, misusing charity funds to support terrorism harms the people who gave the donation, harms the people who should have received it and is dangerous to us all. Organizations that pervert the name of charity are an affront to us all, and we will find them, expose them, and shut them down.

501. After the June 2, 2002, raids of AL-HARAMAIN offices in Bosnia, the Commander of the NATO-led forces in Bosnia, Lieutenant General John Sylvester stated:

> We detected a pattern here . . . for terrorist cells and those who aid and harbor them to operate behind the shield of legitimate humanitarian . . . organizations.... They were preaching good, and sometimes doing good, while plotting evil.

502. On March 11, 2002, the United States froze the funds of the Bosnia-Herzegovina and Somalia branches of the AL-HARAMAIN Islamic Foundation. These branches of AL-HARAMAIN were "diverting charitable funds to terrorism." The United States Treasury Department issued a Press Release about the designations that stated:

> The branch offices of al Haramain in Somalia and Bosnia are clearly linked to terrorist financing.

503. Although AL-HARAMAIN in Saudi Arabia was not included in this designation, the Bosnian and Somalian branches receive their funding and guidance from the AL-HARAMAIN headquarters in Riyadh, Saudi Arabia.

504. AL-HARAMAIN's Bosnia and Somalian offices and the rest of AL-HARAMAIN are closely intertwined. AL-HARAMAIN's headquarters provides the funding, management, and direction of the Somalian and Bosnian branches. The headquarters also maintains one website that covers AL-HARAMAIN worldwide and, on occasion, devotes certain pages of its website to certain individual branches.

505. A United States Treasury Department Press Release stated that AL-HARAMAIN worked with the AL QAEDA-linked Somali-based terrorist group AL ITIHAD AL ISLAMIYA. This like-minded Islamic fundamentalist group operated in the AL QAEDA orbit as it sought to establish an Islamic state in Somalia and moved into a terrorist force in the mid 1990s. AIAI's involvement in September 11 includes sharing of training and personnel with AL QAEDA using money provided by the Saudis through defendant AL HARAMAIN'soffices in Bosnia and Somalia. Defendant the AL BARAKA AT BANK was a financial vehicle for AL QAEDA.. The press release states:

> The Somalia office of AL-HARAMAIN is linked to OSAMA BIN LADEN's AL QAEDA network and al-Itihad al-Islamiya (AIAI), a Somali terrorist group. AL-HARAMAIN Somalia employed AIAI members and provided them with salaries through al-Barakaat Bank, which was designated on November 7, 2001 under E.O. 13224 because of its activities as a principal source of funding, intelligence and money transfers for OSAMA BIN LADEN.

506. The cooperation between AL QAEDA and AL-ITIHAD AL-ISLAMIYA has not ceased. The 2002 United States Department of State's Patterns on Global Terrorism report states that AL-ITIHAD AL-ISLAMIYA is a terrorist group that maintains ties to AL QAEDA. The Treasury Department Press Release about the designation also states that AL-HARAMAIN's support of AL-ITIHAD AL-ISLAMIYA has been concealed under its humanitarian cover:

> Over the past few years, AL-HARAMAIN Somalia has funneled money to AIAI by disguising funds as if they were intended for orphanage projects or Islamic school and mosque construction. The organization has also employed AIAI members and provided them with salaries through Barakaat Banks and Remittances, a subsidiary of al-Barakaat Bank.

507. This concert of action, aiding and abetting of terror and material sponsorship of international terrorism is precisely the hallmark of the offensive upon the United States that culminated on September 11, 2001.

**AL-HARAMAIN'S TIES TO AL QAEDA 'S**
**1998 UNITED STATES EMBASSY BOMBINGS**

508. The AL-HARAMAIN Islamic Foundation was banned from Kenya for national security concerns following the 1998 embassy bombings. OSAMA BIN LADEN

and AL QAEDA were convicted by the United States in 2001 for plotting and executing these dual attacks in Nairobi, Kenya, and Dar Es Salaam, Tanzania, which killed 224 people, including 12 Americans, and injured more than 4,000. These indictments and convictions demonstrate the United States government's belief that both OSAMA BIN LADEN and AL QAEDA have committed acts within and outside the United States which trigger the United States District Courts' jurisdiction over such entities.

509. The United States Treasury Department Press Release following the March 11, 2002, designation of AL-HARAMAIN's Bosnian and Somalian offices, stated the following about its connection to the terrorist group AL-GAMA'A AL-ISLAMIYYA:

> The Bosnia office of AL-HARAMAIN is linked to al-Gama'a al-Islamiyya, an Egyptian terrorist group. Al-Gama'a al-Islamiyya was designated on November 2, 2001 and it is a signatory to OSAMA BIN LADEN's Fatwa dated February 23, 1998, targeting Americans and their allies.

510. In March 2002, Bosnian officials raided AL-HARAMAIN's Sarajevo office and discovered more proof of AL-HARAMAIN using its humanitarian image as a cover for terrorism. A Bosnian intelligence report explains how investigators discovered that AL-HARAMAIN's financial records from 1994 through 1998 had been destroyed and that $1.59 Million dollars had been inexplicably withdrawn from the charity between 1999 and 2001. The Bosnian intelligence report about the March 2002 raids also stated: "We believe that the clear lack of any concrete humanitarian projects indicates that the existence of this organization was a fictitious cover for probable links with terrorism." In 2001, the Saudi-based AL-HARAMAIN aided AL QAEDA terrorists groups in Chechnya and elsewhere by providing them with recruits, weapons, and money.

511. AL-HARAMAIN's website used to have a direct link to the AL QAEDA site about the Chechnyian operations (qoqaz.com). The website was one of several AL QAEDA websites, including qoqaz.com, qoqaz.net, and azzam.com (among others) that are part of the AL QAEDA propaganda effort of Azzam Publications. The government of the United States has been tracking the domains of azzam.com and qoqaz.com in an ongoing effort to shut down the sites for their role as an AL QAEDA sponsor, promoter and mouthpiece. FBI Special Agent Robert Walker described qoqaz.net, the English language equivalent of qoqaz.com, in his April 29, 2002, Affidavit in Support of Complaint Against BENEVOLENCE INTERNATIONAL FOUNDATION, Inc. and ENAAM M. ARNOUT. In his Affidavit, Walker stated that qoqaz.net leverages its relationship with charities:

> In or about early 2000, a website (www.qoqaz.net) dedicated to the cause of Chechen mujahideen identified the leaders of the military fight in Chechnya as including Ibn al Khattab and included pictures of mujahideen training as well as killed mujahideen. CW-1 has identified Ibn al Khattab as a well-known mujahideen leader with links to OSAMA BIN LADEN. . . . The website condemned America . . .

512. Shortly after the merger of EGYPTIAN ISLAMIC JIHAD with OSAMA BIN LADEN's AL QAEDA (*see* SUDAN allegations, *infra*), AHMED IBRAHIM AL-NAJJAR, initially a member of the Egyptian Islamic Jihad, was sent on a new mission to Albania to work for AL-HARAMAIN. After al-Najjar was deported from Albania to Egypt in 1999, he was sentenced to death for acts of terrorism. In his testimony, AL-NAJJAR admitted to being a full-fledged AL QAEDA member who entered Albania with

a false passport and who, like many other AL QAEDA operatives, was engaged in purported humanitarian activities while waiting for orders to participate in terror activities. The case of AL-NAJJAR is but one example of a senior AL QAEDA operative who not only found refuge from authorities with AL-HARAMAIN, but a platform from which to wage war and promote the use of terror.

513. AL-HARAMAIN took part in a committee of charitable organizations that formed the SAUDI JOINT RELIEF COMMITTEE (or "SJRC"). Along with AL-HARAMAIN, the SJRC is comprised of the IIRO, WAMY, the SAUDI RED CRESCENT, and the MUSLIM WORLD LEAGUE, among others. The SJRC has been connected to OSAMA BIN LADEN and two of his top operatives, WA'EL HAMZA JULAIDAN and Adel Muhammad Sadiq bin Kazem. The United States Treasury Department has branded JULAIDAN a Specially Designated Global Terrorist Entity [SDGT], stating that JULAIDAN is "an associate of Usama bin Laden and a support of al-Qa'ida terror." AL-HARAMAIN has been able to continue its cooperation with AL QAEDA for years in large part due to its ostensible appearance as a humanitarian organization.

514. In the United States, AL-HARAMAIN has three business entities in Ashland, Oregon: AL-HARAMAIN FOUNDATION, and AL-HARAMAIN Islamic Foundations. All three of these separately filed businesses are at the same address and under the same management. These three businesses are one and the same as AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, AQEEL AL-AQEEL and MANSOUR AL-KADI, are the

Secretary General and Deputy General, respectively, of the Riyadh office. The AL-HARAMAIN branch in Ashland, Oregon, is specifically linked to AL QAEDA operations.

515. AL-HARAMAIN Ashland states in its year 2000 Form 990 that it operates an Islamic center in Springfield, Missouri. Corporate records reveal that AL-HARAMAIN owns property in Springfield, Missouri.

516. AL-HARAMAIN has been implicated as providing funds for the bombing of a night club in Bali in 2002. AL-HARAMAIN continues in its illicit pattern of conduct in sponsoring acts of international terrorism.

517. During an interrogation conducted by United States authorities at the United States air force base in Baghram, Afghanistan, on May 23, 2002, Umar Faruq, senior AL QAEDA representative in Southern Asia, confessed that AL-HARAMAIN was the main financial mechanism for funding terrorists operations in the region, through its Indonesian office director in Jakarta, Ahmed al-Moudi. The AL-HARAMAIN organization is said to have planned terrorist attacks in Indonesia.

> Al Haramayn was the funding mechanism of all operations in Indonesia. Money was laundered through the foundation by donors from the Middle East. Money was given to [*him*] to al Haramayn's branch in Jakarta, which he said is connected to Kompak [*Crisis Center Committee or Committee for Crisis Handling of the Dewan Dakwah Islamiyah organization, Islamic Propagation Council in Indonesia*]. The two groups plan terrorist activity in Indonesia. The foundation had an office in Makassar where Faruq was introduced to the foundation's head by Agus Dwikarna [*Director of Kompak*]. Faruq was given orders by Rashid [*al-Qaida senior officer*] to get money transferred to the foundation's office in Jakarta through Ahmed al-Moudi [*head of al Haramayn's office in Jakarta*].

518. UMAR FARUQ further stated that AL-HARAMAIN received money from a Saudi Sheikh (Sheikh Bandar), who heads the AL-HARAMAIN ISLAMIC FOUNDATION in Saudi Arabia according to Faruq. Sheikh Bandar gave $99,000 to Faruq to give to Al Moudi. Faruq said SHEIKH BANDAR was the head of AL HARAMAIN in Saudi Arabia.

519. Furthermore, during a custodial interview on September 9, 2002, UMAR FARUQ stated that terrorist operations of JEMAAH ISLAMIYA, founded by Abu Bakar Bashir and directed by his top commander defendant NURJAMAN RIDUAN ISMUDDIN AKA HAMBALI, andefendant MOHAMMED IQBAL ABDURRAHMAN a/k/a Abu Jibril, were funded by donations channeled through AL HARAMAIN ISLAMIC FOUNDATION. JEMAAH ISLAMIYA is an Islamic extremist group closely associated with AL QAEDA. It's terror activities with AL QAEDA included planning the Bojinka attack, a foiled attempt to bomb 12 American airliners traveling over the Pacific, and cooperation in the bombing of the USS Cole in 2000. HAMBALI is also believed to have arranged a meeting of September 11 hijackers with other AL QAEDA members in Malaysia in 2000:

> AL QAEDA encourages Basyir's [*Abu Bakar Bashir*] goal to spark a religious civil war in Indonesia in order to achieve his vision of a pure Islamic state under Islamic law. Basyir's plan of training jihadists and massing weapons and ammunition has been coordinated with Rashid, a senior lieutenant of Usama bin Ladin. Rashid also acts as a representative of a committee of Gulf-state sheiks who are Al Qa'ida financiers and who have committed ample funds, weapons, ammunition and computers to support this war. Funds are channeled through the Al-Haramain NGO.

520. AL-HARAMAIN is engaged in unlawful aiding, abetting, conspiring with and offering material support to AL QAEDA which constitutes an unlawful pattern of conduct, illicit scheme and enterprise.

**AL-BARAKAAT AND JUMALE**

521. The AL-BARAKAT GROUP OF COMPANIES SOMALIA LIMITED and BARAKAAT GROUP OF COMPANIES (BARAKAAT) encompass a money transfer network with operations in 40 countries. These companies were founded in 1989 by SHEIKH AHMED NUR ALI JUMALE, who controls the activities of the BARAKAAT. Defendant BIN LADEN a friend of JUMALE's from the Afghanistan-Soviet war made a significant investment in BARAKAAT. United States Under Secretary for International Affairs John B. Taylor has described BARAKAAT as a premier financial transfer system for AL QAEDA:

> The founder of the organization, Sheikh Ahmed Nur Ali Jumale has close links with Usama bin Laden and has used al Barakaat to facilitate the financing and operations of Al Qaida and other terrorist organizations."

Treasury Secretary O'Neill corroborated BARAKAAT funding of al Qaeda:

> *The al Barakaat companies are the money movers, the quartermasters of terror. At core, it is a hawala conglomerate operating in 40 countries around the world with business ventures in telecommunications, construction, and currency exchange. They are a principal source of funding, intelligence and money transfers for bin Laden."*

Defendant JUMALE was able to penetrate the United States banking system using his BARAKAAT companies. Upon information and belief, during the 1990s and in 2000 and 2001, the BARAKAAT financial network moved over $300-$400 million per year in

its worldwide network, an estimated $15 to $20 million is believed to have gone to AL QAEDA. BARAKAAT also donated a portion of its commissions to AL QAEDA. From 1979 to 1986, JUMALE worked in Jeddah, Saudi Arabia as a senior employee of the SAUDI AMERICAN BANK. The bank was founded by Citibank, which owned 40% of it at the time he worked there. The United States government designated BARAKAAT and its branches as terrorist entities on November 7, 2001, and froze the organization's assets. Two of the United States branches- in Boston, MA, and Alexandria, VA-were accused of racketeering and conspiracy respectively to avoid reporting financial transactions. The members of the Alexandria branch have pled guilty. All of BARAKAAT group of companies are co-conspirators, aiders and abettors, material sponsors of AL QAEDA, BIN LADEN and international terrorism.

## SAUDI AMERICAN BANK

522. SAUDI AMERICAN BANK is based in Riyadh, Saudi Arabia, and was formed in 1980 pursuant to a royal decree to take over the then existing branches of Citibank in Riyadh and Jeddah, Saudi Arabia. Citibank opened its Jeddah branch in 1955 and its Riyadh branch in 1966. SAUDI AMERICAN BANK was formed in accordance with a program adopted by the Kingdom of Saudi Arabia in the mid-1970's under which all foreign banks were required to sell majority equity interests to Saudi nationals.

523. SAUDI AMERICAN BANK started operations on July 12, 1980, based in Riyadh. The SAUDI AMERICAN BANK is chaired by Abdulaziz Bin Hamad Al Gosaibi. Khalil A. Kordi and Rashid M. Al. Romaizan are among the directors of the bank. The SAUDI AMERICAN BANK is the second largest bank in Saudi Arabia.

524. The SAUDI AMERICAN BANK has offices in the United States based in New York. The Chairman of the bank is ABDULAZIZ BIN HAMAD AL GOSAIBI who was born in 1923 is also Chairman of the Saudi Cement Company in Damman, Saudi Arabia. The Saudi Cement Company shareholders include Defendant OMAR SULAIMAN AL-RAJHI. The SAUDI AMERICAN BANK is also the main banker of Arab Cement Company. The company is owned by AL RAJHI Group and SAUDI BIN LADEN GROUP. Arab Cement Company is managed by several other Defendants including KHALID BIN SALIM BIN MAHFOUZ and Mohammed Bin Laden .

525. The SAUDI AMERICAN BANK is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Defendant SALEH ABDULLAH KAMEL. The SAUDI AMERICAN BANK has maintained a partnership with al Baraka financial system since its beginning.

526. The SAUDI AMERICAN BANK serves as the bank for the Dallah AL BARAKA Group, named as Defendant herein and chaired by DEFENDANT SALEH ABDULLAH KAMEL. The SAUDI AMERICAN BANK is close to the Saudi Bin Laden family, and appears on its financial transactions. Bin Lden for Contracting and Trading is owned by members of the Bin Lade family including BAKR BIN LADEN and Mohammed Bin Laden .

527. SAUDI AMERICAN BANK financed these Sudanese projects, described above, by directly providing material support and assistance to OSAMA BIN LADEN. Indeed, SAUDI AMERICAN BANK was the main banker of the Saudi Bin Laden Group and Bin Laden Organization with respect to Sudanese operations. SAUDI AMERICAN

BANK is also the Riyadh correspondent of AL FAISAL ISLAMIC BANK, which is managed by Defendant PRINCE MOHAMMED AL FAISAL AL SAUD. AL FAISAL ISLAMIC BANK has facilitated AL QAEDA terrorist operations as detailed above. The SAUDI AMERICAN BANK is also the main correspondent in Riyadh for a branch of AL SHAMAL BANK, a branch of DMI Trust based in Nassau, involved in the financing of AL QAEDA .

528. In year 2000, the SAUDI AMERICAN BANK participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including Defendants WAMY, IIRO and AL HARAMAIN FOUNDATION.

## MERCY INTERNATIONAL RELIEF AGENCY

529. The Saudi-backed Mercy International Relief Agency (a/k/a MERCY INTERNATIONAL, a/k/a MERCY) (or "MIRA") was incorporated in Dublin, Ireland in 1992 with the ostensible purpose of embarking on Muslim charitable activities around the world. All the shareholders of the charity are all of Saudi nationality and listed their address at Makkah, Saudi Arabia. MIRA also has branches in Somalia and Kenya. Its Dublin branch dissolved on January 16, 1998.

530. During the trial and conviction of OSAMA BIN LADEN's personal secretary WADIH EL-HAGE, for his role in the 1998 United States Embassy bombings in East Africa, WADIH EL-HAGE's testimony before a grand jury established that MIRA was funded by "Saudi merchants":

"Q. The grand jury had a couple of quick questions one of which is who funds the Mercy International relief agent in Kenya?
"A. Some Saudi merchants in Saudi Arabia.
"Q. Merchants in Saudi Arabia?
"A. Yes

531. An AL QAEDA member further maintained that MIRA was also an AL QAEDA sponsor. L'Houssaine Kherchtou, a 36-year old Moroccan, joined al Qaeda in 1991. He affirmed this in his testimony as a government witness in the United States Embassy bombings trial. He worked for AL QAEDA in Kenya, and noted specifically that MIRA served and sponsored AL QAEDA's activities. In his testimony, Kherchtou asserted that several AL QAEDA members were workers at MIRA, received identity cards from MIRA, and that the organization was dealing directly with OSAMA BIN LADEN himself:

Q. And during the time that you were in Nairobi were you familiar with a charity or relief organization known as Mercy International Relief Organization?
A. Yes.
Q. And were there any al Qaeda people affiliated with the Mercy International Relief Organization?
A. Let me just.
(Witness consults with interpreter)
A. Yes, the people of al Qaeda they were dealing with the Mercy International.
Q. Who were those people? Which al Qaeda people were dealing with Mercy International?
A. Bin Laden, Mohammad Masry.
Q. Are you talking about the military commander?
A. Yes.
Q. Abu Mohammad, are you talking about Saleh lay again?
A. Yes.
Q. Were there any people inside Mercy International who were part of al Qaeda in the past or the present?
A. Well, in the past Abu Jamal he was the manager of that relief agency but he was in the past of al Qaeda.

Q. You said Abu Jamal?
A. Yes.
Q. Anyone else in Mercy International who was a member of al Qaeda in the past or while in Kenya?
A. The accountant of Mercy International, too, he was of al Qaeda but in the past his name Abu al Kheryemeni.
Q. Did you ever see any al Qaeda members in Kenya who had identification cards in the Mercy International Relief agency?
A. No.
Q. Did you ever hear whether or not al Qaeda members in Nairobi obtained identification cards from Mercy International Relief agency?
A. Yes.
Q. Who did you hear obtained those cards?
A. I heard that Abu Mohammed Amriki and Bin Laden they had identity card.

532. MIRA's Kenya Office served as a front for AL QAEDA. Like many OSAMA BIN LADEN fronts, MIRA was an operating charity. The organization may have embarked upon actual charitable work, but only as a cover for their insidious goals. Following the Embassy bombings, federal authorities raided the offices of MIRA in Kenya on August 21, 1998, after finding MIRA documents in Wadih el-Hage's residence. At MIRA's office, agents discovered documentary evidence linking it to OSAMA BIN LADEN.

533. Some of the documents seized belonged to WADIH EL-HAGE and concerned Abu Ubaidah, a top AL QAEDA leader who died in 1996. At the Embassy bombing trial in New York Assistant U.S. Attorney ("AUSA") Patrick Fitzgerald stated:

> When they searched Mercy International, they found a number of documents, included among which Wadih El Hage's files and files concerning Abu Ubaidah.

534. Documents found on site indicated that MIRA was smuggling weapons into Kenya from Somalia. AUSA Fitzgerald noted that authorities found a receipt dated July 24, 1998, on the back of which stated it was related to getting weapons from Somalia.

535. FBI Special Agent John Michael Anticev interviewed Mohammed Odeh, who was convicted for his role in the 1998 Embassy bombings. Mr. Anticev testified that Mohammed Odeh explained to him that MIRA was working for AL QAEDA.

Q. Did Odeh talk to you at all about an entity known as the Mercy International Relief Agency?
A. Yes.
Q. What did he tell you about the Mercy International Relief Agency?
A. That was also -- it was run by a guy in Nairobi named Tawhili, and that organization had ties to Al Qaeda, and Harun and Abu Ubaidah al Banshiri were close to that organization.

536. The individual referred to above as Tawhili is also known as Sheikh Ahmad alem Suweidan, one of the FBI's most wanted terrorists. Therefore, a fugitive AL QAEDA member ran MIRA at all relevant points up to the Embassy bombings. Special Agent Anticev further testified that Harun, WADIH EL-HAGE's former roommate who also worked for AL QAEDA, frequented MIRA, typing information for top AL QAEDA leadership:

Q. Did Odeh describe to you any particular tasks that Harun performed for Al Qaeda?
A. Yes. Harun, he said that Harun was a good typist, and, you know, he spent a lot of time at MIRA, the organization we just talked about, and he would type reports for the hierarchy in Al Qaeda.
Q. And when you said MIRA, MIRA, are you referring to the Mercy International Relief?
A. Yes, Mercy International Relief.
Q. Did Odeh indicate to you what was contained in those reports that he typed for the hierarchy?
A. In those reports they were using certain code words to conceal what

their true intentions were.

537. An AL QAEDA fugitive was deeply involved in MIRA's Branch in Dublin. Hamid Aich (or "Aich"), an Algerian who lived in Ireland and volunteered at the MIRA branch in Dublin, was heavily involved in the 2000 bomb plot to destroy Los Angeles International Airport (LAX). Shortly before moving to Ireland, Aich was a roommate of Ahmed Ressam, the man currently in jail for his role in the LAX bomb plot. On December 21, 1999, Aich was arrested by Irish authorities, seizing several personal papers and computer documents, though he was released shortly afterwards, while FBI agents were traveling to interrogate him. Aich fled and went into hiding, and his current whereabouts are unknown.

538. Documents found in MIRA's branch in Dublin link the charity to ZACARIAS MOUSSAOUI. Travel documents found in a raid at a flat which served as one of MIRA's offices in Dublin are linked to forged documents used by alleged 20th hijacker, ZACARIAS MOUSSAOUI, who has been criminally charged in the September 11, 2001 attacks. The documents relate to air travel financed by MUSTAFA MUHAMMED AHMAD a/k/a Shaykh Sai'id a/k/a Mustafa Ahmed Al-Hasawi an alleged paymaster of September 11th. The documents show that MOUSSAOUI's travel was financed by MUSTAFA MUHAMMED AHMAD. FBI agents maintain that the evidence found at MIRA's office "proves 'without a shadow of a doubt' that Moussaoui is linked to Osama bin Laden."

539. Dr. Safar Alhawali, Dr. Soliman Alsaloomi, Dr. Mohamed Said Alghtani (a/k/a Alghatani, Al-Qohtany), Dr. Abdallah Aldomaiji (a/k/a Aldonaji), Abdalaziz Farsi,

Faisal Alahmadi, and Waheed Almasry were co-conspirators, aiders and abettors, agents of MIRA and material sponsors of international terrorism.

## AL WAFA

540. The AL WAFA ORGANIZATION a/k/a Wafa Humanitarian organization; a/k/a Wafa Al-Igatha Al Islamic charity was headed by Saudi citizen SHEIKH ABO ABDUL AZIZ NAGI, a high ranking AL QAEDA official who was captured in Afghanistan in December 2001. Upon information and belief, while part of the organization provided money for humanitarian projects, much of the money was diverted to AL QAEDA. AL WAFA was also instrumental in providing AL QAEDA with arms, supplies and logistical support in Afghanistan before and after September 11, 2001. AL WAFA and AZIZ NAGI have been designated as terrorist co-conspirators and have had their assets frozen.

## MISCELLANEOUS INTERNATIONAL SPONSORS
## AL TAQWA AND NADA MANAGEMENT ORGANIZATION

541. In the late 1980s, the leaders of the Muslim Brotherhood formed financial management firms and banks called AL TAQWA ("Fear of God"), dedicated to the overthrow of Western nations, and the creation of a worldwide Islamic government. Headquartered in Lugano, Switzerland, with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, they consist of the AHMED IDRIS NASREDDIN, a/k/a NASREDDIN AHMED IDRIS, AKIDA BANK PRIVATE LIMITED a/k/a AKIDA ISLAMIC BANK, INTERNATIONAL LIMITED a/k/a IKSIR INTERNATIONAL BANK LIMITED, AKIDA COMMODITY LIMITED, AKIDA INVESTMENT

COMPANY LIMITED, AKIDA MANAGEMENT AND TRUST a/k/a/AKIDA ISLAMIC BANKERS' TRUSTEE AND MANAGEMENT, ALI GHALEB HIMMAT, AL TAQWA TRADE PROPERTY AND INDUSTRY COMPANY LIMITED, a/k/a AL TAQWA TRADE PROPERTY AND INDUSTRY ESTABLISHMENT, a/k/a HIMMAT ESTABLISHMENT, AL TAQWA ZAKA ESTABLISHMENT, ARMAND ALBERT FRIEDRICH HUBER a/k/a AHMED HUBER, ASAT TRUST REGISTERED, BA TAQWA FOR COMMERCE AND REAL ESTATE COMPANY LIMITED, a/k/a BA TAQWA FOR COMMERCE AND REAL ESTATE ESTABLISHMENT, a/k/a BEN M. NADA ESTABLSIHMENT, a/k/a YOUSSEF M. NADA ESTABLISHMENT, BANK AL TAQWA LIMITED, a/k/a AL TAQWA BANK, CEMSTEEL IMPEX ESTABLSIHMENT, GULF CENTER S.R.L, IKSIR LIMITED HOLDING, MIGA – MALAYSIAN SWISS, GULF AND AFRICAN CHAMBER, a/k/a CAMERA DI COMMERCIO, INDUSTRIA E TURISMO PER GLI STATI ARABI DEL GOLFO E LA SVIZZERA, MOHAMED MANSOUR, a/k/a MOHAMED AL-MANSOUR, NADA INTERNATIONAL ANSTALT, a/k/a NADA GROUP INTERNATIONAL ANSTALT, NADA MANAGEMENT ORGANIZATION SA, a/k/a AL TAQWA MANAGEMENT ORGANIZATION, NASCO BUSINESS RESIDENCE CENTER SAS DI NASREDDIN AHMED IDRIS ED, NASCO NASREDDIN HOLDING SA, NASCOSERVICE S.R.L, NASCOTEX S.A., a/k/a INDUSTRIE GENERALE DE FILATURE ET TISSAGE, A/K/A INDUSTRIE GENERALE DE TEXTILE, NASREDDIN CHARITABLE FOUNDATION, NASREDDIN COMPANY NASCO SAS DI AHMED IDRIS NASSNEDDIN EC, NASREDDIN FOUNDATION, a/k/a NASREDDIN STIFTUNG,

NASREDDIN GROUP INTERNATIONAL HOLDING LIMITED, NASREDDIN INTERNATIONAL GROUP, LIMITED HOLDING a/k/a MIDDLE EAST AND TURKEY INVESTMENT HOLDING LIMITED, RAW MAT SERVICE AND MANAGEMENT SA, YOUSSEF MUSTAFA NADA, YOUSSEF M. NADA ESTABLISHMENT, a/k/a YOUSSEF M. NADA ANSTALT, YOUSSEF M. NADA & CO. GESELLSCHAFT MBH, ZEINAB MANSOUR a/k/a ZEINAB MANSOUR FATTOUH

542. Upon information and belief, the AL TAQWA GROUP has financed and laundered money for Arab and Islamic political and militant groups including, Algerian Armed Islamic Group (GIA) and the Egyptian Gama'a al-Islamiya, Islamist terrorist groups with links to BIN LADEN and his AL QAEDA organization. Additionally, international investigations indicate that AL-TAQWA was facilitating the movement of BIN LADEN's money around the world in the late 1990s, a task made easier because its complex structure is designed to prevent scrutiny of its operations.

543. AL-TAQWA was founded by YOUSEF M. NADA and AHMAD I. NASREDDIN, a/k/a Hadj Ahmed Nasreddin, AHMED IDRISS NASRESDDIN, and its other principals are: ALI G. HIMMAT, AHMED HUBER and MOHAMED MANSOUR. HUBER and MANSOUR are senior members of the Muslim Brotherhood. Shortly after the 1998 AL QAEDA embassy bombings, U.S. intelligence agencies tracked telephone contact between AL-TAQWA and members of BIN LADEN's inner circle along with ALBERT "AHMED" HUBER, a convert to Islam in the 1960s who has publically expressed support forAL QAEDA. HUBER has acknowledged the very active funneling

of money from oil wealthy Saudi families to the AL TAQWA BANKS. NASREDDIN is also a AL-TAQWA founding member and bank shareholder who helped finance the creation of the ISLAMIC CULTURAL INSTITUTE OF MILAN, which follows the violent teachings of convicted terrorist OMAR ABDEL RAHMAN. The Institute was frequently visited by known AL QAEDA terrorists. Upon information and belief, the Institute is known in Western intelligence communities as one of the main AL QAEDA stations in Europe and was used to move weapons, men and money around the world.

544. ALI GHALEB HIMMAT, AHMED HUBER, MOHAMED MANSOUR, ZEINAB MANSOUR-FATTOUH, AHMED ALI JUMALE, AHMAD I. NASREDDIN AND YOUSSEF M. NADA (a/k/a Youssef Mustafa Nada) are aiders, abettors, material sponsors and/or co-conspirators of international terrorism.

545. After September 11, 2001 AL TAQWA changed is name to the NADA MANAGEMENT ORGANIZATION, SA in an attempt to avoid scrutiny. AL TAQWA and the NADA group, as well as their four principles - NADA, HIMMAT, HUBER and MANSOUR, have had their assets frozen and are believed by the U.S. Department of Justice to be co-conspirators of AL QAEDA.

**RABITA TRUST**

546. RABITA TRUST is a charitable organization which was created to organize the repatriation and rehabilitation of stranded Pakistanis (Biharis) from Bangladesh. Founded in 1988, the trust fund was started jointly by the government of Pakistan and the Saudi-based charity, the MUSLIM WORLD LEAGUE. RABITA

TRUST received the majority of its funding from the MWL and the Saudis, and been involved with terrorism.

547. RABITA TRUST was initially granted 250 million Royals from the Pakistani government as well as 50 million Royals from the MWL to help relocate some 250,000 displaced Pakistani refugees in Bangladesh. In its 15 years of existence, the Rabita Trust has only managed to relocate a few hundred Biharis.

548. RABITA TRUST is an AL QAEDA front, and the Head of RABITA TRUST is a known AL QAEDA member. A Treasury Department press release issued when RABITA TRUST 's assets were frozen indicated that:

> Rabita Trust is headed by Wa'el Hamza Julaidan, one of the founders of al-Qaida with bin Laden. He is the logistics chief of bin Laden's organization and fought on bin Laden's side in Afghanistan.

549. According to a biography of Bin Laden and the original members of AL QAEDA noted for its accuracy and clarity, the head of RABITA TRUST, WA'EL JULAIDAN, fought alongside OSAMA BIN LADEN and championed his cause. The biography, written by a fellow compatriot of bin Laden, noted how AL QAEDA's key founders fought against the Soviets in Afghanistan during the Soviet-Afghan war of the 1980s.

> One of the men who led the Arab Afghan Jihad forces came from one of the wealthiest Saudi families; he was influenced by the Afghan struggle, who would live together with them and sacrifice everything for the Afghani jihad. This man was Osama Bin Laden, a young, tall man who followed Dr. Abdullah Azzam to fight in Afghanistan. Another Saudi joined together with them; his name was Wa'el Julaidan, a US student who was studying agriculture

> and left to fight jihad in Afghanistan. These three: Osama Bin Laden (a.k.a. 'Abu Abdallah'), Dr. Abdullah Azzam (a.k.a. Abu Muhammed), and Wa'el Julaidan (a.k.a. Abu Al-Hassen al-Madani), gathered together in December 1979 to create the new Islamic revolution in Afghanistan. Accordingly, Julaidan was branded a Specially Designated Global Terrorist Entity by the United States Treasury Department and his assets have been frozen.

550. RABITA TRUST is the sibling organization of the IIRO as they are both subsidiaries of the MWL.

551. RABITA TRUST is connected to the SAAR network(see above), through two officers, Dr. Abdullah Omar Naseef and Abdullah al-Obaid.

552. On October 12, 2001, President George W. Bush's Executive Order designated Defendant RABITA TRUST as a Specially Designated Global Terrorist Entity and the Treasury Department froze its assets. Its chairman is Defendant ABDULLAH OMAR NASEEF who founded the Defendant RABITA TRUST in July 1988 and is currently its chairman.

553. Abdullah Omar Naseef ( or "Naseef") also served as Secretary-General of the MWL during the time he created RABITA TRUST and has attempted to spread MWL offices around the world. Part of his global efforts are found in his involvement in a SAAR network charity. Naseef is an officer of Makkah al-Mukarramah, Inc., registered in Virginia as a non-profit organization. A second shared executive is the Vice-Chairman of the Board of Trustees of RABITA TRUST, ABDULLAH AL-OBAID, who is also an officer at two of the SAAR network businesses that were raided, the MWL and Sanabel al-Kheer. Defendant ABDULLAH OMAR AL-OBAID is unique in that, not only is he an

officer at the MWL and the SAAR Network, but he is also the Deputy General Manager at one of the al-Rajhi's largest businesses, AL-WATANIA POULTRY in Saudi Arabia. AL-WATANIA POULTRY has branches worldwide and in the United States.

## THE GLOBAL RELIEF FOUNDATION

554. The GLOBAL RELIEF FOUNDATION (or "GRF") was incorporated in January 1992 in Illinois. According to its website, GRF "is a non-profit humanitarian organization working to provide care, support and relief to people in need throughout the world."

555. GRF is active all over the world, providing relief for several countries, including the United States, Afghanistan, Kosova, Lebanon, Bosnia, Kashmir, Turkey, and Chechnya, among others. GRF has branches of its organization, aside from Bridgeview, Illinois, located in Belgium, Yugoslavia, and Serbia.

556. In 2000, GRF's name appeared on a list being circulated by the government of charities allegedly funding terrorism. On December 14, 2001, federal authorities raided the offices of the Global Relief Foundation as well as the residences of several of its directors. Simultaneously, the United States Treasury froze GRF's assets. A spokesman for the Treasury Department noted that GRF is aiding terrorism:

> There was coordinated action to block the assets, because this group is suspected of funding terrorist activities.

557. The Treasury spokesman added that the public's safety was at risk if GRF were allowed to continue to operate:

> This extraordinary action was taken because it's relevant to the health and safety of the American public.

558. On the same day as the raids in the United States, the NATO-led task force named the Kosova Force (KFOR) stormed two GRF offices in Yugoslavia and Serbia. A statement from KFOR explaining the raids detailed why:

> This afternoon KFOR soldiers, working in close cooperation with UNMIK-Police, carried out a coordinated search operation on the offices of the Global Relief Foundation in Pristine / Pristina and Dakovice. Dakovica, after receiving credible intelligence information that individuals working for this organization may have been directly involved in supporting worldwide international terrorist activities.

559. This action was an orchestrated element of a worldwide operation coordinated with governments and law enforcement agencies against the offices of the Global Relief Foundation and other organizations suspected of supporting international terrorists.

560. GRF by and through its agents has engaged in the planning of attacks against the United States:

> The Global Relief Foundation is a worldwide, US based Non-Governmental Organization (NGO), which has headquarters in Chicago, Illinois, USA and a European Headquarters in Brussels, Belgium. It is suspected of supporting worldwide terrorist activities and is allegedly involved in planning attacks against targets in the USA and Europe.

561. The head of the GLOBAL RELIEF FOUNDATION branch in Belgium received over $200,000 from MUHAMMED GALEB KALAJE ZOUAYDI (a/k/a Abu Talha) (or "ZOUAYDI"), a high level AL QAEDA financier. ZOUAYDI, who was

arrested by Spanish authorities on April 23, 2002, is a brother-in-law of OSAMA BIN LADEN. A top financier for AL QAEDA, he also served as one of the original terrorists who fought with OSAMA BIN LADEN and the other original founders of AL QAEDA.

562. On October 12, 2001, the United States Treasury froze the assets of Jam'yah Ta'awun Al-Islamia (Society of Islamic Cooperation) and branded it a Specially Designated Terrorist Entity. According to the Treasury, the Society of Islamic Cooperation is headed by ZOUYADI, who is also an explosives expert. Based in Kandahar City, United States Treasury department officials allege that the organization was founded by OSAMA BIN LADEN in early 2001.

563. ZOUYADI was closely connected to the AL QAEDA cell in Germany that participated in the September 11, 2001 attacks. ZOUYADI also sent money to MAMOUN DARKAZANLI, who had his assets frozen as well as the assets of a company he controlled MAMOUN DARKAZANLI IMPORT-EXPORT COMPANY and both were designated a terrorist entity by the United States government shortly after September 11, 2001. DARKAZANLI is suspected of being a key AL QAEDA pointman in Europe, as is described in more detail *infra*.

564. GRF's offices have also been raided in Yugoslavia and Serbia as part of international investigations into GRF's support of terrorism. On at least one occasion, ZOUAYDI transferred 231,664 euros to the head of GRF's Belgium arm, Nabil Sayadi, who is also linked to OSAMA BIN LADEN.

565. Documents provided by the United States government in defense of its freezing of GRF's assets indicate that known AL QAEDA terrorist WADIH EL-HAGE

was in direct contact with GRF officials while he was planning international terrorism attacks. Specifically, the government noted in its supporting documents that the FBI reported that evidence introduced at EL-HAGE's trial demonstrated that, in the late 1990s, GRF maintained communications with WADIH EL-HAGE.

566. Furthermore, the government indicated:

> At the time, el Hage was in contact with GRF, he resided in Kenya, and played an "active role" in an AL QAEDA terrorist cell operating there. . . .

567. During this same period, 1996 and 1997, EL-HAGE was also in contact with GRF offices in Belgium and Bridgeview, Illinois. In particular, documents recovered in a search in Kenya showed that EL-HAGE was in contact with GRF in Bridgeview, Illinois after returning from a visit with AL QAEDA leadership in Afghanistan in February 1997.

568. Evidence provided by the government in freezing GRF's assets corroborates GRF's promotion of martyrdom to kill the "enemies of Islam." The government assessed:

> Newsletters distributed by GRF and published in 1995 by the Central Information News Agency Network (CINAN), which, like GRF, is operated via a Bridgeview post office box, encourage "martyrdom through JIHAD." The newsletters, written in Arabic and translated by the FBI, include an article soliciting funds for the Bosnian relief effort to assist those suffering from the prolonged agony due to atrocities imposed by the "enemies of Islam." The article refers to the Jihad (struggle) that should be carried out by Muslims and states: "It seems that the Prophet (Mohammad) had linked religion with JIHAD. So when do we awake? When can we take revenge for God and his religion? When can we rise to defend our rights and self respect?" The article continued, "God had equated martyrdom through JIHAD with supplying funds for the

> JIHAD effort," and concluded, "All contributions should be mailed to: GRF."

569. GRF newsletters implored individuals to donate money to their organization for the purposes of buying weapons. The government explained:

> Other GRF newsletters and publications encourage readers to give their Zakat, or charitable tithe, to GRF to assist in the purchase of, *inter alia*, weaponry. "[F]or God's cause (the Jihad, they [the Zakat Funds] are disbursed for equipping the readers for the purchase of ammunition and food, and for their [the Mujahideen's] transportation so that they can raise God the Almighty's word and protect the gaps...." The article concluded by exhorting Muslims "to make the Global Relief Foundation your messenger of goodness, and we will, God willing, disburse it as specified in Bosnia, Kashmir, Afghanistan, Tajikistan, and Lebanon."

570. Since GRF's assets were blocked, information gathered about GRF, according to the government, has only reaffirmed that GRF works closely with and in support of terrorist organizations:

> In addition to this unclassified evidence, the classified material gathered since the date of the blocking has greatly amplified OFAC's [Office of Foreign Asset Control] belief that GRF may have acted in concert with, and in support of, terrorists and terrorist entities.

571. Several photographs obtained at GRF's offices in Chicago indicate that GRF used its humanitarian cover as means to send expensive communications equipment abroad. The government described what exactly was found during the raids on GRF's offices:

> A set of photographs and negatives discovered at GRF's Chicago offices indicate types of "humanitarian" supplies that GRF has sent abroad. The photographs display large shipping boxes arrayed under a GRF banner. Other

> photographs reveal that the boxes contain sophisticated communications equipment: approximately 200 handheld radio transceivers, long range radio antennas, and portable power packs, with an estimated total value of $120,000. Arrayed near the communications equipment are a tool kit, a box of Bushnell binoculars, saddles, and ropes.

572. Other photographs found in the raids indicate that GRF had an specific interest in munitions:

> Other photographs in this same set depict fighters armed with automatic rifles, a sand-bagged bunker with a radio mounted outside, and mutilated corpses with the name "KPI" (Kashmiri Press International) printed alongside. Finally, one photograph displays two dead men with the caption "HIZBUL MUJAHIDEEN," a known terrorist organization operating in the Kashmir region between India and Pakistan. On the reverse side of the photograph was handwritten in Arabic, "two martyrs killed by the Indian government."

573. Mohammed Chehade, Rabih Haddad, Hazem Ragab, and Mohammed Alchurbaji are aiders, abettors, agents, sponsors and/or co-conspirators of the GLOBAL RELIEF FOUNDATION.

## TAIBAH INTERNATIONAL AID ASSOCIATION

574. TAIBAH INTERNATIONAL AID ASSOCIATION (or "Taibah") is a charitable organization headquartered in Falls Church, Virginia. Established in 1991, Taibah's IRS Form 1023, which serves as an application to the United States Government for tax exempt status, lists ABDULLAH A. BIN LADEN, OSAMA BIN LADEN's half-brother, as a founding officer. The same form also lists TAIBAH's stated goals as a humanitarian organization.

575. From its headquarters in the United States, TAIBAH has a presence around the world through offices, mosques, and educational centers in the following countries: Albania, Bosnia-Herzegovina (BiH), Bulgaria, Gargizia, Kazakhistan, Kosova, Ozpakistan, Russia, Shofishia, Tajikistan and Tataristan, among others.

576. Despite a well developed website, TAIBAH does not solicit funding through this channel. According to its IRS Form 1023, TAIBAH relies on fundraising trips to the Middle East and mailings sent to Muslims in the United States for its revenue. As a result, roughly half of the United States arm of TAIBAH INTERNATIONAL's revenue comes from Saudi Arabia. On its year 2000 IRS Form 990, TAIBAH lists a four year aggregate contribution of nearly $150,000 dollars in fund raising from Saudi Arabia. Also, TAIBAH's Bosnian branch relies on Saudi Arabia for funding. The Saudi Arabian SAUDI HIGH COMMISSION has been identified by Bosnian intelligence as a source of TAIBAH's funds.

577. Although it purports to be a humanitarian organization, the TAIBAH INTERNATIONAL AID ASSOCIATION furthers the aims and materially supports OSAMA BIN LADEN and AL QAEDA. Through the actions of its agents, officers and employees, TAIBAH has provided financial and material support to AL QAEDA. The strong affiliation that TAIBAH maintains with many other AL QAEDA front-groups demonstrates its place as a highly connected component of OSAMA BIN LADEN's financial and logistical support network.

578. TIABAH's support of international terrorism and AL QAEDA is ongoing. One of the individuals involved in the October 2001 threat to the American and British

Embassies in Bosnia was Mustafa al-Kadir, who was granted Bosnian citizenship based on his employment with Taibah INTERNATIONAL. Al-Kadir was still working with Taibah at the time of this foiled terrorist attack and ensuing arrests.

579. The NATO Secretary-General, George Robertson, stated that at least one of the five arrested Algerians (in Bosnia in October 2001) had direct links with AL QAEDA and OSAMA BIN LADEN. The leader of the group, BENSAYAH BELKACEM, has been identified as a top AL QAEDA lieutenant. In October 2001, BELKACEM was arrested at his apartment in Zenica, Bosnia where authorities found phony passports and a mobile telephone listing for ABU ZUBAYDAH, AL QAEDA's third-in-command. According to phone transcripts, BELKACEM was also in phone contact with AL QAEDA military commander Abu al-Maid.

580. On December 13, 2001, Bosnian police searched the offices of TAIBAH INTERNATIONAL. Following the raid, an audit and investigation of TAIBAH's financial records was conducted on January 25, 2002. This audit reveals that TAIBAH's financial records were managed in a way that obscured its true financial status. The financial records contained flagrant abuses in TAIBAH's allocation of donations and in the manner its expense accounts were maintained. A March, 2002, Bosnian Intelligence Memo from the Agency for Investigation & Documentation (AID) that summarizes the audit described the illegal management of TAIBAH's funds by its executives:

> It is also noteworthy that large cash sums were withdrawn by management individuals at the organization which were never accounted for by any record of expenditure, and which indicates a wide scope for possible illegal spending

of money. It is clear that each of these items is for more than 10 thousand marks.

581. Other discrepancies noted in the audit were the misuse of automobiles, supplying of fictitious declarations of affiliation and employment, as well as suspicious requests for visas.

582. Funding for the Bosnian office of TAIBAH originates from bank accounts at the AL-RAJHI ISLAMIC BANK. The flow of money begins with the AL-RAJHI ISLAMIC BANK in Saudi Arabia, then to TAIBAH via wire transfers through Hypobank in Germany and Commerce Bank in Bosnia. The AL-RAJHI ISLAMIC BANK, its agents, officers, directors, and so-called charities, members of the AL-RAJHI family are significant financial supporters of terrorism as is discussed *supra*.

583. In Bosnia, TAIBAH INTERNATIONAL works closely with another AL QAEDA front-group, the charitable organization and Defendant GLOBAL RELIEF FOUNDATION (or "GRF"). According to the 2002 Bosnian Intelligence Memo, when GRF was initially registered, it operated in Bosnia under the auspices of TAIBAH INTERNATIONAL. TAIBAH's close working relationship with GRF is in accord with both charities' role as AL QAEDA sponsors and front groups.

584. The 2002 Bosnian Intelligence Report on non-profit organizations affirms that TAIBAH's Bosnian office received its revenues from another Saudi Arabian charity, the SAUDI RELIEF COMMISSION (a/k/a Saudi High Relief Commission) (or "SRC"). TAIBAH has been implicated in the 1998 United States embassy bombings along with the SRC.

585. Two officers from TAIBAH INTERNATIONAL's United States branch, SAMIR SALAH and ABDULRAHMAN AL-AMOUDI (or "al-Amoudi"), play a large role with United States organizations that have come under scrutiny for their ties to AL QAEDA. Both of them are officers of a number of organizations in the SAAR network. ABDULRAHMAN AL-AMOUDI, TAIBAH's Vice-President, is a past employee of the SAAR Foundation, the hub of the SAAR Network, and currently heads a few SAAR Network charities. AL-AMOUDI also runs the United States operations of the Saudi based INTERNATIONAL ISLAMIC RELIEF ORGANIZATION. SAMIR SALAH, TAIBAH's Secretary, serves as a director at many SAAR Network organizations, including CFO at PIEDMONT POULTRY. SAMIR SALAH also managed the Caribbean branch of the BANK AL-TAQWA.

**AL RASHID TRUST**

586. The AL RASHID TRUST was established in Pakistan in 1996 at the time the TALIBAN took control in Afghanistan. The trust was established by MUFTI MOHAMMED RASHID (a/k/a Rashid) to carry out welfare projects from fundraising in the Pakistani Muslim Community. The AL RASHID TRUST changed its name to THE AID ORGANIZATION OF THE ULEMA (AOU) following September 11, 2001. This organization remains active and headquartered in Pakistan where it operates offices. Upon information and belief, the Trust provides financial aid to jailed Muslim terrorists around the world and is closely aligned to the TALIBAN and BIN LADEN. The AL RASHID TRUST has been raising funds for the TALIBAN since 1999. The Trust helped fund radio, newsprint and madrassas (schools) that teach a view of Islam that is anti-western and

endorses violence and martyrdom in the name of Allah. The Trust provided money and logistical support to the TALIBAN and AL QAEDA and has had its assets frozen. Upon information and belief, the group conspired with AL QAEDA and Pakistani terrorists to kidnap, torture and murder Wall Street Journal reporter Daniel Pearl, holding him hostage in a two room hut in the AL RASHID compound.

**LAUNDERING OF AL QAEDA FUNDS**
**THROUGH DIAMOND BUSINESSES**

587. Three of the AL QAEDA members on the FBI's most wanted terrorist list have been discovered to have dealings in the diamond filed. Following September 11, 2001, an the increased difficulty AL QAEDA is facing moving its money thorugh its traditional financial channels, AL QAEDA has been converting more of its assets into diamonds. As one Europena investigator put it:

> I now believe that to cut off AL QAEDA funds and laundering activities you have to cut off the diamond pipeline. We are talking about millions and maybe tens of millions of dollars in profits and laundering.

588. Yassmine Diamonds in Vereffening BVBA is a diamond company registered in Antwerp, Belgium. Ossailly's relatives are members of the board: Mike Ossailly, or Najla Ossailly, but the company is managed by Samih Ossailly.

589. Aziz Nassour and Samih Ossailly are both involved in diamonds business in Sierra Leone and Congo on behalf of AL QAEDA leaders in order to continue its terrorists operations despite the international agreements to freeze bank accounts linked to AL QAEDA. According to various investigations conducted on this issue, Samih

Ossailly set up a safe house in Monrovia to funnel money from the diamonds fields to international terrorists throughout the world, including AL QAEDA.

590. Echogem NV, was used as a courier to exchange $300,000 for diamonds every week between December 2000 and September 2001.

591. Since 1998, Ibrahim Bah, through several Lebanese businessmen based in Belgium, has expanded his operations. Official sources identified the key brokers working with Bah as Aziz Nassour and Samih Ossailly.

592. A large part of these financial operations on behalf of AL QAEDA were operated by Aziz Nassour through two companies in Belgium: African International Contact Office BVBA based in Brussels, and Echogem NV based in Antwerp.

593. Echogem, is based in Antwerp, Belgium. Until recently, the company was headed by Aziz Nassour as Managing director and Francis Gerres as CEO.

594. African International Contact Office BVBA is based in Brussels, Belgium. The company is chaired by Aziz Nassour as CEO and Ngalula Tseuhi is Managing Director of the company. Aziz Nassour ran his diamond trading activities with his cousin, Samih Ossailly, CEO of a company based in Brussels called Yassmine Diamonds in Vereffening BVBA. Ossailly is currently detained in Belgium, pending trial.

**AFGHAN SUPPORT COMMITTEE (ASC)**

595. The AFGHAN SUPPORT COMMITTEE ("ASC") a/k/a Ahya Ul Turas; Janiat Ayat-Ur-Rhas Al Islamia; Janiat Ihga Ul Torath Al Islamia; Lajnat Ul Masa Eidatul Afghania was established by BIN LADEN in the 1990s in a small town outside Peshawar, Pakistan with offices in Jalalabad, Afghanistan purporting to raise money for charitable

works in Afghanistan and Pakistan. Upon information and belief, ABU BAKR AL-JAZIRI and ABD AL-MUSHIN AL-LIBI are the officers of ASC who raise money and distribute it to AL QAEDA terrorists. ASC provided travel and other logistical support to AL QAEDA . The U.S. Treasury has frozen the assets of ASC, AL-LIBI and AL-JAZIR, as they are believed to be AL QAEDA co-conspirators.

**SHAYKH SAI'ID**

596. SHAYKH SAI'ID a/k/a MUSTAFA MUHAMMED AHMAD a/k/a MUSTAFA AHMED AL-HAWSAWI was one of the paymasters for the September 11th hijackers. Documents show that SAI'ID sent $100,000 from Pakistan to ATTA in the United States. On the morning of September 11, 2001 in United Arab Emirates SAI'ID receives wire transfers of $15,000 from three of the 9-11 hijackers, money that they had not been spent prior to their suicide hijackings. SAI'ID immediately flies from the UAE to Pakistan. SAI'ID's involvement with BIN LADEN dates back to BIN LADEN'S days operating out of Khartoum, SUDAN. SAI'ID, a London educated economist controlled BIN LADEN's many Sudanese businesses, including a financial network called TABA INVESTMENTS that was created with a $50 million dollar contribution from BIN LADEN. SAI'ID was jailed in 1994 for Islamic based terror operations in Kashmir but freed in 1999 in exchange for a release of hostages on an Indian Airlines flight. The aircraft was commandeered in a manner similar to the way the four September 11th aircraft were hijacked in the United States. A passenger was stabbed and hijackers seized control of Flight 814 diverting the aircraft to Kandahar, Afghanistan. Though Afghanistan's TALIBAN government was in control of the area, authorities did not interfere with the

hijackers' actions in Kandahar or make efforts to apprehend them later. The passengers were held captive for eight days while the release from an Indian prison of SAI'ID and two other Islamic militants was arranged. Upon his release, SAI'ID and the others fled to Pakistan. SAI'ID has also been convicted of the kidnapping and murder of Wall Street Journal reporter Daniel Pearl.

597. SAI'ID's involvement with BIN LADEN dates back to BIN LADEN'S days operating out of Khartoum, SUDAN. SAI'ID, a London educated economist controlled BIN LADEN's many Sudanese businesses, including a financial network called TABA INVESTMENTS that was created with a $50 million dollar contribution from BIN LADEN.

598. SAI'ID was jailed in 1994 for Islamic based terror operations in Kashmir but freed in 1999 in exchange for a release of hostages on an Indian Airlines flight. The aircraft was commandeered in a manner similar to the way the four September 11th aircraft were hijacked in the United States. A passenger was stabbed and hijackers seized control of Flight 814 diverting the aircraft to Kandahar, Afghanistan. Though Afghanistan's TALIBAN government was in control of the area, authorities did not interfere with the hijackers' actions in Kandahar or make efforts to apprehend them later. The passengers were held captive for eight days while the release from an Indian prison of SAI'ID and two other Islamic militants was arranged. Upon his release, SAI'ID and the others fled to Pakistan.

599. SAI'ID is also charged with the kidnaping and murder of Wall Street Journal reporter Daniel Pearl.

## COUNT ONE

## WRONGFUL DEATH BASED ON INTENTIONAL MURDER

600. Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

601. As a direct and proximate result of defendants' intentional, willful and malicious acts of terrorism on September 11, 2001, defendants have caused plaintiffs' decedents' family members to suffer severe and permanent injuries, damages and losses, including but not limited to the following:

(a) Economic damages, including but not limited to, the pecuniary losses suffered by plaintiffs and decedents' remaining survivors, as a result of decedents' deaths, including but not limited to, loss of support, loss of services, loss of parental care and guidance, and loss of prospective inheritance; and

(b) Non-economic damages, including but not limited to, the loss of consortium, solarium, society, companionship, care, comfort and love suffered by plaintiffs and decedents' other survivors.

WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each wrongful death plaintiff in the sum of FIFTY MILLION ($50,000,000.00) DOLLARS, exclusive of interests, costs and fees.

## COUNT TWO

## SURVIVAL DAMAGES BASED ON INTENTIONAL MURDER

602. Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

603. As a result of their deaths, decedents lost the enjoyment of life that they would have had if they had not been killed.

604. Before their deaths, decedents suffered conscious pain and suffering and fear of their impending deaths, entitling their estates to compensatory damages under governing law.

WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each of the decedents' estates in the sum of TWENTY FIVE MILLION ($25,000,000.00) DOLLARS.

## COUNT THREE

## ASSAULT AND BATTERY

605. Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

606. As a result of the September 11, 2001 hijackings and attacks, plaintiffs' decedents and/or personal injury plaintiffs were placed in apprehension of harmful and/or offensive bodily contact, and suffered harmful, offensive bodily contact, from which they ultimately died or suffered serious permanent personal injury.

607. By reason of all of the foregoing, the surviving personal injury plaintiffs were seriously and severely injured, shocked, bruised and wounded and suffered great

physical, mental and emotional pain and injury, and they were rendered sick, sore, lame and disabled, and were otherwise injured, and they were confined to a hospital, and/or to bed and home for a period of time by reason thereof, and required and received medical care and treatment, and incurred medical expenses and will continue to incur future expenses therefor, and the surviving personal injury plaintiffs were prevented from attending to the duties of their employment and prevented from pursuing the furthering their careers and lost salary and earnings and will lose future salary and earnings thereby.

WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each of the personal injury plaintiffs in an amount in excess of FIFTEEN MILLION ($15,000,000.00) DOLLARS.

**COUNT FOUR**

**VIOLATION OF ANTI-TERRORISM ACT, 18 U.S.C. § 2333**

608. Plaintiffs reallege above paragraphs as if fully set forth herein.

609. Personal injury plaintiffs and plaintiffs' decedents, who are and were at all relevant times citizens of the United States, suffered substantial injuries to their persons, property, and business by reason of the acts of international terrorism perpetrated by defendants on September 11, 2001 that resulted in the death of plaintiffs' decedents and serious permanent injury to personal injury plaintiffs, a substantial portion of the planning, training and preparation for which occurred primarily outside the territorial jurisdiction of the United States.

610. Defendants provision of material support and assistance to BIN LADEN and AL QAEDA in Afghanistan, IRAQ and other places as well as their provision of a

safe haven and base of operations to BIN LADEN and AL QAEDA in Afghanistan and other countries from which they carried out terrorist attacks on the United States, including the September 11, 2001 terrorist attacks that resulted in the death of plaintiffs' decedents, also constitutes acts of international terrorism that caused substantial injuries to the persons, property, and business of plaintiffs and plaintiffs' decedents.

WHEREFORE, plaintiffs each demand judgment be entered in favor of plaintiffs acting individually and as the personal representatives of decedents' estates and in favor of the personal injury plaintiffs personally and against defendants, jointly and severally, for an amount THREE TIMES each plaintiff's compensatory damages, plus interests, costs, attorneys fees, and such other relief as the Court deems just and proper.

## COUNT FIVE

## TORTURE VICTIM PROTECTION ACT

611. The Alien Tort Act, 28 U.S.C. § 1350, also known as the Torture Victim Protection Act, creates a cause of action in favor of plaintiffs in this action who are not nationals of the United States, and against the defendants for their violation of international law in torturing and killing the passengers and crew of the aforesaid Flights and victims on the ground.

612. The Torture Victim Protection Act, 28 U.S.C. § 1350, creates a cause of action for all plaintiffs in this action against the defendants, for the torture and extrajudicial killing of the decedents and injury to plaintiffs.

613. The plaintiffs and the estates of each decedent are entitled to recover wrongful death damages, including pecuniary losses, and damages for loss of support,

consortium, society, companionship, prospective inheritance, care, love, guidance, training, education, solatium and services, and damages for grief and mental anguish, moral damages, burial expenses and other damages.

614. By reason of the foregoing, defendants are jointly and severally liable to each plaintiff and each decedent's estate in the sum of FIFTY MILLION ($50,000,000) DOLLARS.

## COUNT SIX

## ANTI TERRORISM AND EFFECTIVE DEATH PENALTY ACT CLAIM, 28 U.S.C. § 1605(A)(7) -- IRAQ, IRAN AND THE SUDAN

615. Plaintiffs reallege the paragraphs above as if fully set forth herein.

616. The death of plaintiffs' decedents and injury to personal injury plaintiffs, who were citizens of the United States at the time, resulted from acts of extrajudicial killing, torture and aircraft sabotage.

617. These acts of extra judicial killing, torture and aircraft sabotage were perpetrated by agents of BIN LADEN and AL QAEDA, who received material support and resources from defendants, TALIBAN, IRAQ, IRAQI INTELLIGENCE, SUDAN, SUDANESE INTELLIGENCE, IRAN, IRANIAN INTELLIGENCE, SUDAN and IRAN.

618. Agents, officials or employees of defendants, TALIBAN, IRAQ, IRAN and the SUDAN provided material support and resources to BIN LADEN and AL QAEDA while acting in the scope of their offices, agencies, or employment. Similar conduct, if committed by agents, officials or employees of the United States, would be actionable.

619. At all relevant times, defendants IRAQ, SUDAN and IRAN were and are designated by the U.S. Government as a state sponsor of terrorism.

620. The activities of Islamic Emirate of Afghanistan under the TALIBAN regime, as described in this Complaint, were effectively deemed terrorist activities pursuant to former President Clinton's July 4, 1999, Executive Order No. 13129 and the continuation Order of June 30, 2001, issued by President George W. Bush. In addition, after the terrorist acts on September 11, 2001, President George W. Bush and other senior U.S., officials clearly designated the Islamic Emirate of Afghanistan as having sponsored and supported the terrorists. For example, see President George W. Bush's September 24, 2001, Executive Order on Terrorist Financing (Executive Order No. 13224).

WHEREFORE, plaintiffs demand judgment be entered in favor of plaintiffs individually and as personal representatives of their decedents' estates and in favor of the personal injury plaintiffs personally and against defendants IRAQ and IRAQI INTELLIGENCE, IRAN and SUDAN and their instrumentalities and agents for an amount in excess of FIFTY MILLION ($50,000,000.00) DOLLARS for each plaintiff, plus interest, costs, punitive damages, attorneys fees, and such other relief as the Court deems just and proper.

## COUNT SEVEN

## PUNITIVE DAMAGES

621. Plaintiffs reallege the above paragraphs as if fully set forth herein.

622. For the reasons stated above, and pursuant to § 28 U.S.C. § 1606, defendants each are liable jointly and severally, to each plaintiff for punitive damages in the amount in excess of THREE HUNDRED MILLION ($300,000,000.00) DOLLARS.

**COUNT EIGHT**

**PROPERTY DAMAGE**

623. Plaintiffs reallege the above paragraphs as if fully set forth herein.

624. As a direct and proximate result of defendants' intentional, willful and malicious acts of terrorism on September 11, 2001, defendants have caused property damage plaintiffs severe and extensive damage in that their building became blighted; physical damage was caused to the building by parts of the World Trade Center which struck the building; asbestos and other materials from the World Trade Center struck plaintiffs' building; the building has become unsafe until the asbestos has been cleaned up; plaintiffs were required to perform extensive asbestos clean-up and clean-up for other toxic materials from the World Trade Center; the plaintiff's building has been closed for a substantial period since September 11, 2001; tenants have not paid rent; many tenants have abandoned and will abandon the building since they claim the building cannot currently safely be occupied as required by the tenants' leases; the exterior and interior of the building will have to be replaced; carpeting in the building has to be torn up and replaced; the value of the building has been blighted and diminished; and plaintiffs have been otherwise damaged, all of which damages are continuing into the future.

625. By reason of the foregoing, property damage plaintiffs are entitled to recover all of their damages from the defendant in an amount not to exceed the sum of ONE HUNDRED MILLION ($100,000,000.00) DOLLARS.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

WHEREFORE, plaintiffs and each decedents' estate demand

(a) Count One - Wrongful Death Based on Intentional Murder the total sum of FIFTY MILLION ($50,000,000) DOLLARS for each wrongful death plaintiff;

(b) Count Two - Survival Damages Based on Intentional Murder the total sum of TWENTY FIVE MILLION ($25,000,000) DOLLARS for each wrongful death plaintiff;

(c) Count Three - Assault and Battery the total sum of FIFTEEN MILLION ($15,000,000) DOLLARS for each plaintiff;

(d) Count Four - Violation of Anti-terrorism Act, 18 U.S.C. § 2333 for treble damages;

(e) Count Five - Torture Victim Protection Act the total sum of FIFTY MILLION ($50,000,000) DOLLARS for each plaintiff;

(f) Count Six - Anti Terrorism and Effective Death Penalty Act Claim, 28 U.S.C. § 1605(a)(7) – Defendants IRAQ, IRAQI INTELLIGENCE and the TALIBAN the total sum of FIFTY MILLION ($50,000,000) DOLLARS for each plaintiff;

(g) Count Seven - Punitive Damages the total sum of THREE HUNDRED MILLION ($300,000,000) DOLLARS for each plaintiff; and

(h) Count Eight - Property damage the total sum of ONE HUNDRED MILLION ($100,000,000.00) DOLLARS for each plaintiff.

plus interests, costs and attorneys fees.

Dated: New York, New York
August 1, 2003

KREINDLER & KREINDLER
Plaintiffs Liaison Counsel

By: ______________________
James P. Kreindler (JK7084)
Marc S. Moller (MM0143)
Justin T. Green (JG0318)
Andrew J. Maloney, III (AM8684)
100 Park Avenue
New York, NY 10017-5590
(212) 687-8181
(212) 972-9432 (Fax)

Barasch McGarry Salzman Penson & Lim
11 Park Place
New York, NY 10007
(212) 385-8000
(212) 385-7845 (fax)

Baumeister & Samuels, P.C.
One Exchange Plaza
New York, NY 10006
(212) 363-1200
(212) 363-1346 (fax)

Speiser, Krause, Nolan & Granito
Two Grand Central Tower
140 East 45th Street (34th Floor)
New York, NY 10017
(212) 661-0011
(212) 953-6483 (fax)

Law Firm of Aaron J. Broder & Jonathan C. Reiter
350 Fifth Avenue, Suite 2811
New York, NY 10118
(212) 244-2000

Jaroslawicz & Jaros, Esqs.
150 William Street
New York, NY 10038
(212) 227-2780

**United States District Court**
Southern District of New York
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, NY 10007-1213

RECEIVED
AUG 05 2003
CHAMBERS OF
RICHARD CONWAY CASEY
U.S.D.J.

**To:** Chambers

02 CV 6977 ( RCC )

**From:** Clerk's Office

The attached document has been accepted for filing under **Rule 5(e) effective December 1, 1991.** Regrettably, as you know, the clerk is no longer authorized to reject papers based on form only. In order for the papers to be rejected, action must be taken by the judge. This document is deficient as to form for the following reason(s):

- ☐ For an original signature of the attorney of record in his/her own name, followed by his/her address and telephone number, at the end of each document. [Local Civil Rule 11.1(b)].
- ☐ All papers must bear the docket number and the initials of the judge and any magistrate judge before whom the action or proceeding is pending and have the name of each person signing it clearly printed or typed directly below the signature [Local Civil Rule 11.1(a)].
- ☐ All original paper must contain the initials of the attorney's first and last name, and the last four digits of the attorney's social security number, or any other four digit number registered by the attorney with the clerk of the court [Local Civil Rule 11.1(b)(1)&(2)].
- ☐ All pleadings, written motions, and other papers must be plainly written, typed, printed or copied without erasures or inter-lineation which may materially deface it [Local Civil Rule 11.1(a)(1)].
- ☐ For an attorney's affirmation or affidavit, as required [Local Civil Rule 6.1(a)(1)].
- ☐ Expired Certificate of Good Standings (30 days) [Local Civil Rule 1.3(7)].
- ☐ Federal Civil Rule 7.1 disclosure statement needed.
- ☒ Proof of service required [Federal Civil Rule 5(a)].
- ☐ **Other**____________________________

**Accept for filing:**

J. Michael McMahon, Clerk

Richard Conway Casey 8/5/03

U.S.D.J. DATE By: [signature] Deputy Clerk 8-1-03

**Return for compliance of local rule:**

____________________ __________

**U.S.D.J.** DATE