# **<u>EXHIBIT 2</u>**

# CIVIL COVER SHEET

JS 44C/SDNY
REV. 1/97
WEB 4/99

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**02 CV 7236**

| PLAINTIFFS | DEFENDANTS |
|---|---|
| VIRGINIA BAUER, Ind. and as Executrix of the Estate of W. DAVID BAUER, dec., et al. (See Rider "A") | AL QAEDA ISLAMIC ARMY; EGYPTIAN ISLAMIC JIHAD; OSAMA BIN LADEN, et al. (See Rider "B") |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Baumeister & Samuels, P.C., One Exchange Plaza, Fl. 15 New York, NY 10006; (212) 363-1200 | Unknown     SEP 1 0 2002 |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

Plaintiffs bring this action for wrongful death and survival damages. This action is brought under 28 U.S.C. §1330(a), 1331, 1332(a)(2), 1605(a)(2), 1605(a)(5) and (a)(7), and the Torture Victim Protection Act, PL 102-256, 106 Stat. 73.

Has this or a similar case been previously filed in SDNY at any time? No? [ ] Yes? [ ]   Judge Previously Assigned

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ]   if yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*                    NATURE OF SUIT

ACTIONS UNDER STATUTES

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY

**TORTS**

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[x] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**

[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**

[ ] 610 AGRICULTURE
[ ] 620 FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**

[ ] 861 MIA (1395FF)
[ ] 862 BLACK LUNG (823)
[ ] 863 DIWC (405(g))
[ ] 863 DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES
[ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**

[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE/ICC RATES/ETC
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 891 AGRICULTURE ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES
[ ] 890 OTHER STATUTORY ACTIONS

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 246 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**

[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**

[ ] 510 MOTIONS TO VACATE SENTENCE 20 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

*Check if demanded in complaint:*

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ $1 Trillion +   OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [ ] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE ~~Unassigned~~ Hellerstein   DOCKET NUMBER 02 CV 6977

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

*(SEE REVERSE)*

| *(PLACE AN x IN ONE BOX ONLY)* | | | | **ORIGIN** | | | | |
|---|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from (Specify District) | ☐ 6 Multidistrict Litigation | | ☐ 7 Appeal to District Judge from Magistrate Judge Judgment | |

| *(PLACE AN x IN ONE BOX ONLY)* | | **BASIS OF JURISDICTION** | | *IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1322, 1441)* |
|---|---|---|---|---|
| ☐ 1 U.S. PLAINTIFF | ☐ 2 U.S. DEFENDANT | ☒ 3 FEDERAL QUESTION (U.S. NOT A PARTY) | ☐ 4 DIVERSITY | |

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF DEF | | PTF DEF | | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1   [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3   [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5   [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2   [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4   [ ] 4 | FOREIGN NATION | [ ] 6   [ ] 6 |

**PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)** (Calendar Rule 4(A))

See Rider "A" for list of all plaintiffs.

**DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)** (Calendar Rule 4(A))

See Rider "B" for list of defendants.

**DEFENDANT(S) ADDRESS UNKNOWN**
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

See Rider "B" for list of defendants.

| Check one: | **THIS ACTION SHOULD BE ASSIGNED TO:** (DO NOT check either box if this a PRISONER PETITION.) | ☐ **WHITE PLAINS** | ☒ **FOLEY SQUARE** |
|---|---|---|---|

| DATE 09/10/02 | SIGNATURE OF ATTORNEY OF RECORD | ADMITTED TO PRACTICE IN THIS DISTRICT |
|---|---|---|
| RECEIPT # | *Michel F. Baumeister* | [ ] NO  [X] YES (DATE ADMITTED Mo. 03  Yr. 72 ) Attorney Bar Code # MB 1896 |

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

James M. Parkison, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

# United States District Court

## SOUTHERN DISTRICT OF NEW YORK

### SUMMONS IN A CIVIL CASE

VIRGINIA BAUER, Individually and as Executrix
of the Estate of W. DAVID BAUER, deceased, et al.
(See Rider "A" for list of all Plaintiffs)

Plaintiffs, 02 CV 7286 Civil Action No.

-against-

AL QAEDA ISLAMIC ARMY; EGYPTIAN ISLAMIC
JIHAD; OSAMA BIN LADEN, a/k/a USAMA BIN
LADEN, a/k/a ABU ABDULLAH, a/k/a MUJAHID
SHAYKH HAIJJS, a/k/a ABDUL HAY; et al.

Defendants.

**TO:**    See Rider "B" for list of all Defendants.

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court
and serve upon:

> Michel F. Baumeister, Esq.
> Baumeister & Samuels, P.C.
> One Exchange Plaza, 15th Floor
> New York, New York 10006

an answer to the complaint which is herewith served upon you, within 20 days after service
of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by
default will be taken against you for the relief demanded in the complaint.

JAMES M. PARKISON                    SEP 1 0 2002

_____            _____
CLERK                                DATE

_____
BY DEPUTY CLERK

# RIDER "A"

## PLAINTIFFS

*Address for Plaintiff:*

VIRGINIA BAUER, Individually and as
Executrix of the Estate of W. DAVID BAUER,
deceased, and on behalf of all survivors of
W. DAVID BAUER,

5 Post Road
Rumson, NJ 07760-1023

CATHY ANN BONNETT, Individually
and as Administratrix of the Estate of
COLIN BONNETT, deceased, and on behalf
of all survivors of COLIN BONNETT,

446 Kingston Avenue, Apt. D34
Brooklyn, New York 11225

DEBORAH BOWDEN, Individually and
as Executrix of the Estate of THOMAS
BOWDEN, deceased, and on behalf of all
survivors of THOMAS BOWDEN,

701 Carriage Lane
Franklin Lakes, NJ 07417

JENNIFER BOWMAN, Individually and as
Administratrix of the Estate of SHAWN E.
BOWMAN, deceased, and on behalf of all
survivors of SHAWN E. BOWMAN,

204 Morrison Street
Staten Island, NY 10310

ELIZABETH CANDELA, Individually and
as Administratrix of the Estate of JOHN
CANDELA, deceased, and on behalf of all
survivors of JOHN CANDELA,

2 Ardsley Road
Glen Ridge, NJ 07028

TOMOKO T. SCHLAG, Individually and
as Executrix of the Estate of STEVEN F.
SCHLAG, deceased, and on behalf of all
survivors of STEVEN F. SCHLAG,

846 Pueblo Drive
Franklin lakes, NJ 07417

BETH MURPHY, Individually and as
Administratrix of the Estate of KEVIN J.
MURPHY, deceased, and on behalf of all
survivors of KEVIN J. MURPHY,

34 Valley Road
Northport, NY 11768

ROSEANN ZISA, Individually and as
Administratrix of the Estate of SALVATORE
ZISA, deceased, and on behalf of all survivors
of SALVATORE ZISA,

57 Old Orchard Rd
Hawthorne, NJ 07506

MICHELE JONES, Individually and as Executrix
of the Estate of DONALD JONES, deceased,
and on behalf of all survivors of DONALD JONES,

18 Billingsley Street
Livingston, NJ 07039

AMY VASEL, Individually and as Administratrix
of the Estate of SCOTT VASEL, deceased, and
on behalf of all survivors of SCOTT VASEL,

4 Pine Drive
Park Ridge, NJ 07656

MARGARET MEYER, Individually and as
Executrix of the Estate of DAVID R. MEYER,
deceased, and on behalf of all survivors of
DAVID R. MEYER,

3 Glendale Road
Glen Rock, New Jersey 07452

BARBARA GALLUCCI, Individually and as
Administratrix of the Estate of VINCENZO
GALLUCCI, deceased, and on behalf of all
survivors of VINCENZO GALLUCCI,

3 Verdi Road
Monroe Township, NJ 08831

ARLENE ORSINI, Individually and as
Administratrix of the Estate of RONALD
ORSINI, deceased, and on behalf of all
survivors of RONALD ORSINI,

6 Schill Place
Hillsdale, NJ

EILEEN HANNAFORD, Individually and as
Administratrix of the Estate of KEVIN
HANNAFORD, deceased, and on behalf of
all survivors of KEVIN HANNAFORD,

27 Juniper Way
Basking Ridge, NJ 07920

JILL GOLDSTEIN, Individually and as
Administratrix of the Estate of STEVEN
GOLDSTEIN, deceased, and on behalf of all
survivors of STEVEN GOLDSTEIN,

16 Burton Circle
Princeton, NJ 08540

AUDREY MAGNUSON, Individually and as
Executrix of the Estate of RONALD E.
MAGNUSON, deceased, and on behalf of all
survivors of RONALD E. MAGNUSON,

123 Royal Drive
Park Ridge, NJ 07656

KAREN D'AMBROSI, Individually and as
Executrix of the Estate of JACK L. D'AMBROSI,           23 James Street
deceased, and on behalf of all survivors of            Woodcliff Lake, NJ 07677
JACK L. D'AMBROSI,

SUSAN MAGAZINE, Individually and as
Administratrix of the Estate of JAY MAGAZINE,          230 Riverside Drive, Apt. 16A
deceased, and on behalf of all survivors of            New York, New York 10025
JAY MAGAZINE,

KATHERINE MAHER, Individually and as
Executrix of the Estate of DANIEL L. MAHER,            6 Wisteria Lane
deceased, and on behalf of all survivors of            Hamilton, NJ 08690
DANIEL L. MAHER,

ELLEN ROBB, Individually and in her capacity
as Proposed Co-Administrator of the                    347 Maryland Avenue
Estate of KRISTEN MONTANARO, deceased,                 Staten Island, NY 10305
and on behalf of all survivors of KRISTEN
MONTANARO,

MICHELLE TANNER, Individually and as
Executrix of the Estate of MICHAEL TANNER,             9 Fairview Avenue
deceased, and on behalf of all survivors of            Secaucus, NJ 07094-3806
MICHAEL TANNER,

MARIE CARLINO, Individually and as Executrix
of the Estate of EDWARD CARLINO, deceased,             1450 30th Avenue
and on behalf of all survivors of EDWARD               Astoria, NY 11102
CARLINO,

PANDORA PO BHARVANEY, Individually and
as Administratrix of the Estate of ANIL T.             5 Adams Court
BHARVANEY, deceased, and on behalf of all              Hightstown, NJ 08520
survivors of ANIL T. BHARVANEY,

DEBRA ZEPLIN, Individually and as Executrix of
the Estate of MARC SCOTT ZEPLIN, deceased,             14 Shelly Lane
and on behalf of all survivors of MARC SCOTT           West Harrison, NY 10604
ZEPLIN,

LAURA BUSTILLO, Individually and as
Administratrix of the Estate of MILTON BUSTILLO,      735 Collfield Avenue
deceased, and on behalf of all survivors of MILTON    Staten Island, NY 10314-4254
BUSTILLO,

CAROLE DiFRANCO, Individually and as                  663 Rensselaer Avenue
Administratrix of the Estate of CARL DiFRANCO,        Staten Island, NY 10312
JR., deceased, and on behalf of all survivors of
CARL DiFRANCO,

CAMERON F. MACRAE, III, Individually and as
Administrator of the Estate of CATHERINE              125 East 72nd Street
FAIRFAX MACRAE, deceased, and on behalf of            New York, NY 10021
all survivors of CATHERINE FAIRFAX MACRAE,

DONALD MAURO, Individually and as Administrator
of the Estate of NANCY T. MAURO, deceased, and        72-61 113th Street, #7V
on behalf of all survivors of NANCY T. MAURO,         Forest Hills, NY 11375

JOHN SANDERS, Individually and as Administrator
of the Estate of STACEY L. SANDERS, deceased,         33 Raymond Street
and on behalf of all survivors of STACEY L.           Darien, CT 06820
SANDERS,

JENNIFER PRICE, Individually and as Executrix
of the Estate of JEAN ELIZABETH                       110 Pond Road, Apt. 5
HOADLEY PETERSON, deceased, and on behalf             Wellesley, MA 02482 -5735
of all survivors of JEAN ELIZABETH HOADLEY
PETERSON,

SANDRA VALDEZ FELT, Individually and as
Executrix of the Estate of EDWARD P. FELT,            31 Crescent Street
deceased, and on behalf of all survivors of           Matawan, NJ 07747
EDWARD P. FELT,

ROSE KELLER, Individually and as Administratrix
Administratrix of the Estate of JOSEPH KELLER,        25 West Park Avenue
deceased, and on behalf of all survivors of           Park Ridge NJ 07656
JOSEPH KELLER,

LYZBETH GLICK, Individually and as Administratrix
of the Estate of JEREMY GLICK, deceased, and on       47 Somerville Road
behalf of all survivors of JEREMY GLICK,              Hewitt, NJ 07421

ELSA STRONG, Individually and as Executrix of the
Estate of LINDA GRONLUND, deceased, and on                17 Brook Road
behalf of all survivors of LINDA GRONLUND,                Amherst, NH 03031

JOHN DiMEGLIO, Individually and as Administrator
of the Estate of DAVID DIMEGLIO, deceased, and            3 June Circle
on behalf of all survivors of DAVID DIMEGLIO,             Wakefield, MA 01880

BARBARA RATCHKO, Individually and as
Administratrix of the Estate of BRYAN JACK,               208 West 29th Street, Studio #605
deceased, and on behalf of all survivors of              New York, NY 10001 -5206
BRYAN JACK,

MICHAEL GIORDANO, Individually and as
Administrator of the Estate of DONNA GIORDANO,            767 Iron Court
deceased, and on behalf of all survivors of              Brick, NJ 08724
DONNA GIORDANO,

ROSA CAICEDO, as Mother and Legal Guardian
of LESLIE VARGAS and KEVIN VARGAS, the                    32-16 Crescent St., Apt. 5A
Natural Children of DAVID VARGAS, deceased, and           Long Island City, New York 11106
as Proposed Administratrix and/or personal
representative of the Estate of DAVID
VARGAS, deceased, and on behalf of all survivors
of DAVID VARGAS,

JILL SWIFT, Individually and as Executrix of the
Estate of THOMAS SWIFT, deceased, and on                  1032 Summit Avenue
behalf of all survivors of THOMAS SWIFT,                  Jersey City, NJ 07307

LISA BEAMER, Individually and as Executrix
of the Estate of TODD BEAMER, deceased, and on            9 Cubberly Court
behalf of all survivors of TODD BEAMER,                   Cranberry, NJ 08512

JENNIFER G. BRENNAN, Individually and
as Administratrix of the Estate of Thomas M.              73 Sargent Road
Brennan, Deceased,                                        Scarsdale, NY 10583

SUSAN BEATINI, Individually and as Administratrix
of the Estate of PAUL F. BEATINI, deceased, and on        240 Vitmar Place
behalf of all survivors of PAUL F. BEATINI,               Park Ridge, NJ 07656

MARY DANAHY, Individually and as Executrix of
the Estate of PATRICK W. DANAHY, deceased, and
on behalf of all survivors of PATRICK W. DANAHY,

2196 Pondfield Court
Yorktown Heights, New York 10598

KATHLEEN M. WISNIEWSKI, Individually and as
Administratrix of the Estate of ALAN L. WISNIEWSKI,
deceased, and on behalf of all survivors of ALAN L.
WISNIEWSKI,

1 Hidden Valley Court
Howell, NJ 07731

TRACI BOSCO, Individually and as Administratrix of
the Estate of RICHARD E. BOSCO, deceased, and on
behalf of all survivors of RICHARD E. BOSCO,

61 Somerset Drive,
Suffern, NY 10901

SUSAN ROSSINOW, Individually and as
Administratrix of the Estate of NORMAN ROSSINOW,
deceased, and on behalf of all survivors of NORMAN
ROSSINOW,

33 Cypress Avenue
North Caldwell, NJ

TERESA CUNNINGHAM, Individually and as
Administratrix of the Estate of MICHAEL J.
CUNNINGHAM, deceased, and on behalf of all
survivors of MICHAEL J. CUNNINGHAM,

1 Becket Court
Princeton Junction, NJ 08550

BEVERLY ECKERT, Individually and as Executrix
of the Estate of SEAN ROONEY, deceased, and on
behalf of all survivors of SEAN ROONEY,

18 Brooklawn Avenue
Stamford, CT 06906

PATRICIA RYAN, Individually and as Executrix
of the Estate of JOHN J. RYAN, deceased, and on
behalf of all survivors of JOHN J. RYAN,

53 Ellsworth Drive
West Windsor, NJ 08550-3517

LORI KANE, Individually and as Administratrix
of the Estate of HOWARD L. KANE, deceased, and
on behalf of all survivors of HOWARD L. KANE,

18 Kildare Road
Hazlet, NJ 07730

SUZANNE SISOLAK, Individually and as
Administratrix of the Estate of JOSEPH M.
SISOLAK, deceased, and on behalf of all
survivors of JOSEPH M. SISOLAK,

62 Verandah Place
Brooklyn, NY 11201

THOMAS S. JOHNSON, Individually and as
Administrator of the Estate of SCOTT M. JOHNSON,
deceased, and on behalf of all survivors of
SCOTT M. JOHNSON,

149 East 73rd Street
New York, NY 10021

# RIDER "B"

## DEFENDANTS

**AL QAEDA ISLAMIC ARMY;**
EGYPTIAN ISLAMIC JIHAD;
OSAMA BIN LADEN, a/k/a USAMA BIN LADEN, a/k/a ABU ABDULLAH,
    a/k/a MUJAHID SHAYKH HAIJJS, a/k/a ABDUL HAY;
ESTATE OF MUHAMMAD ATEF;
AYMAN AL ZAWAHIRI;
ABU ZUBAYDH;
SAIF AL ADEL;
KHALID SHEIKH MOHAMMED;
ABDULLAH AHMED ABDULLAH;
ESTATE OF ABU HAFS, a/k/a KHALED AL SHANGUITI,
    a/k/a MAFUZ OULD AL WALID, a/k/a THE MAURITANIAN;
ESTATE OF ABU SALAH AL-YEMENI;
ESTATE OF ABU JAFFER AL-JAZIRI, a/k/a OMAR CHEBBANI;
MUHSIN MUSA MATWALLI ATWAY;
ANAS AL LIBY;
IBN AL-SHAYKH AL-LIBI;
FAZUL ABDULLAH MOHAMMED;
AHMED MOHAMED HAMED ALI;
MOHAMED SULEIMAN AL NALFI;
MUSTAFA MOHAMED FADHIL;
AHMED KHALFAN GHAILANI;
FAHID MOHAMMED ALLY MSALAM;
SHEIKH AHMED SALIM SWEDAN;
MUHAMMAD ABU-ISLAM;
ABDULLAH QASSIM;
RAMZI BIN AL-SHIBB;
HASHIM ABDULRAHMAN;
MUSTAFA AHMED AL-HAWSAWI, a/k/a SHAYKH SAI'ID;
ABDULLAH AZZAM;
JAMAL AL-BADAWI;
MOHAMMED OMAR AL-HARAZI;
WALID AL-SOUROURI;
FATHA ADBUL RAHMAN;
YASSER AL-AZZANI;
JAMAL BAKHORSH;
AHMAD AL-SHINNI;
RAED HIJAZI;

JAMIL QASIM SAEED;
ABU ABDUL RAHMAN;
MOHAMED BAYAZID;

*(Terrorist Hijackers)*
THE ESTATE OF MARWAN ALSHEHHI;
THE ESTATE OF FAYEZ AHMED;
THE ESTATE OF AHMED AL GHAMDI;
THE ESTATE OF HAMZA AL GHAMDI;
THE ESTATE OF MOHALD AL SHEHRI;
THE ESTATE OF SATAM M. A. AL SUQAMI;
THE ESTATE OF ABDULAZIZ AL OMARI;
THE ESTATE OF WALEED M. AL SHEHRI;
THE ESTATE OF WAIL AL SHEHRI;
THE ESTATE OF MOHAMMED ATTA;
THE ESTATE OF KHALID AL MIDHAR;
THE ESTATE OF HAWAF AL HAZMI;
THE ESTATE OF HANI HANJOUR;
THE ESTATE OF SALEM AL HAZMI;
THE ESTATE OF MAJED MOQED;
THE ESTATE OF ZIAD SAMIR JARRAH;
THE ESTATE OF AHMED IBRAHIM A. AL HAZNAWI;
THE ESTATE OF SAEED AL GHAMDI;
THE ESTATE OF AHMED AL NAMI;
ZACARIAS MOUSSAOUI;

**THE TALIBAN**;
MUHAMMAD OMAR;

**THE REPUBLIC OF IRAQ;**
IRAQI INTELLIGENCE AGENCY, a/k/a THE MUKHABARAT,
    a/k/a THE FEDAYEEN, a/k/a AL QARE, a/k/a UNIT 999,
    a/k/a M-8 SPECIAL OPERATIONS;
SADDAM HUSSEIN;
QUSAY HUSSEIN;
UDAY HUSSEIN;
TAHA YASSIN RAMADAN;
MUHAMMED MAHDI SALAH;
FARUQ AL-HIJAZI;
SALAH SULEIMAN;
AHMED KHALIL IBRAHIM SAMIR AL-ANI;
HABIB FARIS ABDULLAH AL-MAMOURI;
ABDEL HUSSEIN, a/k/a THE GHOST;
HAQI ISMAIL;
TAHA AL ALWANI;

ABU AGAB;
ABU WA'EL;

*(Co-Conspirators)*

ADVICE AND REFORMATION COMMITTEE;
AFGHAN SUPPORT COMMITTEE (ASC);
AFRICAN MUSLIM AGENCY;
AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION,
   a/k/a AL BARAKA BANK, a/k/a DALLAH ALBARAKA GROUP, LLC;
AL BARAKAAT EXCHANGE LLC, a/k/a AL-BARAKAAT BANK,
   a/k/a AL-BARAKAAT GROUP;
AL-HIJRAH CONSTRUCTION & DEVELOPMENT LTD;
AL-HARAMAIN ISLAMIC FOUNDATION, INC., a/k/a AL-HARAMAIN ISLAMIC
FOUNDATION, a/k/a ISLAMIC AL-HARAMAIN;
AL HARAMAIN FOUNDATION, a/k/a AL HARAMAIN;
AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY;
AL RAJHI BANKING AND INVESTMENT, a/k/a AL RAJHI BANK;
AL RASHID TRUST;
AL SHAMAL ISLAMIC BANK, a/k/a SHAMEL BANK, a/k/a BANK EL SHAMAR;
AL TAQWA BANK;
AL TAQWA MANAGEMENT ORGANIZATION SA;
AL TAQWA TRADE, PROPERTY AND INDUSTRY, LTD;
ARADI, INC.;
ASAT TRUST REG.;
BENEVOLENCE INTERNATIONAL FOUNDATION;
   a/k/a AL BIR AL DAWALIA, a/k/a AL BIR SOCIETY ORGANIZATION;
BENEVOLENCE INTERNATIONAL FOUNDATION – USA;
BENEVOLENCE INTERNATIONAL FOUNDATION – CANADA;
FAISAL ISLAMIC BANK;
GLOBAL DIAMOND RESOURCES, INC.
GLOBAL RELIEF FOUNDATION, INC.;
GROVE CORPORATE, INC.;
HERITAGE EDUCATION TRUST;
INTERNATIONAL DEVELOPMENT FOUNDATION;
INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT;
ISLAMIC ARMY FOR THE LIBERATION OF HOLY PLACES;
ISLAMIC CULTURAL INSTITUTE OF MILAN;
INTERNATIONAL ISLAMIC RELIEF ORGANIZATION,
   a/k/a ISLAMIC RELIEF ORGANIZATION,
   a/k/a INTERNATIONAL RELIEF ORGANIZATION,
   a/k/a SUCCESS FOUNDATION;
MAR-JAC INVESTMENTS, INC.;
MAR-JAC POULTRY, INC.;
MENA CORPORATION;

MUSLIM WORLD LEAGUE, a/k/a RABITA AL-ALAM AL-ISLAMI,
   a/k/a ISLAMIC WORLD LEAGUE;
MUSLIM WORLD LEAGUE OFFICES;
MUWAFFAW FOUNDATION;
NATIONAL COMMERCIAL BANK;
NADA MANAGEMENT ORGANIZATION SA;
RABITA TRUST;
RESTON INVESTMENTS, INC.;
SAAR FOUNDATION, a/k/a SAAR NETWORK, a/k/a SAAR INTERNATIONAL;
SAFA TRUST;
SANABEL AL KHEER, INC., a/k/a THE SANA-BELL, INC.,
   a/k/a SANABEL AL KHAIR, a/k/a SANABIL AL-KHAIR;
SAUDI BIN LADEN GROUP, a/k/a BIN LADEN CORPORATION;
SAUDI SUDANESE BANK;
SHAMAL ISLAMIC BANK;
SOMALI INTERNET COMPANY;
SOMALI NETWORK AB;
SOMALI INTERNATIONAL RELIEF ORGANIZATION (U.S.A.);
STERLING CHARITABLE GIFT;
STERLING MANAGEMENT GROUP, INC.;
SUCCESS FOUNDATION, INC.;
TABA INVESTMENTS;
TANZANITE KING;
ULEMA UNION OF AFGRAHNISTAN;
WADI AL AQIA;
WAFA HUMANITARIAN ORGANIZATION;
WORLD ASSEMBLY OF MUSLIM YOUTH,
   a/k/a WAMY INTERNATIONAL, INC.;
WORLD ASSOCIATION FOR MUSLIM YOUTH;
WAMY INTERNATIONAL, INC.;
YORK FOUNDATION;
YOUSEF M. NADA & CO. GESELLSCHAFT M.B.H.
ABD AL-HADI AL-IRAQI;
ABD AL-MUSHIN AL-LIBI,
ABDUL RAHMAN KHALED BIN MAHFOUZ;
ABDUL RAHMAN YASIN;
AHMAD I. NASREDDIN;
AHMED NUR ALI JUMALE a/k/a AHMED NUR ALI JIM'ALE;
AL-GAMMAAH AL ISLAMIAH,
ALBERT FRIEDRICH ARMAND HUBER, a/k/a AHMED HUBER;
ALI GHALEB HIMMAT;
DAR AL MAAL AL ISLAMI;
ENAAM M. ARNAOUT;
MOHAMED S. OMEISH;
MOHAMED MANSOUR;

MOHAMMED SALIM BIN MAHFOUZ;
MUFTI MOHAMMED RASHID, a/k/a RASHID MUHAMMAD SALAH,
ABDURAHMAN ALAMOUDI;
KHALED NOUR;
SULAIMAN AL-ALI;
ABDULLAH M. AL-MAHDI;
TAREQ M. AL-SWAIDAN;
ABDUL AL-MOSLAH;
SALAH BADAHDH;
ABDULLAH BIN SALEH AL OBAID, a/k/a ABDULLA AL OBAID,
HASSAN A.A. BAHFZALLAH;
M. YAQUB MIRZA;
HASSAN A.A. BAHAFZALLAH;
YAQUB M. MIRZA;
JAMAL BARZINI;
ABU SULAYMAN;
AHMED TOTONJI;
HISHAM AL-TALIB;
IQBAL YUNUS;
JAMAL BARZINJI;
M. OMAR ASHRAF;
MOHAMMED JAGHLIT;
MUHAMMAD ASHRAF;
TAHA JABER AL-ALWANI;
TARIK HAMDI;
YAQUB MIRZA;
SHERIF SEDKY;
AQEEL ABDUL-AZEEL AL-AQEEL;
MANSOUR AL-KADI;
SOLIMAN H.S. AL-BUTHE;
PEROUZ SEDA GHATY;
SYED SULEMAN AHMER;
ENAAM MAHMOUD ARNAOUT a/k/a ABDEL SAMIA a/k/a ABU MAHMOUD;
MAZIN M.H. BAHARETH;
ZAHIR H. KAZMI;
MUZAFFAR KHAN;
SOLIMAN J. KHUDEIRA;
JAMAL NYRABEH;
ABDULLAH BIN LADEN;
IBRAHIM S. ABDULLAH;
MOHAMMAD BIN FARIS;
DR. MAHMOUD DAKHIL;
TARIK BIN LADEN;
KHALID BIN SALIM BIN MAHFOUZ, a/k/a KHALID BIN MAHFOUZ;
ABDULRAHMAN BIN;

SALEH ABDULLAH KAMEL;
MOHAMMED AL FAISAL AL SAUD;
TURKI AL FAISAL AL SAUD;
PRINCE NAYEF IBN ABDULAZIZ AL SAUD;
PRINCE SULTAN BIN ABDULAZIZ AL SAUD;
RAHIB HADDAH;
SAFIQ AYADI;
SHEIKH ABU BDUL AZIZ NAGI;
SHEIKH ADIL GALIL BATARGY, a/k/a ADEL ABDUL JAIIL BATTERJEE;
SHAHIR ABDULRAOOF BATTERJEE;
SULAIMAN BIN ABDUL AZIZ AL RAJHI; a/k/a SULEIMAN ABDEL
    AZIZ AL RAJHI;
SALEH ABDUL AZIZ AL RAJHI;
YOUSEF M. NADA;
YUSAF AHMED ALI;
ABDULLAH SULAIMAN AL-RAJHI;
KHALID SULAIMAN AL-RAJHI;
YASSIN ABDULLAH AL KADI;
MOHAMMAD JAMAL AL KHALIFA, a/k/a MOHAMMED JAMAL KHALIFA,
ADEL ABDUL JALIL BATTERJEE;
AQUEEL AL-AQUEEL;
ABDUL RAHMAN AL SWAILEM;
WA'EL HAMZA JALAIDAN;
ABDULLAH OMAR NASEEF;

**THE REPUBLIC OF SUDAN**;

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

VIRGINIA BAUER, Individually and as
Executrix of the Estate of W. DAVID BAUER,
deceased,

CATHY ANN BONNETT, Individually
and as Administratrix of the Estate of
COLIN BONNETT, deceased,

DEBORAH BOWDEN, Individually and
as Executrix of the Estate of THOMAS
BOWDEN, deceased,

JENNIFER BOWMAN, Individually and as
Administratrix of the Estate of SHAWN E.
BOWMAN, deceased,

ELIZABETH CANDELA, Individually and
as Administratrix of the Estate of JOHN
CANDELA, deceased,

TOMOKO T. SCHLAG, Individually and
as Executrix of the Estate of STEVEN F.
SCHLAG, deceased,

BETH MURPHY, Individually and as
Administratrix of the Estate of KEVIN J.
MURPHY, deceased,

ROSEANN ZISA, Individually and as
Administratrix of the Estate of SALVATORE
ZISA, deceased,

MICHELE JONES, Individually and as Executrix
of the Estate of DONALD JONES, deceased,

AMY VASEL, Individually and as Administratrix
of the Estate of SCOTT VASEL, deceased,

<div style="float:right">

02 CV 7236

Civil Action No. _____

**COMPLAINT AND
JURY DEMAND**



</div>

-1-

MARGARET MEYER, Individually and as
Executrix of the Estate of DAVID R. MEYER,
deceased,

BARBARA GALLUCCI, Individually and as
Administratrix of the Estate of VINCENZO
GALLUCCI, deceased,

ARLENE ORSINI, Individually and as
Administratrix of the Estate of RONALD
ORSINI, deceased,

EILEEN HANNAFORD, Individually and as
Administratrix of the Estate of KEVIN
HANNAFORD, deceased,

JILL GOLDSTEIN, Individually and as
Administratrix of the Estate of STEVEN
GOLDSTEIN, deceased,

AUDREY MAGNUSON, Individually and as
Executrix of the Estate of RONALD E.
MAGNUSON, deceased,

KAREN D'AMBROSI, Individually and as
Executrix of the Estate of JACK L. D'AMBROSI,
deceased,

SUSAN MAGAZINE, Individually and as
Administratrix of the Estate of JAY MAGAZINE,
deceased,

KATHERINE MAHER, Individually and as
Executrix of the Estate of DANIEL L. MAHER,
deceased,

ELLEN ROBB, Individually and in her capacity
as Proposed Co-Administrator of the
Estate of KRISTEN MONTANARO, deceased,

MICHELLE TANNER, Individually and as
Executrix of the Estate of MICHAEL TANNER,
deceased,

MARIE CARLINO, Individually and as Executrix
of the Estate of EDWARD CARLINO, deceased,

PANDORA PO BHARVANEY, Individually and
as Administratrix of the Estate of ANIL T.
BHARVANEY, deceased,

DEBRA ZEPLIN, Individually and as Executrix of
the Estate of MARC SCOTT ZEPLIN, deceased,

LAURA BUSTILLO, Individually and as
Administratrix of the Estate of MILTON BUSTILLO,
deceased,

CAROLE DiFRANCO, Individually and as
Administratrix of the Estate of CARL DiFRANCO,
JR., deceased,

CAMERON F. MACRAE, III, Individually and as
Administrator of the Estate of CATHERINE
FAIRFAX MACRAE, deceased,

DONALD MAURO, Individually and as Administrator
of the Estate of NANCY T. MAURO, deceased,

JOHN SANDERS, Individually and as Administrator
of the Estate of STACEY L. SANDERS, deceased,

JENNIFER PRICE, Individually and as Executrix
of the Estate of JEAN ELIZABETH
HOADLEY PETERSON, deceased,

SANDRA VALDEZ FELT, Individually and as
Executrix of the Estate of EDWARD P. FELT,
deceased,

ROSE KELLER, Individually and as Administratrix
of the Estate of JOSEPH KELLER, deceased,

LYZBETH GLICK, Individually and as Administratrix
of the Estate of JEREMY GLICK, deceased,



ELSA STRONG, Individually and as Executrix of the
Estate of LINDA GRONLUND, deceased,

JOHN DiMEGLIO, Individually and as Administrator
of the Estate of DAVID DIMEGLIO, deceased,

BARBARA RATCHKO, Individually and as
Administratrix of the Estate of BRYAN JACK,
deceased,

MICHAEL GIORDANO, Individually and as
Administrator of the Estate of DONNA GIORDANO,
deceased,

ROSA CAICEDO, as Mother and Legal Guardian
of LESLIE VARGAS and KEVIN VARGAS, the
Natural Children of DAVID VARGAS, deceased, and
as Proposed Administratrix and/or personal
representative of the Estate of DAVID
VARGAS, deceased,

JILL SWIFT, Individually and as Executrix of the
Estate of THOMAS SWIFT, deceased,

LISA BEAMER, Individually and as Executrix
of the Estate of TODD BEAMER, deceased,

JENNIFER G. BRENNAN, Individually and as
Administratrix of the Estate of THOMAS M. BRENNAN,
deceased,

SUSAN BEATINI, Individually and as Administratrix
of the Estate of PAUL F. BEATINI, deceased,

MARY DANAHY, Individually and as Executrix of
the Estate of PATRICK W. DANAHY, deceased,

KATHLEEN M. WISNIEWSKI, Individually and as
Administratrix of the Estate of ALAN L. WISNIEWSKI,
deceased,

SUSAN ROSSINOW, Individually and as Administratrix
of the Estate of NORMAN ROSSINOW, deceased,

TERESA CUNNINGHAM, Individually and as
Administratrix of the Estate of MICHAEL J.
CUNNINGHAM, deceased,

BEVERLY ECKERT, Individually and as Executrix
of the Estate of SEAN ROONEY, deceased,

PATRICIA RYAN, Individually and as Executrix
of the Estate of JOHN J. RYAN, deceased,

LORI KANE, Individually and as Administratrix
of the Estate of HOWARD L. KANE, deceased,

SUZANNE SISOLAK, Individually and as
Administratrix of the Estate of JOSEPH M.
SISOLAK, deceased,

THOMAS S. JOHNSON, Individually and as
Administrator of the Estate of SCOTT M. JOHNSON,
deceased,

<div align="center">Plaintiffs,</div>

-against-

**AL QAEDA ISLAMIC ARMY;**
EGYPTIAN ISLAMIC JIHAD;
OSAMA BIN LADEN, a/k/a USAMA BIN LADEN, a/k/a ABU ABDULLAH,
   a/k/a MUJAHID SHAYKH HAIJJS, a/k/a ABDUL HAY;
ESTATE OF MUHAMMAD ATEF;
AYMAN AL ZAWAHIRI;
ABU ZUBAYDH;
SAIF AL ADEL;
KHALID SHEIKH MOHAMMED;
ABDULLAH AHMED ABDULLAH;
ESTATE OF ABU HAFS, a/k/a KHALED AL SHANGUITI,
   a/k/a MAFUZ OULD AL WALID, a/k/a THE MAURITANIAN;
ESTATE OF ABU SALAH AL-YEMENI;
ESTATE OF ABU JAFFER AL-JAZIRI, a/k/a OMAR CHEBBANI;
MUHSIN MUSA MATWALLI ATWAY;

<div align="center">-5-</div>

ANAS AL LIBY;
IBN AL-SHAYKH AL-LIBI;
FAZUL ABDULLAH MOHAMMED;
AHMED MOHAMED HAMED ALI;
MOHAMED SULEIMAN AL NALFI;
MUSTAFA MOHAMED FADHIL;
AHMED KHALFAN GHAILANI;
FAHID MOHAMMED ALLY MSALAM;
SHEIKH AHMED SALIM SWEDAN;
MUHAMMAD ABU-ISLAM;
ABDULLAH QASSIM;
RAMZI BIN AL-SHIBB;
HASHIM ABDULRAHMAN;
MUSTAFA AHMED AL-HAWSAWI, a/k/a SHAYKH SAI'ID;
ABDULLAH AZZAM;
JAMAL AL-BADAWI;
MOHAMMED OMAR AL-HARAZI;
WALID AL-SOUROURI;
FATHA ADBUL RAHMAN;
YASSER AL-AZZANI;
JAMAL BAKHORSH;
AHMAD AL-SHINNI;
RAED HIJAZI;
JAMIL QASIM SAEED;
ABU ABDUL RAHMAN;
MOHAMED BAYAZID;

***(Terrorist Hijackers)***
THE ESTATE OF MARWAN ALSHEHHI;
THE ESTATE OF FAYEZ AHMED;
THE ESTATE OF AHMED AL GHAMDI;
THE ESTATE OF HAMZA AL GHAMDI;
THE ESTATE OF MOHALD AL SHEHRI;
THE ESTATE OF SATAM M. A. AL SUQAMI;
THE ESTATE OF ABDULAZIZ AL OMARI;
THE ESTATE OF WALEED M. AL SHEHRI;
THE ESTATE OF WAIL AL SHEHRI;
THE ESTATE OF MOHAMMED ATTA;
THE ESTATE OF KHALID AL MIDHAR;
THE ESTATE OF HAWAF AL HAZMI;
THE ESTATE OF HANI HANJOUR;
THE ESTATE OF SALEM AL HAZMI;
THE ESTATE OF MAJED MOQED;

-6-

THE ESTATE OF ZIAD SAMIR JARRAH;
THE ESTATE OF AHMED IBRAHIM A. AL HAZNAWI;
THE ESTATE OF SAEED AL GHAMDI;
THE ESTATE OF AHMED AL NAMI;
ZACARIAS MOUSSAOUI;

**THE TALIBAN**;
MUHAMMAD OMAR;

**THE REPUBLIC OF IRAQ;**
IRAQI INTELLIGENCE AGENCY, a/k/a THE MUKHABARAT,
   a/k/a THE FEDAYEEN, a/k/a AL QARE, a/k/a UNIT 999,
   a/k/a M-8 SPECIAL OPERATIONS;
SADDAM HUSSEIN;
QUSAY HUSSEIN;
UDAY HUSSEIN;
TAHA YASSIN RAMADAN;
MUHAMMED MAHDI SALAH;
FARUQ AL-HIJAZI;
SALAH SULEIMAN;
AHMED KHALIL IBRAHIM SAMIR AL-ANI;
HABIB FARIS ABDULLAH AL-MAMOURI;
ABDEL HUSSEIN, a/k/a THE GHOST;
HAQI ISMAIL;
TAHA AL ALWANI;
ABU AGAB;
ABU WA'EL;

*(Co-Conspirators)*

ADVICE AND REFORMATION COMMITTEE;
AFGHAN SUPPORT COMMITTEE (ASC);
AFRICAN MUSLIM AGENCY;
AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION,
   a/k/a AL BARAKA BANK, a/k/a DALLAH ALBARAKA GROUP, LLC;
AL BARAKAAT EXCHANGE LLC, a/k/a AL-BARAKAAT BANK,
   a/k/a AL-BARAKAAT GROUP;
AL-HIJRAH CONSTRUCTION & DEVELOPMENT LTD;
AL-HARAMAIN ISLAMIC FOUNDATION, INC., a/k/a AL-HARAMAIN ISLAMIC
FOUNDATION, a/k/a ISLAMIC AL-HARAMAIN;
AL HARAMAIN FOUNDATION, a/k/a AL HARAMAIN;
AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY;
AL RAJHI BANKING AND INVESTMENT, a/k/a AL RAJHI BANK;

AL RASHID TRUST;
AL SHAMAL ISLAMIC BANK, a/k/a SHAMEL BANK, a/k/a BANK EL SHAMAR;
AL TAQWA BANK;
AL TAQWA MANAGEMENT ORGANIZATION SA;
AL TAQWA TRADE, PROPERTY AND INDUSTRY, LTD;
ARADI, INC.;
ASAT TRUST REG.;
BENEVOLENCE INTERNATIONAL FOUNDATION;
   a/k/a AL BIR AL DAWALIA, a/k/a AL BIR SOCIETY ORGANIZATION;
BENEVOLENCE INTERNATIONAL FOUNDATION – USA;
BENEVOLENCE INTERNATIONAL FOUNDATION – CANADA;
FAISAL ISLAMIC BANK;
GLOBAL DIAMOND RESOURCES, INC.
GLOBAL RELIEF FOUNDATION, INC.;
GROVE CORPORATE, INC.;
HERITAGE EDUCATION TRUST;
INTERNATIONAL DEVELOPMENT FOUNDATION;
INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT;
ISLAMIC ARMY FOR THE LIBERATION OF HOLY PLACES;
ISLAMIC CULTURAL INSTITUTE OF MILAN;
INTERNATIONAL ISLAMIC RELIEF ORGANIZATION,
   a/k/a ISLAMIC RELIEF ORGANIZATION,
   a/k/a INTERNATIONAL RELIEF ORGANIZATION,
   a/k/a SUCCESS FOUNDATION;
MAR-JAC INVESTMENTS, INC.;
MAR-JAC POULTRY, INC.;
MENA CORPORATION;
MUSLIM WORLD LEAGUE, a/k/a RABITA AL-ALAM AL-ISLAMI,
   a/k/a ISLAMIC WORLD LEAGUE;
MUSLIM WORLD LEAGUE OFFICES;
MUWAFFAW FOUNDATION;
NATIONAL COMMERCIAL BANK;
NADA MANAGEMENT ORGANIZATION SA;
RABITA TRUST;
RESTON INVESTMENTS, INC.;
SAAR FOUNDATION, a/k/a SAAR NETWORK, a/k/a SAAR INTERNATIONAL;
SAFA TRUST;
SANABEL AL KHEER, INC., a/k/a THE SANA-BELL, INC.,
   a/k/a SANABEL AL KHAIR, a/k/a SANABIL AL-KHAIR;
SAUDI BIN LADEN GROUP, a/k/a BIN LADEN CORPORATION;
SAUDI SUDANESE BANK;
SHAMAL ISLAMIC BANK;
SOMALI INTERNET COMPANY;

SOMALI NETWORK AB;
SOMALI INTERNATIONAL RELIEF ORGANIZATION (U.S.A.);
STERLING CHARITABLE GIFT;
STERLING MANAGEMENT GROUP, INC.;
SUCCESS FOUNDATION, INC.;
TABA INVESTMENTS;
TANZANITE KING;
ULEMA UNION OF AFGRAHNISTAN;
WADI AL AQIA;
WAFA HUMANITARIAN ORGANIZATION;
WORLD ASSEMBLY OF MUSLIM YOUTH,
    a/k/a WAMY INTERNATIONAL, INC.;
WORLD ASSOCIATION FOR MUSLIM YOUTH;
WAMY INTERNATIONAL, INC.;
YORK FOUNDATION;
YOUSEF M. NADA & CO. GESELLSCHAFT M.B.H.
ABD AL-HADI AL-IRAQI;
ABD AL-MUSHIN AL-LIBI,
ABDUL RAHMAN KHALED BIN MAHFOUZ;
ABDUL RAHMAN YASIN;
AHMAD I. NASREDDIN;
AHMED NUR ALI JUMALE a/k/a AHMED NUR ALI JIM'ALE;
AL-GAMMAAH AL ISLAMIAH,
ALBERT FRIEDRICH ARMAND HUBER, a/k/a AHMED HUBER;
ALI GHALEB HIMMAT;
DAR AL MAAL AL ISLAMI;
ENAAM M. ARNANOUT;
MOHAMED S. OMEISH;
MOHAMED MANSOUR;
MOHAMMED SALIM BIN MAHFOUZ;
MUFTI MOHAMMED RASHID, a/k/a RASHID MUHAMMAD SALAH,
ABDURAHMAN ALAMOUDI;
KHALED NOUR;
SULAIMAN AL-ALI;
ABDULLAH M. AL-MAHDI;
TAREQ M. AL-SWAIDAN;
ABDUL AL-MOSLAH;
SALAH BADAHDH;
ABDULLAH BIN SALEH AL OBAID, a/k/a ABDULLA AL OBAID,
HASSAN A.A. BAHFZALLAH;
M. YAQUB MIRZA;
HASSAN A.A. BAHAFZALLAH;
YAQUB M. MIRZA;

JAMAL BARZINI;
ABU SULAYMAN;
AHMED TOTONJI;
HISHAM AL-TALIB;
IQBAL YUNUS;
JAMAL BARZINJI;
M. OMAR ASHRAF;
MOHAMMED JAGHLIT;
MUHAMMAD ASHRAF;
TAHA JABER AL-ALWANI;
TARIK HAMDI;
YAQUB MIRZA;
SHERIF SEDKY;
AQEEL ABDUL-AZEEL AL-AQEEL;
MANSOUR AL-KADI;
SOLIMAN H.S. AL-BUTHE;
PEROUZ SEDA GHATY;
SYED SULEMAN AHMER;
ENAAM MAHMOUD ARNAOUT a/k/a ABDEL SAMIA a/k/a ABU MAHMOUD;
MAZIN M.H. BAHARETH;
ZAHIR H. KAZMI;
MUZAFFAR KHAN;
SOLIMAN J. KHUDEIRA;
JAMAL NYRABEH;
ABDULLAH BIN LADEN;
IBRAHIM S. ABDULLAH;
MOHAMMAD BIN FARIS;
DR. MAHMOUD DAKHIL;
TARIK BIN LADEN;
KHALID BIN SALIM BIN MAHFOUZ, a/k/a KHALID BIN MAHFOUZ;
ABDULRAHMAN BIN;
SALEH ABDULLAH KAMEL;
MOHAMMED AL FAISAL AL SAUD;
TURKI AL FAISAL AL SAUD;
PRINCE NAYEF IBN ABDULAZIZ AL SAUD;
PRINCE SULTAN BIN ABDULAZIZ AL SAUD;
RAHIB HADDAH;
SAFIQ AYADI;
SHEIKH ABU BDUL AZIZ NAGI;
SHEIKH ADIL GALIL BATARGY, a/k/a ADEL ABDUL JAIIL BATTERJEE;
SHAHIR ABDULRAOOF BATTERJEE;
SULAIMAN BIN ABDUL AZIZ AL RAJHI; a/k/a SULEIMAN ABDEL
    AZIZ AL RAJHI;

SALEH ABDUL AZIZ AL RAJHI;
YOUSEF M. NADA;
YUSAF AHMED ALI;
ABDULLAH SULAIMAN AL-RAJHI;
KHALID SULAIMAN AL-RAJHI;
YASSIN ABDULLAH AL KADI;
MOHAMMAD JAMAL AL KHALIFA, a/k/a MOHAMMED JAMAL KHALIFA,
ADEL ABDUL JALIL BATTERJEE;
AQUEEL AL-AQUEEL;
ABDUL RAHMAN AL SWAILEM;
WA'EL HAMZA JALAIDAN;
ABDULLAH OMAR NASEEF;

**THE REPUBLIC OF SUDAN**;

Defendants.
_____

Plaintiffs, by their attorneys, Baumeister & Samuels, P.C., as and for their Complaint, hereby allege:

## JURISDICTION AND VENUE

1.    Plaintiffs listed in the caption of this action are U.S. citizens or residents who are survivors, beneficiaries, heirs, distributees and/or next of kin as well either the Executors, Administrators or Personal Representatives of the Estates of persons killed in the September 11, 2001 terrorist attacks perpetrated by some of the defendants with the support and assistance of the other defendants, in which four United States' commercial aircraft were caused to crash into the World Trade Center Towers, the Pentagon, and a field in Shanksville, Pennsylvania (hereinafter the "September 11th Attacks"). Plaintiffs' decedents were passengers or crew members on board American Airlines Flights 11 and 77, United Airlines Flights 175 and 93, and persons present at both Towers of the World Trade Center in New York, or present at the Pentagon in Virginia.

-11-

2.      Jurisdiction with respect to the defendants arises pursuant to 28 U.S.C.

§§1330(a)(actions against foreign states), 1331 (federal question), 1332(a)(2)(diversity of

citizenship), 1350 ("Alien Tort Act"), 1605(a)(2), 1605(a)(5) and (a)(7) ("Foreign Sovereign

Immunities Act"), and the Torture Victim Protection Act, PL 102-256, 106 Stat. 73 (reprinted at

28 U.S.C.A. § 1350 note (West 1993)).

3.      Venue is proper in this district pursuant to the Air Transportation Safety and

System Stabilization Act, (Pub. Law 107-42, 115 Stat. 230), 49 U.S.C. §40101, Title IV, §

408(b)(3), designating the United States District Court for the Southern District of New York as

the exclusive venue for all civil actions brought as a result of, or relating to the September 11th

Attacks, and 28 U.S.C. §1391(b)(2) and 1391(f)(1) because a substantial number of acts,

occurrences, injuries and deaths occurred within the Southern District of New York.

4.      As set forth herein, actions for wrongful death, trauma, loss of consortium,

companionship, survival, and related torts perpetrated by foreign states, such as the Republics of

Sudan and Iraq, through their agencies, instrumentalities, their officials, employees and/or agents

alleged herein, fall within the exceptions to jurisdictional immunity under 28 U.S.C. §§

1605(a)(5) and 1605(a)(7)(the "Foreign Sovereign Immunities Act").

## THE PARTIES

### THE PLAINTIFFS

5.      Plaintiff, VIRGINIA BAUER, is the wife of the decedent, W. DAVID BAUER,

and has been appointed the Executrix of her husband's estate.  Plaintiff brings this action on

behalf of herself individually, as well as in a representative capacity on behalf of all potential

heirs, survivors, next of kin and/or beneficiaries of the decedent, W. DAVID BAUER, and on

-12-

behalf of any other individual entitled to recover under the applicable law.

6.      Plaintiff, CATHY ANN BONNETT, is the wife of the decedent, COLIN
ARTHUR BONNETT, and has been appointed the Administratrix of her husband's estate.
Plaintiff brings this action on behalf of herself individually, as well as in a representative
capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the
decedent, COLIN ARTHUR BONNETT, and on behalf of any other individual entitled to
recover under the applicable law.

7.      Plaintiff, DEBORAH BOWDEN, is the wife of the decedent, THOMAS
BOWDEN, and has been appointed the Executrix of her husband's estate.  Plaintiff brings this
action on behalf of herself individually, as well as in a representative capacity on behalf of all
potential heirs, survivors, next of kin and/or beneficiaries of the decedent, THOMAS BOWDEN,
and on behalf of any other individual entitled to recover under the applicable law.

8.      Plaintiff, JENNIFER BOWMAN, is the wife of the decedent, SHAWN E.
BOWMAN, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings
this action on behalf of herself individually, as well as in a representative capacity on behalf of
all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, SHAWN E.
BOWMAN, and on behalf of any other individual entitled to recover under the applicable law.

9.      Plaintiff, ELIZABETH CANDELA, is the wife of the decedent, JOHN
CANDELA, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings
this action on behalf of herself individually, as well as in a representative capacity on behalf of
all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, JOHN CANDELA,
and on behalf of any other individual entitled to recover under the applicable law.

10.      Plaintiff, TOMOKO T. SCHLAG, is the wife of the decedent, STEVEN F.

SCHLAG, and has been appointed the Executrix of her husband's estate.  Plaintiff brings this

action on behalf of herself individually, as well as in a representative capacity on behalf of all

potential heirs, survivors, next of kin and/or beneficiaries of the decedent, STEVEN F.

SCHLAG, and on behalf of any other individual entitled to recover under the applicable law.

11.      Plaintiff, BETH MURPHY, is the wife of the decedent, KEVIN MURPHY, and

has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on

behalf of herself individually, as well as in a representative capacity on behalf of all potential

heirs, survivors, next of kin and/or beneficiaries of the decedent, KEVIN MURPHY, and on

behalf of any other individual entitled to recover under the applicable law.

12.      Plaintiff, ROSEANN ZISA, is the wife of the decedent, SALVATORE ZISA, and

has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on

behalf of herself individually, as well as in a representative capacity on behalf of all potential

heirs, survivors, next of kin and/or beneficiaries of the decedent, SALVATORE ZISA, and on

behalf of any other individual entitled to recover under the applicable law.

13.      Plaintiff, MICHELE JONES, is the wife of the decedent, DONALD T. JONES,

and has been appointed the Executrix of her husband's estate.  Plaintiff brings this action on

behalf of herself individually, as well as in a representative capacity on behalf of all potential

heirs, survivors, next of kin and/or beneficiaries of the decedent, DONALD T. JONES, and on

behalf of any other individual entitled to recover under the applicable law.

14.      Plaintiff, AMY VASEL, is the wife of the decedent, SCOTT VASEL, and has

been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf

-14-

of herself individually, as well as in a representative capacity on behalf of all potential heirs,

survivors, next of kin and/or beneficiaries of the decedent, SCOTT VASEL, and on behalf of any

other individual entitled to recover under the applicable law.

15.    Plaintiff, MARGARET MEYER, is the wife of the decedent, DAVID R.

MEYER, and has been appointed the Executrix of her husband's estate.  Plaintiff brings this

action on behalf of herself individually, as well as in a representative capacity on behalf of all

potential heirs, survivors, next of kin and/or beneficiaries of the decedent, DAVID R. MEYER,

and on behalf of any other individual entitled to recover under the applicable law.

16.    Plaintiff, BARBARA GALLUCCI, is the wife of the decedent, VINCENZO

GALLUCCI, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings

this action on behalf of herself individually, as well as in a representative capacity on behalf of

all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, VINCENZO

GALLUCCI, and on behalf of any other individual entitled to recover under the applicable law.

17.    Plaintiff, ARLENE ORSINI, is the wife of the decedent, RONALD ORSINI, and

has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on

behalf of herself individually, as well as in a representative capacity on behalf of all potential

heirs, survivors, next of kin and/or beneficiaries of the decedent, RONALD ORSINI, and on

behalf of any other individual entitled to recover under the applicable law.

18.    Plaintiff, EILEEN HANNAFORD, is the wife of the decedent, KEVIN

HANNAFORD, and has been appointed the Administratrix of her husband's estate.  Plaintiff

brings this action on behalf of herself individually, as well as in a representative capacity on

behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, KEVIN

HANNAFORD, and on behalf of any other individual entitled to recover under the applicable law.

19.    Plaintiff, JILL GOLDSTEIN, is the wife of the decedent, STEVEN GOLDSTEIN, and has been appointed the Administratrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, STEVEN GOLDSTEIN, and on behalf of any other individual entitled to recover under the applicable law.

20.    Plaintiff, AUDREY MAGNUSON, is the wife of the decedent, RONALD E. MAGNUSON, and has been appointed the Executrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, RONALD E. MAGNUSON, and on behalf of any other individual entitled to recover under the applicable law.

21.    Plaintiff, KAREN D'AMBROSI, is the wife of the decedent, JACK L. D'AMBROSI, and has been appointed the Executrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, JACK L. D'AMBROSI, and on behalf of any other individual entitled to recover under the applicable law.

22.    Plaintiff, SUSAN MAGAZINE, is the wife of the decedent, JAY MAGAZINE, and has been appointed the Administratrix, Executrix, and/or Personal Representative of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, JAY MAGAZINE, and on behalf of any other individual entitled to recover

under the applicable law.

23.    Plaintiff, KATHERINE MAHER, is the wife of the decedent, DANIEL L.

MAHER, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this

action on behalf of herself individually, as well as in a representative capacity on behalf of all

potential heirs, survivors, next of kin and/or beneficiaries of the decedent, DANIEL L. MAHER,

and on behalf of any other individual entitled to recover under the applicable law.

24.    Plaintiff, ELLEN ROBB, is the mother of the decedent, KRISTEN

MONTANARO, and is the proposed Co-Administrator of her daughter's estate.  Plaintiff brings

this action on behalf of herself individually, as well as in a representative capacity on behalf of

all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, KRISTEN

MONTANARO, and on behalf of any other individual entitled to recover under the applicable

law.

25.    Plaintiff, MICHELLE TANNER, is the wife of the decedent, MICHAEL

TANNER, and has been appointed the Executrix of her husband's estate.  Plaintiff brings this

action on behalf of herself individually, as well as in a representative capacity on behalf of all

potential heirs, survivors, next of kin and/or beneficiaries of the decedent, MICHAEL TANNER,

and on behalf of any other individual entitled to recover under the applicable law.

26.    Plaintiff, MARIE CARLINO, is the wife of the decedent, EDWARD CARLINO,

and has been appointed the Executrix of her husband's estate.  Plaintiff brings this action on

behalf of herself individually, as well as in a representative capacity on behalf of all potential

heirs, survivors, next of kin and/or beneficiaries of the decedent, EDWARD CARLINO, and on

behalf of any other individual entitled to recover under the applicable law.

-17-

27.     Plaintiff, PANDORA PO BHARVANEY, is the wife of the decedent, ANIL T. BHARVANEY, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, ANIL T. BHARVANEY, and on behalf of any other individual entitled to recover under the applicable law.

28.     Plaintiff, DEBRA ZEPLIN, is the wife of the decedent, MARC SCOTT ZEPLIN, and has been appointed the Executrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, MARC SCOTT ZEPLIN, and on behalf of any other individual entitled to recover under the applicable law.

29.     Plaintiff, LAURA BUSTILLO, is the wife of the decedent, MILTON BUSTILLO,  and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, MILTON BUSTILLO, and on behalf of any other individual entitled to recover under the applicable law.

30.     Plaintiff, CAROLE DiFRANCO, is the mother of the decedent, CARL DiFRANCO, JR., and has been appointed the Administratrix of her son's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, CARL DiFRANCO, JR., and on behalf of any other individual entitled to recover under the applicable law.

-18-

31.    Plaintiff, CAMERON F. MACRAE, III, is the father of the decedent, CATHERINE FAIRFAX MACRAE, and has been appointed the Administrator of his daughter's estate. Plaintiff brings this action on behalf of himself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, CATHERINE FAIRFAX MACRAE, and on behalf of any other individual entitled to recover under the applicable law.

32.    Plaintiff, DONALD MAURO, is the husband of the decedent, NANCY T. MAURO, and has been appointed the Administrator of his wife's estate. Plaintiff brings this action on behalf of himself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, NANCY T. MAURO, and on behalf of any other individual entitled to recover under the applicable law.

33.    Plaintiff, JOHN SANDERS, is the father of the decedent, STACEY L. SANDERS, and has been appointed the Administrator of his daughter's estate. Plaintiff brings this action on behalf of himself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, STACEY L. SANDERS, and on behalf of any other individual entitled to recover under the applicable law.

34.    Plaintiff, JENNIFER PRICE, is the daughter of the decedent, JEAN ELIZABETH HOADLEY PETERSON, and has been appointed the Executrix of her mother's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, JEAN ELIZABETH HOADLEY PETERSON, and on behalf of any other individual entitled to recover under the applicable law.

35.     Plaintiff, SANDRA VALDEZ FELT, is the wife of the decedent, EDWARD P.

FELT, and has been appointed the Executrix of her husband's estate.  Plaintiff brings this action

on behalf of herself individually, as well as in a representative capacity on behalf of all potential

heirs, survivors, next of kin and/or beneficiaries of the decedent, EDWARD P. FELT, and on

behalf of any other individual entitled to recover under the applicable law.

36.     Plaintiff, ROSE KELLER, is the wife of the decedent, JOSEPH KELLER, and

has been appointed the Administratrix, Executrix, and/or Personal Representative of her

husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a

representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries

of the decedent, JOSEPH KELLER, and on behalf of any other individual entitled to recover

under the applicable law.

37.     Plaintiff, LYZBETH GLICK, is the wife of the decedent, JEREMY GLICK, and

has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on

behalf of herself individually, as well as in a representative capacity on behalf of all potential

heirs, survivors, next of kin and/or beneficiaries of the decedent, JEREMY GLICK, and on

behalf of any other individual entitled to recover under the applicable law.

38.     Plaintiff, ELSA STRONG, is the sister of the decedent, LINDA GRONLUND,

and has been appointed the Executrix of her sister's estate.  Plaintiff brings this action on behalf

of herself individually, as well as in a representative capacity on behalf of all potential heirs,

survivors, next of kin and/or beneficiaries of the decedent, LINDA GRONLUND, and on behalf

of any other individual entitled to recover under the applicable law.

39.     Plaintiff, JOHN DiMEGLIO, is the father of the decedent, DAVID DiMEGLIO,

and has been appointed the Administrator of his son's estate. Plaintiff brings this action on behalf of himself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, DAVID DiMEGLIO, and on behalf of any other individual entitled to recover under the applicable law.

40.    Plaintiff, BARBARA RATCHKO, is the wife of the decedent, BRYAN JACK, and has been appointed the Administratrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, BRYAN JACK, and on behalf of any other individual entitled to recover under the applicable law.

41.    Plaintiff, MICHAEL GIORDANO, is the son of the decedent, DONNA GIORDANO, and has been appointed the Administrator of his mother's estate. Plaintiff brings this action on behalf of himself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, DONNA GIORDANO, and on behalf of any other individual entitled to recover under the applicable law.

42.    Plaintiff, ROSA CAICEDO, is the Natural Mother and Legal Guardian of LESLIE VARGAS and KEVIN VARGAS, the natural children of DAVID VARGAS, and is the Proposed Administrator of the decedent's estate. Plaintiff brings this action on behalf of her children, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, DAVID VARGAS, and on behalf of any other individual entitled to recover under the applicable law.

43.    Plaintiff, JILL SWIFT, is the wife of the decedent, THOMAS SWIFT, and has been appointed the Executrix of her husband's estate. Plaintiff brings this action on behalf of

herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, JILL SWIFT, and on behalf of any other individual entitled to recover under the applicable law.

44.     Plaintiff, LISA BEAMER, is the wife of the decedent, TODD BEAMER, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, TODD BEAMER, and on behalf of any other individual entitled to recover under the applicable law.

45.     Plaintiff, JENNIFER G. BRENNAN, is the wife of the decedent, THOMAS M. BRENNAN, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, THOMAS M. BRENNAN, and on behalf of any other individual entitled to recover under the applicable law.

46.     Plaintiff, SUSAN BEATINI, is the wife of the decedent, PAUL F. BEATINI, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, PAUL F. BEATINI, and on behalf of any other individual entitled to recover under the applicable law.

47.     Plaintiff, MARY DANAHY, is the wife of the decedent, PATRICK W. DANAHY, and has been appointed the Executrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, PATRICK W.

DANAHY, and on behalf of any other individual entitled to recover under the applicable law.

48.    Plaintiff, KATHLEEN M. WISNIEWSKI, is the wife of the decedent, ALAN L. WISNIEWSKI, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, ALAN L. WISNIEWSKI, and on behalf of any other individual entitled to recover under the applicable law.

49.    Plaintiff, SUSAN ROSSINOW, is the wife of the decedent, NORMAN ROSSINOW, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, NORMAN ROSSINOW, and on behalf of any other individual entitled to recover under the applicable law.

50.    Plaintiff, TERESA CUNNINGHAM, is the wife of the decedent, MICHAEL J. CUNNINGHAM, and has been appointed the Administratrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, MICHAEL J. CUNNINGHAM, and on behalf of any other individual entitled to recover under the applicable law.

51.    Plaintiff, BEVERLY ECKERT, is the wife of the decedent, SEAN ROONEY, and has been appointed the Executrix of her husband's estate.  Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, SEAN ROONEY, and on behalf of

any other individual entitled to recover under the applicable law.

52.     Plaintiff, PATRICIA RYAN, is the wife of the decedent, JOHN J. RYAN, and has been appointed the Administratrix, Executrix, and/or Personal Representative of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, JOHN J. RYAN, and on behalf of any other individual entitled to recover under the applicable law.

53.     Plaintiff, LORI KANE, is the wife of the decedent, HOWARD L. KANE, and has been appointed the Administratrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, HOWARD L. KANE, and on behalf of any other individual entitled to recover under the applicable law.

54.     Plaintiff, SUZANNE SISOLAK, is the wife of the decedent, JOSEPH M. SISOLAK, and has been appointed the Administratrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, JOSEPH M. SISOLAK, and on behalf of any other individual entitled to recover under the applicable law.

55.     Plaintiff, THOMAS S. JOHNSON, is the father of the decedent, SCOTT M. JOHNSON, and has been appointed the Administrator of his son's estate. Plaintiff brings this action on behalf of himself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or other beneficiaries of the decedent, SCOTT M. JOHNSON, and on behalf of any other individual entitled to recover under the applicable law.

56.    The plaintiffs identified above shall be collectively referred to as the "plaintiffs."

57.    As a result of the terrorist attacks as described herein, the plaintiffs' decedents' were forced to endure severe mental anguish, fear of impending death, and ultimately suffered severe physical injuries which caused their deaths.

58.    As a direct and proximate result of the foregoing, the heirs and distributees of each decedents' estate, represented by the individual plaintiffs identified above, individually, and in their capacity as Administrators, Executors, and/or Personal Representatives, were caused to sustain the loss of income, support, society, love, grief, consortium, services, guidance, care, comfort, companionship and inheritance of the decedents and suffered mental anguish and mental pain and suffering, and were caused to incur other necessary and reasonable expenses as a result of the decedents' deaths, including, but not limited to, funeral and burial costs, and were otherwise damaged.

59.    As a direct and proximate result of the foregoing, the plaintiffs' decedents were caused to sustain severe and serious permanent injuries, grievous pain, agony and mental anguish, all prior to the decedents' death, with no negligence on the part of the decedent contributing thereto.

## THE DEFENDANTS

60.    Defendants are co-conspirators who intentionally, wilfully and knowingly conspired, planned, financed, supported, executed and carried out a plan to murder, maim and injure United States' citizens, residents and others on September 11, 2001; and all participated directly or indirectly in the September 11th Attacks on the United States of America. Defendants fall into three primary categories, AL QAEDA and its members and associates, including Osama

Bin Laden, IRAQ and SUDAN as State Sponsors of AL QAEDA's terrorist activities, and entities or individuals who provided financial or other support to the defendant AL QAEDA and its terrorist activities.

61.    Defendant AL QAEDA, a/k/a Islamic Army, is an unincorporated association organized to perpetrate acts of international terrorism, including murder, mayhem, bombings and hijackings against the United States, its citizens and its allies.  The defendant AL QAEDA has also encouraged, financed and supported other terrorist groups who targeted U.S. citizens. Defendant AL QAEDA, as of September 11, 2001, was headquartered in Afghanistan, but has a network of terrorist "cells" throughout the world.

62.    Defendant OSAMA BIN LADEN a/k/a Usama Bin Laden, Abu Abdullah, Mujahid Shaykh Hajjs and Abdul Hay ("BIN LADEN") was formerly a national of Saudi Arabia with Yemen as his ancestral home, but who is now an alien of unknown nationality.  He is last known to have been living in Afghanistan.  Defendant BIN LADEN has headed and directed the terrorist activities of the defendant AL QAEDA.

63.    Defendants BIN LADEN, MUHAMMAD ATEF, AYMAN AL ZAWAHIRI, ABU ZUBAYDH, SAIF AL ADEL, KHALID SHEIKH MOHAMMED, ABDULLAH AHMED ABDULLAH, ABU AL JAFAR AL-JAZIRI, ABU HAFS, a/k/a THE MAURITANIAN, ABU JAFFER AL-JAZIRI, ABU SALAH AL-YEMENI, MUHSIN MUSA MATWALLI ATWAY, ANAS AL LIBY, FAZUL ABDULLAH MOHAMMED, AHMED MOHAMED HAMED ALI, MOHAMED SULEIMAN AL NALFI, MUSTAFA MOHAMED FADHIL, AHMED KHALFAN GHAILANI, FAHID MOHAMMED ALLY MSALAM, SHEIKH AHMED SALIM SWEDAN, MUHAMMAD, ABU-ISLAM, ABDULLAN QASSIM, RAMZI BIN AL-SHIBB,

HASHIM ABDULRAHMAN, MUSTAFA AHMED AL-HAWSAWI, ABDULLAH AZZAM, JAMAL AL-BADAWI, MOHAMMED OMAR AL-HARAZI, WALID AL-SOUROURI, FATHA ADBUL RAHMAN, YASSER AL-AZZANI, JAMAL BAKHORSH, AHMAD AL-SHINNI, RAED HIJAZI, JAMIL QASIM SAEED, ABU ABDUL RAHMAN, MOHAMED BAYAZID, AL SHAYKF AL IRAQUI are or were natural persons who, on or before September 11, 2001, were leaders and/or members of AL QAEDA who conspired, acted in concert with, aided and abetted, sponsored and assisted directly and indirectly, in the September 11th Attacks against the United States of America.

64.    Defendants MOHAMMED ATTA, MARWAN AL-SHEHHI, FAYEZ AHMED, AHMED AL GHAMDI, HAMZA AL GHAMDI, MOHALD AL SHEHRI, SATAM M. A. AL SUQAMI, ABDULAZIZ AL OMARI, WALEED M. AL SHEHRI, WAIL AL SHEHRI, KHALID AL MIDHAR, NAWAF AL HAZMI, HANI HANJOUR, SALEM AL HAZMI, and MAJED MOQED hijacked three commercial aircraft of September 11, 2001 and committed mass murder by deliberately flying the aircraft into the World Trade Center Towers and the Pentagon. Defendants ZIAD SAMIR JARRAH, AHMED IBRAHIM A. AL HAZNAWI, SAEED AL GHAMDI, and AHMED AL NAMI hijacked United Airlines Flight 93 which departed from Newark, New Jersey bound for San Francisco, California, and attempted to deliberately fly the aircraft into the White House or other prominent Washington, D.C. landmark, but were thwarted by the efforts of the heroic passengers, resulting in the aircraft crashing to the ground in Shanksville, Pennsylvania. The "twentieth hijacker", defendant ZACARIAS MOUSSAOUI, was in custody of U.S. government officials on September 11, 2001 and thus unable to participate in the attacks perpetrated that day. Plaintiffs have named as defendants, the

estates of various AL QAEDA members who were killed on September 11, 2001 or in armed

conflict with allied forces since September 11, 2001.

65.    The defendant TALIBAN, as of September 11, 2001, was an unincorporated

association that served as the *de facto* government of Afghanistan from approximately 1996 until

sometime after September 11, 2001.  Defendant TALIBAN, as of September 11, 2001, was

headquartered in Kandahar, Afghanistan and had declared itself to constitute the government of

Afghanistan.

66.    Defendant MUHAMMAD OMAR ("OMAR") founded the defendant TALIBAN

in 1996.  Since 1996, OMAR has been the leader of the defendant TALIBAN's six member

ruling council and was responsible for the TALIBAN's financial activities.  Defendant OMAR,

individually and through the defendant TALIBAN organization that he controlled, supplied

material and logistical support to defendants AL QAEDA and BIN LADEN in furtherance of

their terrorist plans to attack the United States of America and murder U.S. citizens.

67.    Defendants AL QAEDA and TALIBAN were closely linked.  Defendants OMAR

and the TALIBAN afforded BIN LADEN special status in Afghanistan; and defendant BIN

LADEN was the *de facto* head of the defendant TALIBAN's intelligence and security.

Defendant BIN LADEN acted on defendant OMAR's behalf, by providing soldiers to crush

opposition to the defendant TALIBAN's ruthless rule inside Afghanistan.  Defendant OMAR

enabled defendant BIN LADEN to export terrorism to the United States by allowing him to

construct and maintain camps in Afghanistan and train defendant AL QAEDA members and

other terrorists from around the world in the deadly and depraved methods of committing acts of

violence, murder, destruction and mayhem.  The Defendant OMAR refused to turn over the

-28-

defendant BIN LADEN to the United States after the September 11th Attacks, and instead, continued to offer sanctuary to the defendant BIN LADEN and members of the defendant AL QAEDA.

68.     The defendant REPUBLIC OF IRAQ ("IRAQ") is a foreign sovereign state within the meaning of 28 U.S.C. § 1391(f) located in the Middle East that shares borders with Saudi Arabia, Jordan, Syria, Turkey, Iran and Kuwait.  The United States does not have formal diplomatic relations with the current government of the defendant IRAQ, which maintains an office in New York, the Permanent Representative of IRAQ to the United Nations at 14 East 79th Street, New York, New York 10021.  The defendant IRAQ maintains an Interest Section in the Algerian Embassy in Washington, D.C. located at 1801 "P" Street, N.W., Washington, D.C. 20036.

69.     The defendant IRAQ has for many years been designated by the Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 28 U.S.C. §2333.  The defendant IRAQ by and through its agents and instrumentalities has supported, encouraged, sponsored, aided and abetted and conspired with a variety of groups that use terror to pursue their goals.  The defendant IRAQ has provided financing, training, safe-haven, and weapons for terrorist groups including the defendants AL QAEDA and BIN LADEN.

70.     The defendant IRAQI INTELLIGENCE AGENCY ("IRAQI INTELLIGENCE"), a/k/a THE MUKHABARAT, a/k/a THE FEDAYEEN, a/k/a AL-QARE, a/k/a UNIT 999, a/k/a M-8 OPERATIONS, is the intelligence and operational entity in charge of conducting clandestine operations for the government of the defendant IRAQ, and is an agency,

-29-

instrumentality and/or organ of the Iraqi government.

71.    Defendants SADDAM HUSSEIN, QUSAY HUSSEIN, UDAY HUSSEIN, TAHA YASSIN RAMADAN, MUHAMMED MAHDI SALAH, FARUQ AL-HIJAZI, SALAH SULEIMAN, AHMED KHALIL IBRAHIM SAMIR AL-ANI HABIB FARRIS ABDULLAH AL-MAMOURI, and ABDEL HUSSEIN, a/k/a THE GHOST, HAQI ISMAIL, TAHA AL ALWANI ABU AGAB, and ABU WA'EL are natural persons, subjects and citizens of IRAQ and leaders, agents and/or employees of the defendant IRAQ and/or the defendant INTELLIGENCE AGENCY, who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

72.    The defendant REPUBLIC OF SUDAN ("SUDAN") is a foreign sovereign state within the meaning of 28 U.S.C. § 1391(f) located on the continent of Africa. The United States does not have formal diplomatic relations with the current government of the defendant SUDAN, which maintains an Embassy in Washington, D.C. located at 2210 Massachusetts Avenue, N.W., Washington, D.C. 20008-2831.

73.    The defendant SUDAN has for many years been designated by the Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 28 U.S.C. §2333. The defendant SUDAN by and through its agents and instrumentalities has supported, encouraged, sponsored, aided and abetted and conspired with a variety of groups that use terror to pursue their goals. The defendant SUDAN has provided financing, training, safe-haven, and weapons for terrorist groups including the defendants AL QAEDA and BIN LADEN.

-30-

74.    The co-conspirator defendants are individuals, organizations, banks and charities located all over the world who conspired with the defendants AL QAEDA, BIN LADEN, IRAQ, the TALIBAN, and SUDAN to raise, launder, transfer, distribute and hide funds for the defendants AL QAEDA and BIN LADEN in order to support and finance their terrorist activities, including, but not limited to, the September 11th Attacks.  Some of the individuals, businesses, banks and charities operate legitimate businesses, but also maintain a dual role as co-conspirator with the defendant AL QAEDA and have actively supported its terrorist activities; while others, including some of the individuals, are a sham front for the defendant AL QAEDA or all full fledged members of the defendant AL QAEDA.

## SUMMARY OF ALLEGATIONS

75.    The September 11th Attacks were the result of a world-wide terror conspiracy against the United States involving, among others, the defendants AL QAEDA, BIN LADEN, the TALIBAN, IRAQ and SUDAN, who have conspired for many years to attack the United States and murder its citizens.  The defendants herein supported, conspired, aided and abetted, sponsored, planned and executed the September 11th Attacks that killed thousands of persons and injured many thousands more.

76.    For many years, the defendants AL QAEDA, BIN LADEN and the TALIBAN wanted to drive the United States from the Arabian peninsula, topple Middle Eastern governments supported by the United States, including Egypt and Israel, and create an Islamic empire based upon its narrow interpretation of the Koran.  Over the years, the defendant AL QAEDA has grown as it has absorbed or allied with other like-minded Islamic terrorist groups, including the defendant EGYPTIAN ISLAMIC JIHAD.

-31-

77.     The defendant IRAQ has sworn revenge against the United States dating back to 1992 when the defendant IRAQ was soundly defeated in the Persian Gulf War. Since the defendant IRAQ could not defeat U.S. military forces, it resorted to terror attacks on U.S. citizens. In order to avoid another confrontation with U.S. military forces, the defendant IRAQ contracted with or sponsored Islamic fundamentalists who were willing to commit terrorist acts on its behalf. Indeed, in 1993, agents of the defendant IRAQ tried to destroy the towers of the World Trade Center by planting a bomb in the parking garage of the World Trade Center.

78.     During this time period, members of the defendant AL QAEDA established close working relations with agents of the defendant IRAQI INTELLIGENCE residing in the defendant IRAQ, Afghanistan, the defendant SUDAN and elsewhere. Soon thereafter, the defendant IRAQI INTELLIGENCE decided to support the defendant AL QAEDA and employ terrorists trained by the defendant AL QAEDA to carry out the defendant IRAQ's terror attacks. The relationship between the defendants IRAQ and AL QAEDA benefitted the defendant IRAQ because it provided the country with trained terrorists willing to die in terror attacks. As a secular state, the defendant IRAQ does not have a large number of citizens wishing to die as martyr warriors. Additionally, by utilizing suicide terrorists from the defendant AL QAEDA, the defendant IRAQ could disavow involvement in terrorist attacks and avoid retribution. The relationship benefitted the defendant AL QAEDA who, in exchange, it received the support, funding, facilities and training it needed to carry out its campaign of terror.

79.     During the mid 1990s, the defendant IRAQ began actively supporting the operations of the defendant AL QAEDA by providing intelligence, training, weapons, supplies, passports, travel documents and financial support as a co-conspirator. Significantly, one of the

-32-

defendant IRAQ's training camps contained the fuselage of a Boeing 707 used to train members of the defendant AL QAEDA in hijacking commercial aircraft.

80.    The defendant SUDAN has also provided extensive support for the terrorist efforts of the defendants AL QAEDA and BIN LADEN. In or about 1991, the defendant SUDAN, through Hassan al-Turabi, leader of the country's ruling National Islamic Front party ("NIF") aided and abetted the defendants AL QAEDA and BIN LADEN by providing for entrance of same into the defendant SUDAN. In furthering the efforts of these defendants, the defendant SUDAN abandoned visa requirements for Arabs and actively encouraged Islamic militants to live and train within its borders. By the end of 1991, it is estimated that between 1,000 and 2,000 members of the defendant AL QAEDA resided in the defendant SUDAN, including the defendant BIN LADEN who established his headquarters in the Riyadh section of Khartoum, Sudan, an area heavily populated by Saudi citizens.

81.    The defendant AL QAEDA, backed by the defendants the TALIBAN, IRAQ and SUDAN carried out the September 11th Attacks with the financial and logistical support of numerous individuals and organizations. These individuals and organizations provided the defendant AL QAEDA with the means to recruit, train and employ thousands of terrorists, including the twenty assigned the ghastly mission of murdering thousands of United States' citizens and destroying a number of U.S. landmarks on September 11, 2001.

82.    The September 11th Attacks were perpetrated against not only the United States, but against the very freedoms that make democratic society and civilization possible. This civil action seeks to hold the terrorists and their estates responsible as well as those who perform acts of terrorism under the cloak of legitimacy. The defendants identified herein not only took part in

-33-

the terrorist atrocities of September 11, 2001, but are also those individuals and entities that provided the support which enabled the attacks to take place, namely, those who provided the financing that allowed the hijackers to carry out their heinous acts.

83.    Following the horrific September 11th Attacks, Congress responded to the call to bring a halt to terrorism in numerous ways, including passage of the Patriot Act of 2001, which strengthens the legal rights of individual citizens to pursue justice and punishment against the perpetrators of terror. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism, (The USA Patriot Act, Title X, 2001). The Patriot Act itself was the culmination of decades of precedent setting judicial decisions and statutory enactments that gave individuals enlarged rights to seek redress and compensation for damages from the sponsors of terrorism. When viewed as a whole, these executive, legislative and judicial actions vastly empower individual victims of terrorism to seek, win and enforce justice.

84.    Plaintiffs herein, as the appointed and/or to be appointed Personal Representatives of the estates of those killed on September 11, 2001, assert federal common law and statutory claims as available, on behalf of all potential heirs, survivors, next of kin and beneficiaries, as well as on behalf of any individual entitled to recover under the applicable law. In addition to these causes of action, claims are brought pursuant to the Foreign Sovereign Immunities Act 28 U.S.C. § 1605(a)(2); § 1605(a)(5); and § 1605 (a)(7) with Pub. L. 104-208, Div. A. Title I, § 1605 note (West Supp.)(Flatow Amendment); Torture Victim Protection Act, Pub. La. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993); Alien Tort

Claim Act, 28 U.S.C. § 1350; and the Anti Terrorism Claims Act, 18 U.S.C. § 2333, *et. seq.* [1]

## DEFENDANTS AL QAEDA AND BIN LADEN

85.      Upon information and belief, the defendant BIN LADEN went to Afghanistan just after the Soviet invasion in 1979. He became a prime financier, recruiter, and military leader of the Mujahedeen groups fighting against the Soviet forces, advertising all over the Arab world for young Muslims to come to Afghanistan to fight against the Soviets. As part of his actions, the defendant BIN LADEN set up recruiting offices all over the world, including in the United States and Europe. These recruiting offices were often funded through charitable organizations that received donations made by Islamic charities, wealthy Saudi families, mosques, legitimate businesses and criminal enterprises and others. These charities operated in the United States, Europe, Asia, Africa, and the Middle East and were to become an essential part of the support system used by the defendants BIN LADEN and AL QAEDA, providing them with the financial resources necessary to engage in acts of terrorism and war.

86.      Monies were raised in part through a system of Islamic thinking known as zakat. Zakat, as one of the pillars of Islam, calls for faithful Muslims to give a specified percentage on

---

[1] As set forth in the Air Transportation Safety and System Stabilization Act and the amendments to same contained in the Aviation Transportation Security Act, the instant complaint does not prevent any of the Plaintiffs identified herein from also seeking relief through the September 11th Victim Compensation Fund of 2001 (the "Fund"). This fact was further confirmed by the Special Master to the Fund, Kenneth Feinberg, Esq., when he publicly stated that Nations harboring terrorists, or promoting terrorism, can be sued by those participated in the Fund. The Department of Justice, Office of Attorney General has also reiterated victims' rights to pursue actions against terrorists: A claimant who files for compensation waives any right to file a civil action (or to be a party to an action) in any federal or state court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, *except* for actions to recover collateral source obligations *or civil actions against any person who is a knowing participant in any conspiracy to hijack any aircraft or to commit any terrorist act.*

certain properties to certain classes of needy people. Cash funds held in possession for one year require a two and a half percent zakat payment to a charity which manages the donations. The intended recipients of the zakat were soon perverted as a radical Islamic fundamentalist sect took hold and grew.

87.    Born to a wealthy Saudi family, the defendant BIN LADEN paid for the transportation of the new recruits to Afghanistan with some of his personal fortune, and set up a number of terrorist training camps within the country. The Afghan government donated land and resources, while the defendant BIN LADEN brought experts from all over the world to the camps to train recruits on guerilla warfare, sabotage, and covert operations. Within a little over a year, there were thousands of volunteers training in the defendant BIN LADEN's private military camps.

88.    Under the leadership of the defendant BIN LADEN and the defendants MUHAMMAD ATEF ("ATEF"), a/k/a ABU HAFS AL MASRY, SHEIKH TAYSIR ABDULLAH, ABU FATIMA; ABU KHADIJA, together with Abu Ubaidah Al Banshiri (who died in 1996), AYMAN AL ZAWAHIRI and others, the "Mekhtab al Khidemat" or the "Azzam Service Center", the rudimentary organization initially established by the defendant BIN LADEN expanded, creating terrorist cells in various parts of the world, including Afghanistan, Pakistan and the United States.

89.    The Azzam Service Center continued to grow over the next several years, financing and supporting other terrorist groups throughout the world committed to acts of violence, murder, destruction and mayhem. From approximately 1989 to the present, this violent international terrorist group has been known as "AL QAEDA", which translates from Arabic to

-36-

mean "the Base" or "the Vanguard". One of the primary objectives of the defendant AL QAEDA is to oppose non-Islamic governments and to seeks to overthrow the governments of those Islamic states it considers too secular, or too beholden to the West.

90.     At all relevant times, the defendant AL QAEDA was led by the defendant BIN LADEN. Members of the defendant AL QAEDA pledge an oath of allegiance (known as a "bayat") to both the defendants BIN LADEN and AL QAEDA, committing themselves to become martyrs in their depraved cause.

91.     The defendant AL QAEDA actively and vehemently oppose the United States for several reasons. First, it regards the United States as a "kafir" or "infidel" nation governed in a manner inconsistent with the group's interpretation of Islam. Second, it believes the United States provides essential support to other "infidel" nations and organizations, particularly the governments of Egypt, Israel and the United Nations, which are regarded by the defendant AL QAEDA as its enemies. Third, the defendant AL QAEDA opposed the involvement of the United States armed forces in the Gulf War in 1991 and its presence in the Middle East afterwards as illustrated by Operation Restore Hope in Somalia in 1992 and 1993. The defendant AL QAEDA viewed these as pre-textual preparations for an American occupation of Islamic countries. In particular, the defendant AL QAEDA opposed the continued presence of American military forces in Saudi Arabia and elsewhere on the Saudi Arabian peninsula following the Gulf War. Fourth, the defendant AL QAEDA opposed the United States government because of the arrest, conviction and imprisonment of members of the defendant AL QAEDA or other terrorists with whom it worked, including the Islamic Group's Sheik Omar Abdel Rahman, who was convicted of planning to bomb bridges and tunnels in New York City. Finally, the defendant AL

QAEDA believes that the United Nations sanctions against the defendant IRAQ were orchestrated by the United States out of an "eagerness to destroy" the defendant IRAQ. The response of the defendant AL QAEDA was to issue fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

92.    As early as 1991, the defendants BIN LADEN and AL QAEDA began working closely with the defendant AYMAN AL ZAWAHIRI ("ZAWAHIRI"), a/k/a ABDEL MUAZ, a/k/a DR. AYMAN AL ZAWAHIRI, a/k/a THE DOCTOR, a/k/a NUR, a/k/a USTAZ, a/k/a ABU MOHAMMED, a/k/a ABU MOHAMMED NUR AL-DEEN, whose organization, the defendant EGYPTIAN ISLAMIC JIHAD, shared the goals of the defendants BIN LADEN and AL QAEDA. The defendant EGYPTIAN ISLAMIC JIHAD is a group dedicated to the forceful overthrow of the Egyptian government and committing violence against the United States. The defendant BIN LADEN had met the defendant ZAWAHIRI in Peshawar, Pakistan in 1987 during the Afghan-Soviet War.

93.    Upon information and belief, by February 1998, the defendant EGYPTIAN ISLAMIC JIHAD lead by the defendant ZAWAHIRI had effectively merged with the defendant AL QAEDA and had joined its efforts to target violent acts against United States citizens.

94.    Upon information and belief, the defendant AL QAEDA has a command and control structure which includes a "majalis al shura" (or "consultation council") that discusses and approves major undertakings, including terrorist operations. Defendants BIN LADEN, ATEF, ZAWAHIRI, SAIF AL ADEL ("SAIF AL ADEL"), MAMDOUH MAHMUD SALIM, a/k/a ABU HAJER" and ABDULLAH AHMED ABDULLAH, a/k/a ABU MOHAMED EL MASRY, a/k/a SALEH, among others, sat on the consultation council of the defendant AL

-38-

QAEDA.  Its affiliate, the defendant EGYPTIAN ISLAMIC JIHAD also had a founding council, on which the defendant IBRAHIM EIDAROUS sat.

95.    Upon information and belief, the defendant AL QAEDA also maintains a "military committee" which considers and approves military matters.  The defendant ATEF sat on the military committee and was one of the defendant BIN LADEN's two principal military commanders together with Abu Ubaidah al Banshiri, until his death in 1996.  The defendant ATEF had the principal responsibility for supervising the training of members of the defendant AL QAEDA.  The defendant SAIF AL ADEL also served on the military committee reporting to the defendant ATEF.

96.    Upon information and belief, the defendant AL QAEDA functions both on its own and as a conduit for other terrorist organizations in other parts of the world that share its ideology, such as the defendant EGYPTIAN ISLAMIC JIHAD, the defendant AHMED REFAI TAHA, a/k/a ABU YASSER AL MASRI, and a number of jihad terrorist groups in other countries, including those located in the defendant SUDAN, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Phillippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyan region of Russia.  Training camps of the defendant AL QAEDA are used to train terrorists to right in Islamic causes, such as supporting Pakistan in its dispute with India over the province of Kashmir.  The defendant AL QAEDA maintains terrorist cells and personnel in a number of countries to facilitate its activities, including Kenya, Germany, Tanzania, the United Kingdom, Canada and the United States.

97.    Upon information and belief, the defendants BIN LADEN and AL QAEDA have

-39-

also forged alliances with the National Islamic Front in the defendant SUDAN, and with representatives of the government of Iran, and its associated terrorist group, Hezbollah, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

98.    Upon information and belief, at various times from as early as 1989, the defendant BIN LADEN and others known and unknown, ran terrorist training camps and guesthouses in various areas, including Afghanistan, the defendant IRAQ, Iran, Pakistan, the defendant SUDAN, Somalia, Kenya, Malaysia, Phillippines and Germany for the use of members of the defendant AL QAEDA and its affiliated groups.  The defendants MAMDOUH MAHMUD SALIM and ABU HAJER AL IRAQI, an Iraqi, managed some of these training camps and guesthouses in Afghanistan and Pakistan.

99.    Upon information and belief, the defendant BIN LADEN was "expelled" from Saudi Arabia in 1991, and allegedly "disowned" by his own family for his extremist actions. Thereafter, the defendant BIN LADEN moved to Khartoum, the capital of the defendant SUDAN.  Here, the defendant BIN LADEN continued to recruit former fundamentalist warriors into the ranks of the defendant AL QAEDA, offering them employment and setting up terrorist training camps with his funding.  The defendant BIN LADEN also built roads and other infrastructure for the government of the defendant SUDAN with his construction company, the defendant AL-HIJRAH CONSTRUCTION AND DEVELOPMENT LTD., including the airport at Port Sudan, as well as a highway linking Khartoum to Port Sudan. These projects helped to establish and strengthen his relationship with the government of the defendant SUDAN.  His import-export firm, the defendant WADI AL-AQIQ, began doing brisk business. Another of his

companies, the defendant TABA INVESTMENT COMPANY LTD. flourished while his

agriculture company bought up huge plots of land. The defendant AL-SHAMAL ISLAMIC

BANK, in which the defendant BIN LADEN invested $50 million, helped finance all of these

thriving companies, as well as the growing presence of the defendant AL QAEDA within the

defendant SUDAN.

100.    Upon information and belief, tor five years, terrorist training activities fueled by

these economic developments continued, while the defendant BIN LADEN lived in Khartoum

under the protection of the regime of the defendant SUDAN. In 1996, the defendant BIN

LADEN moved back to Afghanistan under the protection of the defendant TALIBAN

government. For the next five years, with the aiding and abetting of all of the defendants named

herein, the defendant BIN LADEN continued to fund the terrorist training camps that filled the

ranks of the defendant AL QAEDA and served as bases from which to plan new attacks against

the United States and other Western countries.

101.    Upon information and belief, dating back to soon after 1989, and through the

funding that it was receiving from the co-conspirator defendants named herein, members of the

defendant AL QAEDA began staging international terrorist attacks. The first such attack was

against the United Nations forces in Somalia on October 3 and 4 of 1993, in which 18 American

servicemen were killed. Individuals who were members of the defendant AL QAEDA also

plotted the first terrorist attacks against the World Trade Center in 1993, and a put together a plan

in 1995 (code named "Project Bojinka") to blow up twelve American airliners simultaneously in

the Pacific region. The backup plan for Project Bojinka was to hijack planes and use them as

missiles against prominent American landmarks such as the World Trade Center, the White

House, and the CIA headquarters in Langley, Virginia. Operatives of the defendant AL QAEDA were also involved in the bombing of the Khobar Towers in Riyadh, Saudi Arabia in which five American servicemen were killed in November 1995.

102.    Upon information and belief, after the Khobar Towers attack in Saudi Arabia, a group of prominent Saudi individuals met in Paris where they agreed to "pay off" the defendants BIN LADEN and AL QAEDA to ensure that similar attacks would not occur within the borders of the Saudi Kingdom again. This protection money served to safeguard Saudi Arabia, but also enlarged the power of the defendants BIN LADEN and AL QAEDA.

103.    Upon information and belief, in 1998, the defendants BIN LADEN and AL QAEDA orchestrated an attack on the United States embassies in the East African countries of Kenya and Tanzania. These explosions resulted in two-hundred ninety-one deaths and over five-thousand injuries. Thereafter, in October 2000, operatives of the defendant AL QAEDA committed yet another act of terrorism against the United States of America when they attacked the ship, the U.S.S. Cole in Yemen.

104.    Upon information and belief, the attack on the U.S.S. Cole followed by the atrocities committed on September 11, 2001 for which the defendants BIN LADEN and AL QAEDA have publicly and proudly proclaimed direct responsibility.

105.    Although this complaint is brought under United States statutes, it is also based upon the common law and developing jurisprudence that provides that responsibility for terrorism lies not only with those who actually commit the act, but also with those who enabled or facilitated the terrorist attacks through financial backing.

106.    Since 1989, the defendants BIN LADEN and AL QAEDA and many of their co-

-42-

defendants named herein, have unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to murder and injure citizens of the United States in sites throughout the world, including the United States, and to conceal their activities and methods by, among other things, establishing front companies, providing false identify and travel documents, financing terrorist operations, engaging in coded correspondence, providing false information to the authorities in various countries and seeking to detect and kill informants.

## PREPARATION FOR THE SEPTEMBER 11TH ATTACKS

107.    Upon information and belief, according to foreign intelligence officials, in the spring of 2000, agents from the defendant IRAQI INTELLIGENCE met with defendant hijackers ZAID SAMIR JARRAH ("JARRAH") and MARWAN AL-SHEHHI ("AL-SHEHHI") in Dubai, U.A.E. in order advance the hijacking of U.S. aircraft to commit terrorist acts. Not long after the meeting, the defendant AL-SHEHHI entered the United States on May 29th and defendant JARRAH entered the United States on June 27th to begin preparations for the September 11th Attacks.

108.    Upon information and belief, according to Czech intelligence sources, on June 2, 2000, the defendant MOHAMMAD ATTA ("ATTA"), a pilot and the operational leader of the September 11th Attacks, traveled to Prague to meet other defendant co-conspirators. The following day, the defendant ATTA arrived at Newark International Airport in the United States.

109.    Upon information and belief, according to the FBI, from July 2000 through March 2001, defendants ATTA, SHEHHI, HANJOUR, JARRAH and HAMZI traveled to the U.S. where they resided and took pilot courses to learn to fly Boeing 747, 757, 767 and Airbus A320 aircraft in furtherance of the defendant AL QAEDA conspiracy to hijack U.S. commercial

-43-

aircraft to commit terrorist acts.

110.    Upon information and belief, sometime between April 8th through April 11th 2001, the defendant ATTA left Florida where he was a flight student, to again meet in Prague with an agent of the defendant IRAQI INTELLIGENCE, defendant AL-ANI.  Defendant ATTA returned to Florida and within two weeks opened a Sun County Bank account with $100,000 sent through a money changer in the UAE.  Later in 2001, the defendant AL-ANI was expelled from the Czech Republic for espionage activities.  Other intelligence reports indicate that the defendant AL-ANI met with the defendant KHALID AL MIDHAR ("MIDHAR"), another September 11th hijacker.

111.    Upon information and belief, Italian security sources reported that the defendant IRAQ made use of its embassy in Rome to foster and cultivate the defendant IRAQ's partnership with defendants BIN LADEN and AL QAEDA.  Defendant HABIB FARIS ABDULLAH AL-MAMOURI ("AL-MAMOURI"), a general in the Iraqi Secret Service, and a member of the defendant IRAQ's M-8 SPECIAL OPERATIONS branch, who was responsible for developing links with Islamist militants in Pakistan and Afghanistan, was stationed in Rome as an "instructor" for children of Iraqi diplomats.  The defendant AL-MAMOURI met with September 11th pilot hijacker defendant ATTA in Rome, Hamburg and Prague.  The defendant AL-MAMOURI has not been seen in Rome since July 2001, shortly after he last met with the defendant ATTA.

112.    Upon information and belief, on or about April 23, 2001, and on or about June 29, 2001, defendants SATAM AL SUQAMI (AA Flight 11), WALEED AL SHEHRI (AA Flight 11), AHMED AL-GHAMDI (UAL Flight 175), MAJED MOQED (AA Flight 77), AHEMD AL

-44-

NAMI (UAL Flight 93), HAMZA AL GHAMDI (UAL Flight 175), MOHALD AL SHEHRI

(UAL Flight 175), WAIL AL SHEHRI (AA Flight 11), AHMED AL HAZNAWI (UAL Flight

93), and FAYEZ AHMED (UAL Flight 175), traveled from various points in the world to the

United States.

113.    Upon information and belief, the FBI has reported that the defendant ATTA

visited commercial crop dusting aircraft facilities in Florida in March and August 2001.  In the

wake of the September 11th Attacks, authorities concluded that the defendant ATTA was

investigating the possibility of spraying chemical or biological weapons on U.S. civilians.  In

July and August 2001, on several occasions several other Middle Eastern men also visited the

same crop dusting facility.

114.    Upon information and belief, on July 7, 2001, two members of the IRAQ

MUKHABARAT, defendants ABU AGAB and ABU WA'EL traveled together from Germany

to Afghanistan and eventually to Kurdistan.  The defendant ABU WA'EL trained at the

defendant AL QAEDA terror camps and became the authority for fundamentalist groups

operating in Kurdistan, intent on crushing opposition to defendant SADDAM HUSSEIN.

115.    Upon information and belief, the FBI reported that on June 20, 2001, in

furtherance of his participation in the hijacking conspiracy, the defendant ZACARIAS

MOUSSAOUI ("MOUSSAOUI") purchased flight deck videos for Boeing 747 aircraft and took

a three day Boeing 747 simulator course in Minneapolis, Minnesota from August 13th through

15th, 2001.  The defendant MOUSSAOUI also purchased two knives in Oklahoma City,

Oklahoma on August 3, 2001.  The defendant MOUSSAOUI received approximately $14,000

from the defendant RAMZI BIN AL-SHIBH sometime between August 1st through August 3,

2001.

116.    Upon information and belief, U.S. government officials reported that in the summer of 2001, the defendants FAYEZ BANIHAMMAD (UAL Flight 175), SAEED ALGHAMDI (UAL Flight 93), SATAM AL SUQAMI (AA Flight 11), MOHALD AL SHEHRI (UAL Flight 175), AHMED AL GHAMDI (UAL Flight 93), and AHMED AL HAZNAWI (UAL Flight 93) each opened a Florida Sun Trust Bank account with a cash deposit. These and other bank accounts were used by the hijackers for living expenses, travel, pilot training, weapons and other incidentals and served as places where operatives acting on behalf of the defendant AL QAEDA could wire money to support the terrorist conspiracy in the months and weeks leading up to September 11, 2001.

117.    Upon information and belief, on September 9, 2001, the defendants BIN LADEN and members of the defendant AL QAEDA, defendant OMAR and other members of the defendant TALIBAN carried out a plan to assassinate Ahmad Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the defendant TALIBAN for many years. Defendant AL QAEDA terrorists posed as television journalists seeking an interview with Masood. The video camera was armed with explosives and when detonated at the purported interview, killed Ahmad Shah Masood, one of the suicide terrorists and other ranking members of the Afghanistan Northern Alliance opposition forces.

118.    Upon information and belief, this assassination solidified the defendant BIN LADEN's asylum and protection in the defendant TALIBAN controlled Afghanistan and cleared the way for the defendant AL QAEDA's unprecedented attack on the United States two days later. The defendant TALIBAN continued to refuse to surrender the defendant BIN LADEN and

members of the defendant AL QAEDA to the United States after the September 11th Attacks.

## THE SEPTEMBER 11TH ATTACKS

119.    On September 11, 2001, defendants MOHAMMED ATTA, ABDUL ALZIZ AL OMARI, WAIL AL-SHEHRI, WALEED AL-SHEHRI and SATAM AL SUQAMI hijacked American Airlines Flight 11 carrying 92 persons, bound from Boston, Massachusetts to Los Angeles, California, and at approximately 8:46 A.M., crashed it into the North Tower, or Tower One, of the World Trade Center in New York, New York.

120.    On September 11, 2001, defendants MARWAN AL-SHEHHI, FAYEZ AHMED, a/k/a BANIHAMMAD FAYEZ, AHMED AL-GHAMDI, HAMZA AL-GHAMDI, and MOHAUD AL-SHEHRI hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston, Massachusetts to Los Angeles, California, and at approximately 9:02 A.M., crashed it into the South Tower, or Tower Two, of the World Trade Center in New York, New York.

121.    On September 11, 2001, defendants KHALID AL-MIHDHAR, NAWAF AL-HAZMI, HANI HANJOUR, SALEM AL-HAZMI, and MAJED MOQED hijacked American Airlines Flight 77 carrying 64 persons, bound from Arlington, Virginia to Los Angeles, California, and at approximately 9:37 A.M. crashed it into the Pentagon in Arlington, Virginia.

122.    On September 11, 2001, defendants ZIAD JARRAH, AHMED AL-HAZNAWI, SAEED AL-GHAMDI and AHMED AL-NAMI hijacked United Airlines Flight 93 carrying 45 persons, bound from Newark, New Jersey to San Francisco, California with the intention of crashing it into a target in Washington, D.C., probably the White House.  At approximately 10:10 A.M., because of the heroic intervention of the United Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

123.    As a result of the defendants deliberate acts intended to cause the deaths and serious injuries of thousands of innocent persons, at approximately 9:50 A.M., the South Tower of the World Trade Center collapsed, and at approximately 10:29 A.M., the North Tower of the World Trade Center collapsed.

124.    The hijackings referenced herein were the culmination of a conspiracy among the defendants to attack the United States and murder United States citizens.

## THE IRAQI AND SUDAN DEFENDANTS

125.    Upon information and belief, since the early 1990s, the defendants IRAQ and IRAQI INTELLIGENCE have used both Iraqi agents and independent "contractors" to commit terrorist acts against the United States in revenge for Iraq's Gulf War defeat.

126.    Upon information and belief, there have been numerous meetings between agents of the defendant IRAQI INTELLIGENCE and high ranking terrorists from the defendant AL QAEDA group to plan, strategize and coordinate terror attacks.  One such meeting occurred in 1992, when defendant ZAWAHIRI, a leader of the defendant EGYPTIAN ISLAMIC JIHAD and officer of the defendant AL QAEDA met with agents of the defendant IRAQI INTELLIGENCE in Baghdad, Iraq over several days.  An Iraqi serving with the defendant TALIBAN who fled Afghanistan in the fall of 2001 and was later captured, has corroborated this meeting and confirmed that contacts between agents and operatives of the defendant IRAQ began in 1992.

127.    Upon information and belief, as referred to herein, in 1991, the defendant BIN LADEN left Saudi Arabia and relocated in the defendant SUDAN.  He centered his operations for the defendant AL QAEDA there for the next several years while maintaining offices and orchestrating terrorist recruitment, training and attacks in various parts of the world.  The

-48-

defendant BIN LADEN recruited new members in the defendant SUDAN, including defendant

MOHAMED SULEIMAN AL NALFI and at least 200 Afghan Arabs, Saudis, Yemenis and

Egyptians who had fought against the Soviets in Afghanistan and who became part of the

defendant AL QAEDA's cell in the defendant SUDAN. Defendant ABU HAJER AL-IRAQI,

a/k/a MAMDOUH MAHMUD SALIM, an Iraqi, served as the defendant BIN LADEN's top

lieutenant in the defendant SUDAN shortly after the defendant BIN LADEN's arrival in the

country.

128.    Upon information and belief, while the defendant AL QAEDA's presence was

growing in the defendant SUDAN in 1992, the government of the defendant IRAQ was also

developing close ties with the government of the defendant SUDAN. The defendant SUDAN

supported the defendant IRAQ during the Gulf War and allowed the defendant IRAQ to establish

a center for the defendant IRAQI INTELLIGENCE in the defendant SUDAN through the

defendant IRAQ's ambassador to Khartoum, the defendant ABD AL SAMAD AL-TA'ISH

("TA'ISH"). The defendant TA'ISH was a highly placed agent of the defendant IRAQI

INTELLIGENCE who brought 35 other intelligence officers with him to the defendant SUDAN

to establish a base for operations. The defendant TA'ISH remained in the defendant SUDAN

through the summer of 1998. The defendant IRAQ arranged to smuggle scud missiles, chemical

weapons and uranium into the defendant SUDAN using diplomatic mail privileges and other

means. The defendant SUDAN agreed to store this material for the defendant IRAQ for

safekeeping after the Gulf War to help circumvent U.S. weapons inspections.

129.    Upon information and belief, during the early 1990s, defendant SHEIKH

HASSAN AL-TOURABI of the Islamic National Front arranged meetings between the

defendants BIN LADEN and IRAQI INTELLIGENCE. The defendant BIN LADEN met with defendant FARUQ AL-HIJAZI, an agent of the defendant IRAQI INTELLIGENCE in the defendant SUDAN who would later head the defendant IRAQI INTELLIGENCE for the defendant SADDAM HUSSEIN. The defendant BIN LADEN met again with agents for the defendant IRAQI INTELLIGENCE in 1994 and 1995 in the defendant SUDAN. At these meetings, the defendant BIN LADEN and defendant IRAQI INTELLIGENCE secret service director defendant FARUQ AL-HIJAZI agreed to work together on terrorist projects directed against the United States.

130.    Upon information and belief, in 1996, the defendant BIN LADEN returned to Afghanistan after the defendant TALIBAN seized control of most of that country. The number of defendant AL QAEDA members and terrorist training camps in Afghanistan grew rapidly following the defendant BIN LADEN's return. The defendant AL QAEDA actively supported the defendant TALIBAN and violently suppressed all opposition to the defendant TALIBAN.

131.    Upon information and belief, from 1996 until 2001, the defendant BIN LADEN with the financial and logistical support of the defendant OMAR and others in the defendants TALIBAN, IRAQ AND IRAQI INTELLIGENCE created, supplied and operated at least five training camps in order to create an "Islamic Foreign Legion" capable of attacking their enemies throughout the world. These camps trained  men from 15 nations in guerrilla warfare, terrorist activities, rocket warfare, demolition and bombing, including the use of mines, grenades, TNT, nitroglycerine and plastic explosives.

132.    Upon information and belief, on August 23, 1996, a strengthened defendant BIN LADEN issued another fatwa declaring a jihad against Americans present in Muslim lands. The

message was disseminated throughout all of the cells of the defendant AL QAEDA and associated terrorists groups, including the defendant EGYPTIAN ISLAMIC JIHAD. The London, England cell of the defendant AL QAEDA, run by the defendant KHALID AL FAWWAZ under the name "Advice and Reformation Committee", and the Egyptian cell, run by the defendants ZAWAHIRI and ABDEL BARRY, were used to send the fatwa to Muslims living in the Western world. The defendant WADIH EL HAGE was also used by the defendant BIN LADEN to deliver messages, money and terrorist materials to defendant AL QAEDA operatives located in the United States and United Kingdom.

133.    Upon information and belief, in February 1997, the defendant BIN LADEN publicly expressed his support for the defendant IRAQ in its conflict with the United States by stating:

> "The hearts of the Muslims are filled with hatred towards the
> United States of America and the American president for American
> conduct towards IRAQ"

134.    Upon information and belief, having decided to carry out acts of terrorism, the defendant SADDAM HUSSEIN, with the advice and prompting of his son and officer of the defendant IRAQI INTELLIGENCE, QUSAY HUSSEIN and his other son, UDAY HUSSEIN, head of a subdivision of the defendant IRAQI INTELLIGENCE known as the "Fedayeen" and "Al-Qare", concluded that a campaign of terrorist attacks against the United States under the banner of the defendants BIN LADEN and AL QAEDA was the most effective means of both deflecting U.S. attempts to topple his regime and obtaining revenge.

135.    Upon information and belief, the defendant IRAQ agreed to supply arms to the defendant AL QAEDA and to provide said defendant with access to and training in the use of chemical and biological weapons and agreed to instruct trainers of the defendant AL QAEDA at its Salman Pak camp in Baghdad which contained a Boeing 707 used to practice hijacking. The defendant IRAQ also agreed to supply terrorists from the defendant AL QAEDA with new identities and passports from Yemen and the United Arab Emirates.

136.    Upon information and belief, the defendant AL QAEDA agreed to provide protection from political opponents to the defendants IRAQ and SADDAM HUSSEIN, and to commit assassinations and other acts of violence to create instability in regions of the defendant IRAQ, particularly Kurdistan, to assist the regime of defendant SADDAM HUSSEIN. The defendant AL QAEDA further agreed to provide trained errorists, assassins and martyrs to carry out terror attacks in concert with the defendant IRAQ against their common enemies, including the United States.

137.    Upon information and belief, on February 22, 1998, the defendants BIN LADEN, FAWWAZ and ZAWAHIRI of the defendant EGYPTIAN ISLAMIC JIHAD issued a fatwa published in the Arabic newspaper *Al-Quds* stating:

> "The ruling to kill the Americans and their allies - civilian and
> military - is an individual duty for every Muslim who can do it in
> any country in which it is possible to do it . . . ".

138.    Upon information and belief, additional fatwas of a similar nature were issued in May 1998 and published in *Al-Quids* under the banner of ULEMA UNION OF AFGHANISTAN.

139.    Upon information and belief, between April 25th and May 1, 1998, two of the

defendant BIN LADEN's senior military commanders, defendants MUHAMMAD ABU-ISLAM

and ABDULLAH QASSIM, visited Baghdad for discussions with the defendant SADDAM

HUSSEIN's son, defendant QUSAY HUSSEIN, the "czar" of the defendant IRAQI

INTELLIGENCE.

140.    Upon information and belief, participation by the defendant QUSAY HUSSEIN

in the aforementioned meetings highlights the importance of the talks in both symbolic and

practical terms.  As a direct result of these meetings, the defendant IRAQ again made

commitments to provide training, intelligence, clandestine Saudi border crossing, financial

support and weapons and explosives to the defendant AL QAEDA.

141.    Upon information and belief, officials of the defendant IRAQ INTELLIGENCE

met with the defendant BIN LADEN in Afghanistan several more times.  A second group of

operatives of the defendants BIN LADEN and AL QAEDA from Saudi Arabia were trained by

the defendant IRAQI INTELLIGENCE in the defendant IRAQ to smuggle weapons and

explosives into Saudi Arabia and other countries, which they later accomplished in an effort to

carry out future terrorist acts of violence.  A third group of operatives of the defendants BIN

LADEN and AL QAEDA received a month of sophisticated guerrilla operations training from

officials of the defendant IRAQI INTELLIGENCE later in the summer of 1998.

142.    Upon information and belief, the defendant BIN LADEN continually sought to

strengthen and reinforce the support he and the defendant AL QAEDA received from the

defendant IRAQ.  In July 1998, the defendant BIN LADEN sent the defendant ZAWAHIRI to

the defendant IRAQ to meet with senior officials, including Iraqi vice-president defendant

TAHA YASSIN RAMADAN.  The purpose of this meeting was to discuss and plan a joint

strategy for a terrorist campaign against the United States.

143.    Upon information and belief, officials of the defendant IRAQI INTELLIGENCE pledged the defendant IRAQ's full support and cooperation on the condition that the defendants BIN LADEN and AL QAEDA promised not to incite groups inside the defendant IRAQ opposed to the regime of the dictator defendant SADDAM HUSSEIN.

144.    Upon information and belief, during the July 1998 visit, the defendant ZAWAHIRI toured a military base and nuclear and chemical weapons facility located in the defendant IRAQ and observed training by officials of the defendant IRAQI INTELLIGENCE at the al-Nasiriyah military and chemical weapons facility in the defendant IRAQ.

145.    Upon information and belief, to demonstrate its commitment to the defendant IRAQ and its anti-U.S. policies, in the spring of 1998, the defendant AL QAEDA planned terrorist bombing attacks on the U.S. Embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania. Defendants FAZUL ABDULLAH MOHAMED, KHALFAN KHAMIS, MOHAMED, MUSTAFA MOHAMED FADHIL, MOHAMED RASHED DAOUD AL'OWALI, SHEIKH AHMED SALIM SWEDAN, FAHID MOHAMED ALLY MSALAM and an individual known as ABDULLAH AZZAM were chosen as some of the terrorists of the defendant AL QAEDA who would conduct the coordinated attacks in Nairobi and Dar Es Salaam.

146.    Upon information and belief, on August 7, 1998, at approximately 10:30 A.M., the defendants FAZUL, ABDULLAH MOHAMED, MOHAMED RASHED DAOUD AL'OWALI and ABDULLAH AZZAM drove a Toyota Dyna truck to the U.S. Embassy in Nairobi, Kenya and detonated a large bomb damaging the Embassy and demolishing a nearby Secretarial College building and Cooperative Bank building, resulting in more than 200 deaths,

including 12 Americans, and injuries to more than 4,500 people.

147.    Upon information and belief, on the same day, approximately ten minutes after the bombing in Kenya, at 10:40 A.M., defendants KHALFAN KHAMIS MOHAMED and AHMED the German detonated the Dar Es Salaam bomb in the vicinity of the U.S. Embassy in Dar Es Salaam, Tanzania, severely damaging the building, and killing 11 people and injuring more than 85 others.

148.    Upon information and belief, on August 7, 1998, shortly *before* the bombings, the defendant EIDAROUS, a member of the defendant AL QAEDA in London, England, sent a letter to news organizations in Paris, Doha, Qatar and Dubai, claiming responsibility for the Embassy bombings under the fictitious name "Islamic Army for the Liberation of Holy Places".

149.    Upon information and belief, on August 20, 1998, the United States initiated a pre-emptive and retaliatory air strike with cruise missiles on training camps of the defendant AL QAEDA in Khost, Afghanistan and a factory in Khartoum, in the defendant SUDAN, believed at the time to be a chemical weapons plan used by the defendant SUDAN and IRAQ governments to manufacture weapons for their use and for the use of terrorists of the defendant AL QAEDA.

150.    Upon information and belief, in December 1998, after a stand-off between the United Nations and the defendant IRAQ and a discovery of weapons violations in the defendant IRAQ, the United States led United Nations allies in a four day air strike on the defendant IRAQ. Following the air strikes, Iraqi Trade Minister defendant MUHAMMAD MAHDI SALAH stated that he expected terrorist activities against the United States to *increase* as a result of the bombing of the defendant IRAQ, including cooperation with the defendant BIN LADEN.

151.    Upon information and belief, following the December 1998 air strikes on the

defendant IRAQ, the defendant SADDAM HUSSEIN dispatched the defendant FARUQ AL-

HIJAZI to Kandahar, Afghanistan in order to meet with the defendant BIN LADEN to plot their

revenge.

152.    Upon information and belief, the defendant QUSAY HUSSEIN also dispatched

representatives to follow-up with the defendant BIN LADEN and obtain his firm commitment to

exact revenge against the United States for the December 1998 bombing campaign.  The

defendant IRAQ offered the defendants BIN LADEN and AL QAEDA an open-ended

commitment of joint operations against the United States and its "moderate" Arab allies in

exchange for an absolute guarantee that the defendants BIN LADEN, AL QAEDA and their

allies would not attempt to overthrow the defendant SADDAM HUSSEIN's regime in the

defendant IRAQ.

153.    Upon information and belief, the defendant IRAQ also agreed to provide the

defendants BIN LADEN and AL QAEDA with assistance of an expert in chemical weapons; and

the defendant BIN LADEN agreed to hunt down Iraqi opposition leaders who cooperated with

the United States against the defendant SADDAM HUSSEIN.  In furtherance of this agreement,

the defendant BIN LADEN agreed to have a group of the defendant AL QAEDA's "Afghan"

Arabs enter the defendant IRAQ to fight Kurdish dissidents.

154.    Upon information and belief, the defendant IRAQ maintains an advanced

chemical and biological weapons program and is one of only three countries in the world

producing a highly developed weaponized anthrax.  Some time during or after 1998, the

defendant IRAQ agreed to help the defendants BIN LADEN and AL QAEDA develop a

laboratory in Afghanistan designed to produce anthrax.

155.    Upon information and belief, by January 1999, operatives of the defendants BIN LADEN and AL QAEDA were being trained by agents of the defendant IRAQI INTELLIGENCE at training camps on the outskirts of Baghdad.

156.    Upon information and belief, in January 1999, the defendant IRAQ began reorganizing and mobilizing front operations of the defendant IRAQI INTELLIGENCE throughout Europe in support of the defendants BIN LADEN and AL QAEDA. The defendant HAQI ISMAIL, believed to be a member of the defendant IRAQ's MUKHABARAT Secret Service, left the defendant IRAQ to train in an Afghanistan camp of the defendant AL QAEDA. The defendant HAQI ISMAIL is believed to be a liaison between the defendants IRAQ, the TALIBAN and AL QAEDA and was rewarded with a position in the defendant TALIBAN's foreign ministry.

157.    Upon information and belief, in or about June 1999, during an interview with an Arabic-language television station, the defendant BIN LADEN issued a further threat indicating that all American males should be killed.

158.    Upon information and belief, on December 14, 1999, Ahmed Ressam, an operative of the defendant AL QAEDA, was arrested while driving a truck from Canada into the United States at Port Angeles, Washington. The truck was loaded with bombing making materials and detonators. Ressam later confessed to, and was convicted of conducting a defendant AL QAEDA plan to detonate a large bomb at Los Angeles International Airport on New Year's Day 2000. Defendant AL QAEDA terrorists defendants ABU JAFFER AL-JAZIRI, the defendant BIN LADEN's longtime IRAQI assistant, and defendant MAHFUZ OUL AL-WALID, a/k/a KHALED AL-SHANGUITI, a/k/a ABU HAFS, a/k/a "THE MAURITANIAN"

were both identified as orchestrating the so-called "Millennium Plot". Both are believed to have been killed in Afghanistan in January 2002 during fighting with United States Armed Forces.

159.    Upon information and belief, in April 2000, the defendant UDAY HUSSEIN, as a birthday gift to his father, defendant SADDAM HUSSEIN, assembled a squad of 1,200 trained men called "AL QARE". Third of them were dispatched with UAE passports to points around the world to stand by for orders to commit acts of sabotage, urban warfare and hijacking.

160.    Upon information and belief, in the spring of 2000, the defendant IRAQI INTELLIGENCE began planning to attack United States warships in the Persian Gulf in an effort to prompt a United States withdrawal. The defendant IRAQ sought suicide bombers who would employ small boats packed with explosives to ram United States' warships.

161.    Upon information and belief, on October 12, 2000, the defendant IRAQI INTELLIGENCE and members of the defendant AL QAEDA, including defendants BIN LADEN, JAMAL AL-BADAWI, KHALID AL-MIDHAR, MOHAMMED OMAR AL-HARAZI, WALID AL-SOUROURI, FATHA ADBUL RAHMAN, YASSER AL-AZZANI, JAMAL BA KHORSH, AHMAD AL-SHINNI, RAED HIJAZI, JAMIL QASIM SAEED MOHAMMED, as well as the two suicide boat bombers Abd Al-Mush8in Al-Taifi (deceased)(and a suspect in the August 1998 Embassy bombings) and Hassan Aaid Awadh Kheremi (deceased) carried out their plan to bomb the U.S.S. Cole by ramming a small boat loaded with explosives into the side of the ship as it was anchored in the harbor at Aden, Yemen, resulting in the deaths of 17 American sailors and injuries to an additional 39 persons.

162.    Upon information and belief, on June 20, 2001, in a videotape released to the media, the defendant BIN LADEN boasted that his followers conducted the bombing.

163.     Upon information and belief, on October 14, 2000, just two days after the attack on the U.S.S. Cole, two Saudis hijacked a Boeing 777 aircraft from Saudi Arabia and had it flown to Baghdad. The hijackers of the aircraft were granted asylum in the defendant IRAQ.

164.     Upon information and belief, this hijacking was a message from the defendants BIN LADEN and IRAQ intending to demonstrate that defendant AL QAEDA terrorists could seize control of a large commercial aircraft that could be used as a weapon in the hands of suicide terrorists, foreshadowing a coordinated attack that was less than a year away.

165.     Upon information and belief, on January 22, 2001, the Arab language newspaper *Al Watan Al Arabi* reported that the defendant SADDAM HUSSEIN and his sons had called for an Arab alliance to "launch a global terrorist war against the United States and its allies".

166.     Upon information and belief, in May 2001, operatives of the defendant AL QAEDA in Kurdistan assassinated Franso Hariri, a member of the Kurdish Democratic Party, as part of a deal with SADDAM HUSSEIN. The killing of Hariri created instability in the region by damaging relations between the co-leaders of Kurdistan, benefitting the regime of the defendant SADDAM HUSSEIN in the defendant IRAQ.

167.     Upon information and belief, in May 2001, Iraqi physician and kidney specialist, Dr. Mohammed Khayal was dispatched from Baghdad to Afghanistan for three days to treat the defendant BIN LADEN's kidney problems, further demonstrating the important relationship between the defendants IRAQ and BIN LADEN less than four months before the single largest terrorist attack in history.

168.     Upon information and belief, during the May 2001 trial of some of the defendant AL QAEDA operatives who bombed the U.S. Embassies in Africa, said defendants expressed

sympathy, solidarity and support for the defendant IRAQ and condemnation for the United States.

169.    On May 29, 2001, the defendant WADIH EL-HAGE, a U.S. citizen believed to be the defendant BIN LADEN's personal secretary, was convicted, along with MOHAMED SADEEK ODEH, MOHAMMED RASHED DAOUD AL-OWALI and KHALFAN KHAMIS MOHAMED, for participating in the conspiracy to bomb the United States' Embassies in Nairobi and Dar es Salaam in August of 1998.  The defendant BIN LADEN and other members of the defendant AL QAEDA were indicted for these crimes, but remain at large.

170.    Upon information and belief, the defendant IRAQ knew in advance that the defendant AL QAEDA was planning to attack U.S. landmarks and civilians in September 2001 in Washington, D.C. and New York, and the defendant IRAQ supported the planned attacks.

171.    Upon information and belief, Iraqi news columnist, defendant NAEEM ABD MULHALHAL ("MULHALHAL) has been connected with the defendant IRAQI INTELLIGENCE since the early 1980s.  As such, he comments on matters of Iraqi political interest for an Iraqi newspaper published in the provincial capital city of Al Nasiriyah.  On September 1, 2001, he was honored for his "documentation of important events and heroic deeds that proud Iraqis have accomplished" and praised by the defendant SADDAM HUSSEIN.

172.    Upon information and belief, on July 21, 2001, approximately 6 weeks prior to the September 11th Attacks, the defendant MULHALHAL reported that the defendant BIN LADEN was making plans to "demolish the Pentagon after he destroys the White House".

173.    Upon information and belief, the defendant MULHALHAL's July 21st article further informed that the defendant BIN LADEN would strike America "on the arm that is

already hurting". This references a second attack on the World Trade Center sponsored by the

defendant IRAQ. This interpretation is further bolstered by another reference to New York as

"[BIN LADEN] will curse the memory of Frank Sinatra every time he hears his songs" (e.g.

"New York, New York") identifying New York, New York as a target.

174.    Upon information and belief, the defendant MULHALHAL further indicated "the

*wings* of a dove and the *bullet* are all but one and the same in the heart of a believer" (emphasis

supplied). This appears to be a reference to the use of commercial aircraft as a weapons. The

information was reported in an Iraqi newspaper who editor-in-chief serves as secretary to

defendant UDAY HUSSEIN's Iraqi Syndicate of Journalists. The article expressed Iraqi

admiration and support for the defendant BIN LADEN's plans and its appearance in the

newspaper would clearly have to be endorsed by the defendant SADDAM HUSSEIN himself.

175.    Upon information and belief, all Iraqi news media is strictly controlled and

censored by the government of the defendant SADDAM HUSSEIN and in under the direct

oversight of the defendant UDAY HUSSEIN. Various members of the defendant IRAQI

INTELLIGENCE work at and control the content of each and every newspaper published inside

the defendant IRAQ.

176.    Upon information and belief, the information contained in the defendant

MULHALHAL's published statements were known prior to the September 11th Attacks, and the

defendant MULHALHAL has ties to the defendant IRAQI INTELLIGENCE, demonstrates

foreknowledge of the planned attacks by the defendant BIN LADEN and indicates support by the

defendant IRAQ co-conspirators.

## SAUDI DEFENDANTS

177.    Upon information and belief, there were and are a large number of Saudi businesses, citizens, and members of the Saudi Royal Family who have supported the defendant BIN LADEN.  High ranking officials in the Saudi government and Saudi businessmen have provided money to support the defendants BIN LADEN and AL QAEDA.  Money to fund the terrorist operations of the defendants BIN LADEN and AL QAEDA has been transferred by using charitable institutions, businesses and banks.  In many cases, these entities shared management and/or offices, creating an interlocking financing structure that obscures the movement, source and ultimate destination of money.

178.    Upon information and belief, certain of the highest members of the Saudi Royal Family have maintained a close relationship with the defendant BIN LADEN stretching back several years.

179.    Upon information and belief, on August 2, 1990, the defendant IRAQ invaded Kuwait.  The defendant BIN LADEN met with the defendant PRINCE SULTAN BIN ABDUL AZIZ AL-SAUD ("PRINCE SULTAN").  The defendant PRINCE SULTAN is the Second Deputy Prime Minister, Minister of Defense and Aviation, Inspector General, and Chairman of the Board of Saudi Arabian Airlines, which does business in the United States.  During this meeting, the defendant BIN LADEN offered the engineering equipment available from his family's construction company and suggested bolstering Saudi forces with Saudi "Afghans" who he was willing to recruit.

180.    Upon information and belief, the aforesaid offer was also made to the defendant TURKI AL-FAISAL AL SAUD ("PRINCE TURKI"), then Chief of Saudi Intelligence,

Istakhbarat.  The defendant PRINCE TURKI  had an ongoing relationship with the defendant BIN LADEN from the time that they first met in Islamabad, Pakistan at the Saudi embassy, during the Soviet Union occupation of Afghanistan.

181.    Upon information and belief, in or about 1995, Istakhbarat, headed by the defendant PRINCE TURKI, decided to give massive financial support to the defendant TALIBAN.

182.    Upon information and belief, in 1996, according to a non published French intelligence report, a group of Saudi princes and business leaders met in Paris and agreed to continue contributing, sponsoring, aiding and abetting the terrorist network of the defendant BIN LADEN.

183.    Upon information and belief, in July 1998, a meeting occurred in Kandahar, Afghanistan that led to an agreement between Saudi Arabia and the defendant TALIBAN.  The participants at the meeting were the defendant PRINCE TURKI, leaders of the defendant TALIBAN, senior Pakistani intelligence officers, and representatives of the defendant BIN LADEN.  The agreement stipulated that the defendant BIN LADEN and his followers would not use the infrastructure in Afghanistan to subvert the Saudi government and in return, the Saudis would make sure that no demands for the extradition of individuals, including the defendant BIN LADEN and/or the closure of terrorist facilities and camps were ever met.  The defendant PRINCE TURKI also promised to provide oil and generous financial assistance to the defendant TALIBAN in both Afghanistan and Pakistan.

184.    Upon information and belief, the defendant PRINCE TURKI headed Istakhbarat until August 2001.  Istakhbarat had served as the defendant BIN LADEN's nexus to the network

of Saudi charities, foundations, and other funding sources.

185.    Upon information and belief, in December 1998, the defendant PRINCE TURKI was instrumental in arranging a meeting in Kandahar between Iraqi senior intelligence operatives, the Ambassador to Turkey, Faruq al-Hijazi, and the defendant BIN LADEN.

186.    Upon information and belief, the defendant PRINCE SULTAN BIN ABDULAZIZ AL SAUD, ("PRINCE SULTAN") is the son of Abdulaziz Bin Faisal al Saud, founder of the modern Kingdom of Saudi Arabia. The defendant PRINCE SULTAN, is one of the seven full brothers of King Fahd bin Abdulaziz al Saud and was appointed Governor of Riyadh in 1947.

187.    Upon information and belief, the defendant PRINCE SULTAN has been the Second Deputy Prime Minister, Minister of Defense and Aviation since 1963 and Inspector-General of the Kingdom of Saudi Arabia. In addition, the defendant PRINCE SULTAN is Chairman of the Supreme Council for Islamic Affairs.

188.    Upon information and belief, beginning with the Gulf War and continuing through the current Afghanistan Operations, the defendant PRINCE SULTAN has taken radical stands against Western countries and publicly supported and funded several Islamic charities who were known to have sponsored the operations of the defendants BIN LADEN and AL QAEDA, including those of the defendants INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, MUSLIM WORLD LEAGUE, WORLD ASSEMBLY OF MUSLIM YOUTH AND AL-HARAMAIN.

189.    Upon information and belief, shortly after the September 11th Attacks, the defendant PRINCE SULTAN publicly accused the "Zionist and Jewish lobby" of orchestrating a

"media blitz" against the Kingdom. Saudi embassy press release announced in April 2001 that "Prince Sultan affirms [the] Kingdom's Support" for the Palestinian Intifada, to the tune of $40 million already disbursed to "the families of those martyred" and other "worthies."

190.    Upon information and belief, the defendant PRINCE SULTAN also denied the United States use of Saudi bases to stage military strikes on Afghanistan after the September 11th Attacks, stating that his government "will not accept in [Saudi Arabia] even a single soldier who will attack Muslims or Arabs." Years before, in much the same way, the defendant PRINCE SULTAN stated that his country would not permit allied aircraft to launch preventive or major retaliatory strikes against the defendant IRAQ from bases located in Saudi Arabia, and further expressing the hope that the Arab Nationals who fought alongside the defendant TALIBAN would be allowed to return safely to their respective countries.

191.    Upon information and belief, in 1994, the Saudi Kingdom issued a royal decree banning the collection of money in the Kingdom for charitable causes without official permission. King Fahd set up a Supreme Council of Islamic Affairs, headed by his brother, the defendant PRINCE SULTAN to centralize, supervise and review aid requests from Islamic groups. This council was established to control charity financing and look into ways of distributing donations to eligible Muslim groups.

192.    Upon information and belief, as Chairman of the Supreme Council, the defendant PRINCE SULTAN could not have ignored the destination of the charity funds, and at a minimum, could not have ignored the implication of several of those entities in financing the defendant AL QAEDA terrorist organization.

193.    Upon information and belief, despite that knowledge, the defendant PRINCE

-65-

SULTAN directly funded several Islamic charities over the years, including the defendants

INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, AL-HARAMAIN, MUSLIM

WORLD LEAGUE, and the WORLD ASSEMBLY OF MUSLIM YOUTH, all of which are

involved in financing the terrorist operations of the defendant AL QAEDA.

194.    Upon information and belief, the defendant YASIN AL-QADI ("AL-QADI")

a/k/a SHAYKH YASSIN ABDULLAH KADI, a/k/a YASIN KHADI, is a Saudi business man

who funded the defendant charity, MUWAFAQ FOUNDING ("MUWAFAQ), a/k/a BLESSED

RELIEF, designed to offer education and food donations.  The defendant MUWAFAQ was

initially established in Zagreb, Croatia and was run by the defendant SAFIQ AYADI.  The

defendant MUWAFAQ combines its charitable work with active support of Muslim terrorists in

armed conflict and was used by the defendant AL-QADI and others to transfer millions of dollars

to the defendants BIN LADEN and AL QAEDA and other violent Islamic groups.

195.    Upon information and belief, in June 1998, the U.S. Justice Department stated

that the defendant AL-QADI was providing funding to the terror group Hamas.  According to a

federal lawsuit it filed in 1998, the defendant AL-QADI transferred $820,000 to help purchase

weapons for Hamas operations in Israel.

196.    Upon information and belief, the defendant AL-QADI's personal investments are

also linked to the defendant BIN LADEN.  In December of 1998, the defendant AL-QADI was

installed as a board member of the defendant GLOBAL DIAMOND RESOURCES, INC.

("GLOBAL DIAMOND") based in San Diego, California.  The defendant AL-QADI's presence

on the board of GLOBAL DIAMOND was at the request of the siblings of the defendant BIN

LADEN who were major investors in the company through the financial conglomerate, the

defendant BIN LADEN GROUP.

197.    Upon information and belief, the defendant AL-QADI sits on the board of the defendant GLOBAL DIAMOND as a representative of NEW DIAMOND HOLDINGS, a foreign investor firm that has a controlling interest in the defendant GLOBAL DIAMOND.

198.    Upon information and belief, the defendant GLOBAL DIAMOND is a diamond company that manages three mines in South Africa.

199.    Upon information and belief, the defendants BIN LADEN and AL QAEDA have been trading in diamonds to support their terrorist activities and to convert currency for ease of movement.

200.    Upon information and belief, the defendants MUWAFAQ, AL-QADI and AYADI have had their assets frozen by the United States, and are co-conspirators with the defendants BIN LADEN and AL QAEDA.

201.    Upon information and belief, the defendant MUWAFAQ has been further linked to the defendant AL QAEDA through the defendant KHALID BIN MAHFOUZ ("MAHFOUZ"), who is the former lead financial adviser to the Saudi Royal Family.  The defendant MAHFOUZ has endowed the defendant MUWAFAQ with substantial sums of money, and is a supporter of the defendant BIN LADEN.

202.    Upon information and belief, the defendant MAHFOUZ is linked to the defendant BIN LADEN through several financial and charitable organizations, including the defendants INTERNATIONAL DEVELOPMENT FOUNDATION, SAUDI SUDANESE BANK and AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY ("EXPORT PROMOTION AND MARKETING COMPANY") and the NATIONAL COMMERCIAL

BANK.

203.    Upon information and belief, the family of the defendant MAHFOUZ controlled the defendant NATIONAL COMMERCIAL BANK in Saudi Arabia until 1999 when the Saudi government bought the majority of its ownership.  The defendant NATIONAL COMMERCIAL BANK has financed the operations of the defendant BIN LADEN and reports from the defendant NATIONAL COMMERCIAL BANK show that in 1998, the defendant MUWAFAQ provided the defendant BIN LADEN with $3 million dollars.

204.    Upon information and belief, an audit of the defendant NATIONAL COMMERCIAL BANK conducted in 1998 revealed that over a 10 year period $74 million were funneled by its Zakat Committee to the defendant INTERNATIONAL ISLAMIC RELIEF ORGANIZATION ("IIRO"), headed by the defendant MOHAMMED JAMAAL KHALIFA ("KHALIFA"), brother-in-law to the defendant BIN LADEN.

205.    Upon information and belief, the defendant MOHAMMED SALIM BIN MAHFOUZ ("SALIM BIN MAHFOUZ")(the brother of the defendant MAHFOUZ) is the founder of the defendant SAUDI SUDANESE BANK located in Khartoum in the defendant SUDAN, which in the early 1990s, shared an address With the defendant IIRO, a known recruiting facility for the defendant AL QAEDA.  The London branch of the defendant IIRO shares an address with the defendant INTERNATIONAL DEVELOPMENT FOUNDATION, an organization also believed to be designed to support activities of the defendant BIN LADEN and also established by the defendant SALIM BIN MAHFOUZ.

206.    Upon information and belief, the defendant MAHFOUZ served on the board of directors of the defendant MUWAFAQ.

-68-

207.    Upon information and belief, the defendant SALIM BIN MAHFOUZ managed the defendant EXPORT PROMOTION AND MARKETING COMPANY, a company directly linked to the defendant BIN LADEN.

208.    Upon information and belief, the defendant MAHFOUZ is also linked to the defendant SAAR FOUNDATION, a/k/a SAAR NETWORK ("SAAR NETWORK") and its related charities.  Offices of the defendant SAAR FOUNDATION, a Saudi financed entity located in Herndon, Virginia, were searched by the U.S. Treasury Department investigators in March 2002.  The defendant SAAR shares a mailing address with many Islamic organizations, with overlapping offices, donors, directors and significantly, overlapping goals.  Many of the organizations whose offices were searched along with the defendant SAAR, have been listed by the U.S. Treasury as having links to the defendant BIN LADEN or of sponsoring terrorism.

209.    Upon information and belief, Virginia Secretary of State Corporate Records indicate that there are more than one hundred affiliated organizations registered or doing business at just one of the defendant SAAR's addresses in Herndon, Virginia.  Most of these organizations do not maintain a physical presence at that address, or elsewhere.  The defendant SAAR NETWORK is a sophisticated arrangement of non-profit and for-profit organizations that serve as front-groups for fundamentalist Islamic terrorist organizations.

210.    Upon information and belief, the defendant SAAR NETWORK and the more than one-hundred businesses that make up its reach are fronts for sponsors of terror.  Members of the defendant SAAR NETWORK are closely intertwined with defendants IIRO, MUSLIM WORLD LEAGUE and their related "charities."  The connections between the al-Rajhi family, the defendant SAAR NETWORK, and the terrorist front-groups goes beyond the financial network

in that there is a repetitious pattern of overlapping officers between them as well.  The United

States branches of the defendant MUSLIM WORLD LEAGUE and its subsidiaries are a part of

the defendant SAAR NETWORK in that they share officers and addresses, and are analogous to

the defendant SAAR NETWORK in that they play an intermediary role between wealthy Saudi

financiers and terrorist groups.

211.    Upon information and belief, co-conspirators, and aiders and abettors of the

defendant SAAR network include the defendants ABU SULAYMAN, AHMED TOTONJI,

HINMAN AL-TALIB, IQBAL YUNUS, JAMAL BARZINJI, M. OMAR ASHRAF,

MOHAMMED JAGHLIT, MUHAMMAD ASHRAF, TAHA JABER AL-ALWANI, TARIK

HAMDI, YAQUB MIRZA, SHERIF SEDKY, AFRICAN MUSLIM AGENCY, ARADI, INC.,

GROVE CORPORATE, INC., HERITAGE EDUCATION TRUST, INTERNATIONAL

INSTITUTE OF ISLAMIC THOUGHT, MAR-JAC INVESTMENTS, INC., MAR-JAC

POULTRY, INC., MENA CORPORATION, RESTON INVESTMENTS, INC., SAAR

INTERNATIONAL, SAFA TRUST, STERLING CHARITABLE GIFT FUND, STERLING

MANAGEMENT GROUP, INC., and YORK FOUNDATION, all doing business in and/or

registered to do business in the United States.

212.    Upon information and belief, the defendant JAMAL BARZINI ("BARZINI") of

the defendant WORLD ASSEMBLY OF MUSLIM YOUTH ("WAMY") with offices in

Herndon, Virginia, was also a target of the U.S. Treasury Department's raids following the

September 11th Attacks.  The president of defendant WAMY is the defendant ABDULA BIN

LADEN, the younger brother of the defendant BIN LADEN.  The U.S. government has frozen

the assets of the defendants WAMY and BARZINI because of their role in funneling money to

the defendants BIN LADEN and AL QAEDA.

213.    Upon information and belief, the defendant WAMY is a front for the defendant AL QAEDA. Co-conspirators, and aiders and abettors of the defendant WAMY include the defendants WAMY INTERNATIONAL, INC., ABDULLAH BIN LADEN, IBRAHIM S. ABDULLAH, MOHAMMAD BIN FARIS, and DR. MAHMOUD DAKHIL, all located in, doing business or registered to do business in the United States.

214.    Upon information and belief, the defendant SAAR NETWORK provided the bulk of the operating expenses for the defendant INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT ("IIIT") which, in turn, financed two Florida charitable organizations accused of being cells for Islamic Jihad in Florida. The defendant IIIT is directed by the defendant TAHA AL ALWANI, an Iraqi who also founded the defendant MUSLIM WORLD LEAGUE, another group whose assets were also frozen by the U.S. government because of its links to terror. The defendant MUSLIM WORLD LEAGUE is funded, in part, by Saudi government officials.

215.    Upon information and belief, the defendant MUSLIM WORLD LEAGUE is the parent organization of the defendant IIRO, one of the charities exploited by the defendant AL QAEDA.

216.    Upon information and belief, the defendant MUSLIM WORLD LEAGUE has at least two offices located in the United States: one in New York City and its main office in Herndon, Virginia.

217.    Upon information and belief, several employees of the defendant MUSLIM WORLD LEAGUE, parent of the defendant IIRO, have explicitly worked with members of the defendant AL QAEDA. Associates of the defendant BIN LADEN from Afghanistan infiltrated

and propagated offices of the defendant MUSLIM WORLD LEAGUE around the world.

218.    Upon information and belief, co-conspirators, and aiders and abettors of the defendant IIRO include defendants: SUCCESS FOUNDATION, INC., MOHAMED S. OMEISH, ABDURAHMAN ALAMOUDI, KHALED NOURI, SULAIMAN AL-ALI, ABDULLAH M. AL-MAHDI, TAREQ M. AL-SWAIDAN, ABDUL AL-MOSLAH, SALAH BADAHDH, ABDULLAH BIN SALEH AL OBAID, HASSAN A.A. BAHFZALLAH, and M. YAQUB MIRZA, all doing business in and/or registered to do business in the United States.

219.    Upon information and belief, the defendant RABITA TRUST, another branch of the defendant MUSLIM WORLD LEAGUE, has had its assets frozen by the United States Treasury.  The defendant RABITA TRUST receives the majority of its funding from the defendant MUSLIM WORLD LEAGUE.  The defendant WA'EL HAMZA JALAIDAN, as Secretary General of the defendant RABITA TRUST, and the defendant MUSLIM WORLD LEAGUE office in Peshawar, Pakistan have repeatedly aided and abetted terrorist members of the defendant AL QAEDA.

220.    Upon information and belief, the defendant RABITA TRUST is also connected to the defendant SAAR NETWORK through two of its officers, defendants DR. ABDULLAH OMAR NASEEF ("NASEEF") and ABDULLAH AL-OBAID ("OBAID").  The defendant NASEEF is one of the founders of the defendant RABITA TRUST, and also served as Secretary-General of the defendant MUSLIM WORLD LEAGUE, and is involved in the works of the defendant SAAR NETWORK.  The defendant OBAID is also an officer at the defendant SAAR NETWORK and at the defendant MUSLIM WORLD LEAGUE.

221.    Upon information and belief, co-conspirators, and aiders and abettors of the

-72-

defendant MUSLIM WORLD LEAGUE and the defendant RABITA TRUST include the

defendants ABDULLAH BIN SALEH AL-OBAID, HASSAN A.A. BAHAFZALLAH, and

YAQUB M. MIRZA, all located in, doing business or registered to do business in the United

States.

222.    Upon information and belief, the defendant SULEIMAN ABDEL AZIZ AL

RAHJI ("AZIZ AL-RAHJI"), a Saudi banker, is a large contributor to the defendant SAAR

NETWORK, which raised more than one and half billion dollars in one recent year.  Director of

one of the defendant AZIZ AL-RAHJI's businesses, the defendant OBAID is also the president

of the defendant MUSLIM WORLD LEAGUE.

223.    Upon information and belief, the defendant SAUDI BIN LADEN GROUP ("BIN

LADEN GROUP"), a/k/a BIN LADEN CORPORATION, is one of the largest conglomerates in

the Middle East today, estimated to generate $3 billion to $5 billion dollars in annual revenues.

A multi-national group of companies, the defendant BIN LADEN GROUP has several divisions

including construction, real estate, petroleum, telecommunication projects and a media operating

division with offices around the world and in the United Sates.

224.    At the time of the September 11th Attacks, 22 members of the family of the

defendant BIN LADEN were living in the United States.

225.    Upon information and belief, while publicly denying a relationship with the

defendant BIN LADEN, a number of his brothers and a brother-in-law personally and privately

support his cause and contribute monies to the defendant BIN LADEN's jihad efforts.  Some of

these familial supporters of the defendant BIN LADEN's terror network including his brother,

the defendant ABDULA BIN LADEN, and his brother-in-law, the defendant MOHAMMED

JAMAL KHALIFA, who has ties to the defendant IIRO and the defendant BENEVOLENCE

INTERNATIONAL FOUNDATION, INC. ("BIF").

226.    Upon information and belief, the defendant BIF is a Saudi based charity set up by

the defendant SHEIK ADIL GALIL BATARGY ("BATARGY"), a/k/a ADEL ABDUL JALIL

BATTERJEE, chairman of the defendant SHAMAL ISLAMIC BANK.  Upon information and

belief, the defendant BATARGY befriended the defendant BIN LADEN during the Afghan-

Soviet War.

227.    Upon information and belief, the U.S. State Department reported that the

defendant BIN LADEN capitalized the defendant SHAMAL ISLAMIC BANK with a $50

million investment.  The defendant BIN LADEN and the companies he set up in the early 1990s,

maintain accounts at the defendant SHAMAL ISLAMIC BANK.  According to U.S. government

officials, the defendant SHAMAL ISLAMIC BANK has been used as a conduit to funnel funds

to the defendant AL QAEDA terrorists.

228.    Upon information and belief, the defendant BIF has a branch in Illinois that

purports to provide assistance to Muslim orphanages and hospitals in the United States and

abroad, particularly in Bosnia.  The current chief executive of the defendant BIF is the defendant,

ENAAM M. ARNANOUT ("ARNANOUT").  The defendant BATARGY remains a director of

the defendant BIF according to documents filed with the Illinois Secretary of State.  The

defendant ARNANOUT was arrested in May 2002 on charges that he perjured himself by

denying links with the defendants BIN LADEN and AL QAEDA.

229.    Upon information and belief, the defendant ARNANOUT initially denied

knowing the defendant BIN LADEN, but a March 19, 2002 police raid at Bosnian offices and

homes related to the defendant BIF, uncovered photographs of the defendant ARNANOUT with a rifle in his hands and the defendant BIN LADEN at his side at what appeared to be a training facility for the defendant AL QAEDA. Documents found in the raid detail a relationship between the defendants ARNANOUT and BIN LADEN dating back 15 years. Both the defendant BIF and defendant ARNANOUT have had their assets frozen and are believed, by the United States Department of Justice, to be co-conspirators of the defendant AL QAEDA.

230. Upon information and belief, a former member of the defendant AL QAEDA informed the FBI that the defendant BIF is used by the defendant AL QAEDA for logistical support. Additionally, terrorists attempting to obtain chemical and nuclear weapons on behalf of the defendant AL QAEDA had direct contacts with the defendant BIF and its employees, and listed the Illinois offices of the defendant BIF as their residence.

231. Upon information and belief, terrorists who had direct contact with the defendant BIF include the defendant MAMDOUH MAHMUD SALIM ("SALIM"), an Iraqi who established links between the defendant AL QAEDA and groups in the defendants IRAQ and SUDAN and Lebanon. The defendant SALIM was a key aide to the defendant BIN LADEN and tried to obtain nuclear and chemical weapons for the defendant AL QAEDA. The defendant SALIM was arrested in the 1998 Embassy bombings and was at one time listed as a director of the defendant BIF.

232. Other terrorists linked to the defendant BIF include the defendants MOHAMED BAYAZID, who also assisted the defendant AL QAEDA's attempts to acquire nuclear materials; defendant MOHAMAD JAMAL KHALIFA, brother-in-law of the defendant BIN LADEN who has been linked to the 1993 World Trade Center bombing and the disrupted plot to bomb 12

American airliners in 1995; and the defendant WALI KHAN AMIN SHAH who was convicted for his participation in the plot to bomb American airliners.

233.    Upon information and belief, the defendant BIF assisted these and other terrorists associated with the defendant AL QAEDA with housing, travel documents and/or funding in the United States and abroad.  Members of the defendant AL QAEDA were given jobs with the defendant BIF and used the charity to transfer money to other members of the defendant AL QAEDA.

234.    Upon information and belief, other evidence obtained in a search of the defendant BIF's U.S. headquarters in Illinois, included a newspaper clipping of an article about using small pox as a biological terrorism weapon.  The section of the story reporting that authorities are not prepared for a biological attack using small pox was highlighted.  Also recovered in the search was a handwritten plea for donations to the defendant BIF that cited as reasons to contribute "to repel the Crusader-Zionist attack on Muslim lands" and "steeds of war projects" which the FBI interpreted to be a reference to the verse in the Koran which says "Against them, (the enemies) make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies. . . ".

235.    Upon information and belief, using unidentified witnesses who are former members of the defendant Al QAEDA or terrorists currently in U.S. custody, and documents seized in the raids on the defendant BIF's offices in Chicago and Bosnia, the U.S. Justice Department has detailed links between the defendant BIF and the defendants BIN LADEN and AL QAEDA.

236.    Upon information and belief, federal agents stated that the defendants BIN

LADEN and AL QAEDA withdrew funds from bank accounts held by the defendant BIF to support terrorist activities, and that the accounts of the defendant BIF in offices around the world provided a cover for the movement of terror funds.

237. Upon information and belief, co-conspirators, and aiders and abettors of the defendant BIF include the following defendants: BENEVOLENCE INTERNATIONAL FOUNDATION – U.S.A. (Main Office), BENEVOLENCE INTERNATIONAL FOUNDATION – U.S.A. (East Coast Office), BENEVOLENCE INTERNATIONAL FOUNDATION – Canada, SYED SULEMAN AHMER, ENAAM MAHMOUD ARNANOUT, a/k/a ABDEL DEL SAMIA, a/k/a ABU MAHMOUD, MAZIN M.H. BAHARETH, SHAHIR ABDULRAOOF BATTERJEE, ZAHIR H. KAZMI, MUZAFFAR KHAN, SOLIMAN J. KHUDEIRA, and JAMAL NYRABEH, all located in, doing business or registered to do business in the United States.

238. Upon information and belief, the defendant AL-BARAKAAT is a money transfer network with operations in 40 countries. It was founded in 1989 by the defendant SHEIKH AHMED NUR ALI JUMALE, with significant investment from the defendant BIN LADEN, a friend of Jumale's from the Afghanistan-Soviet War.

239. Upon information and belief, during the 1990s and in 2000 and 2001, the defendant AL-BARAKAAT financial network moved over $300 to $400 million dollars per year in its worldwide chain, of which, an estimated $15 to $20 million dollars is believed to have gone to finance the operations of the defendant AL QAEDA. The defendant AL-BARAKAAT also donated a portion of its commissions to the defendant AL QAEDA. In addition to funding the defendant AL QAEDA and shepherding its money around the world for use by terrorists, the

defendant AL-BARAKAAT provided Internet and telephone services to terrorists and arranged money for weapons transfers in various parts of the world.

240.    Upon information and belief, as a result of the September 11th Attacks, the following affiliates of the defendant AL-BARAKAAT financial network have had their assets frozen as a result of their conspiracy with and aiding and abetting the defendant AL QAEDA's terrorist actions:

Affiliates of Defendant AL-BARAKAAT Located in North America:

Al-Barakaat Wiring Service of Minneapolis; Barakaat Boston of Dorchester, Massachusetts; Barakaat North America, Inc. of Dorchester, Massachusetts and Ottawa, Ontario; Barakat Wire Transfer Co. of Seattle; Somali International Relief Organization of Minneapolis.

Affiliates of Defendant AL-BARAKAAT Located in Somalia

Barakaat Telecommunications; Al-Baraka Exchange; Barakaat Refreshment Co.; Al-Barakaat; Al-Barakaat Bank; Al-Barakaat Bank of Somalia; Al-Barakaat Group of Companies Somalia, Ltd.; Al-Barakaat Finance Group; Al-Barakaat Financial Holding Company; Al-Barakaat Global Telecommunications; Barakaat Group of Companies; Barakaat International Companies (BICO); Barakaat Red Sea Telecommunications; Barakat Telecommunications Co. Ltd., (BTELCO); Barakat Bank and Remittances; Barakat Computer Consulting (BCC); Barakat Consulting Group (BCG); Barakat Global Telephone Co.; Barakat Post Express (BPE); Heyatul Ulya; Red Sea Barakat Co. Ltd.; Somali Internet Company.

Affiliates of Defendant AL-BARAKAAT Located in the United Arab Emirates

Barako Trading Company, LLC; Al Baraka Exchange.

Each of the foregoing businesses and affiliates is believed to have funneled money to the

defendant AL QAEDA.

241.    Upon information and belief, the defendant AL BARAKA INVESTMENT &

DEVELOPMENT CORPORATION ("AL BARAKA BANK") is a wholly owned subsidiary of

the defendant DALLAH ALBARAKA GROUP ("DALLAH ALBARAKA") based in Jeddah,

Saudi Arabia. Its investments include 43 subsidiaries, consisting mainly of banks located in

Arab and Islamic countries. Most are known as or registered as "AL BARAKA BANK." United

States assets include AL BARAKA BANCORP INC. in Chicago, Illinois, and AL BARAKA

BANCORP INC. in Houston, Texas.

242.    Upon information and belief, the defendant AL BARAKA BANK provided

financial funding to commanders of the defendant AL QAEDA which, in whole or in part,

permitted the September 11th Attacks to take place.

243.    Upon information and belief, the defendant AL BARAKA BANK provided the

defendant BIN LADEN with financial infrastructures inside the defendant SUDAN dating back

to 1983.

244.    Upon information and belief, the defendant AL BARAKA BANK operates

primarily in the banking sector of the defendant SUDAN, through assets held in defendants

ALGHARB ISLAMIC BANK, AL SHAMAL ISLAMIC BANK, FAISAL ISLAMIC BANK,

SUDANESE ISLAMIC BANK and TADAMON ISLAMIC BANK. The defendant AL

BARAKA BANK is also affiliated with the defendant NATIONAL DEVELOPMENT BANK

located in the defendant SUDAN.

245.    Upon information and belief, the defendant SALEH ABDULLAH KAMEL,

former adviser to the Saudi Minister of Finance, founded the defendant DALLAH ALBARAKA.

246.    Upon information and belief, the defendant DALLAH ALBARAKA is a diversified conglomerate based in Jeddah, Saudi Arabia, involved in various industries, services and financial activities.  The group includes 23 banks located mostly in the Arab and Islamic countries, in addition to several investment and financial companies.

247.    Upon information and belief, the defendant DALLAH ALBARAKA portfolio includes a wholly owned subsidiary specializing in aviation-services, DALLAH AVCO TRANS-ARABIA CO. LTD., formed in 1975 and based in Jeddah, Saudi Arabia.

248.    Upon information and belief, two of the September 11th hijackers of American Airlines Flight 77, defendants AWAF AL HAZMI and KHALID AL MIHDHAR received funding from the defendant OMAR AL BAYOUMI ("AL BAYOUMI")a/k/a ABU IMARD a Saudi national who paid their house rent in San Diego.  The defendant AL BAYOUMI is listed as a suspect wanted by the FBI in connection with the September 11th Attacks.

249.    Upon information and belief, the defendant AL BAYOUMI was Assistant to the Director of Finance for DALLAH AVCO, based on an application he filed for admission to a doctoral program at Case Western Reserve University in Cleveland in 1998.

250.    Upon information and belief, on May 5, 1998, the defendant AL BAYOUMI registered a fictitious company name called Masjid al Madinah al Munawarah based in San Diego, California.

251.    Upon information and belief, on March 25, 1999, a mosque was registered in the State of Pennsylvania under the name of Masjid al Madinah al Munawarah Inc.

252.    Upon information and belief, the financial arm of the defendant DALLAH ALBARAKA is the defendant AL BARAKA BANK.

-80-

253.   Upon information and belief, the defendant SALEH ABDULLAH KAMEL, chairman of the defendants DALLAH ALBARAKA and AL BARAKA BANK, was one of the three founding members of the defendant AL SHAMAL ISLAMIC BANK in 1983, and was also chairman of a Sudanese company, the defendant AL SHAMAL FOR INVESTMENT AND DEVELOPMENT and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim.

254.   Upon information and belief, the defendant AL BARAKA BANK provided support to the defendant AL HARAMAIN's operations and helped transfer funds for the defendant BIN LADEN which has been confirmed by a report authored by Bosnian intelligence.

255.   Upon information and belief, the defendant AL SHAMAL ISLAMIC BANK was formed in the defendant SUDAN in April 1983.  In April 1984, the defendant AL SHAMAL ISLAMIC BANK issued shares to its main founders, including the Government of Northern State of Sudan, the defendant FAISAL ISLAMIC BANK - SUDAN, the defendant SALEH ABDULLAH KAMEL, his brother defendant OMAR ABDULLAH KAMEL, and the defendant AL BARAKA BANK.  The defendant FAISAL ISLAMIC BANK - SUDAN is a subsidiary of Islamic Investment Company of the Gulf (Bahrain) EC, whose holding company is the defendant DAR-AK-MAAL AL ISLAMI (DMI), based in Switzerland.  The entity is chaired by the defendant MOHAMMED AL FAISAL AL SAUD, and controlled by Saudi investors.

256.   Upon information and belief, in or about the same year of the bank's formation, the defendant BIN LADEN moved several of his Saudi businesses and assets, or extended the reach of these businesses and assets, into the defendant SUDAN.

257.   Upon information and belief, in 1989, Hassan al Turabi staged a coup in the

-81-

defendant SUDAN installed a fundamentalist Islamic government.

258.    Upon information and belief, in 1991, the defendant BIN LADEN settled in the defendant SUDAN, by invitation of Hassan al Turabi and the Sudanese government and the defendant BIN LADEN began several business ventures with or on behalf of both the Sudanese government and the Sudanese National Islamic Front ("NIF").

259.    Upon information and belief, the General Manager of the defendant AL SHAMAL ISLAMIC BANK, Mohammad S. Mohammad, acknowledged in a September 2001 press release that the defendant BIN LADEN had two accounts in the bank, opened on March 30, 1992 for the defendant AL-HIJRAH CONSTRUCTION AND DEVELOPMENT, LTD., a company the U.S. State Department says "works directly with Sudanese military officials to transport and provision terrorists training in [the defendant BIN LADEN's terrorist training camps in northern Sudan]."

260.    Upon information and belief, a third account was opened at the defendant AL SHAMAL ISLAMIC BANK in 1993 in the name of the defendant BIN LADEN's holding company, the defendant WADI AL AQIQ, a company registered in Saudi Arabia. The import-export firm, in conjunction with another of the defendant BIN LADEN's companies, the defendant TABA INVESTMENT COMPANY, LTD., secured a near monopoly over the defendant SUDAN's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members.

261.    Upon information and belief, the defendant AL SHAMAL BANK has repeatedly been used to fund criminal and terrorist activities. A former associate of the defendant BIN LADEN, defendant JAMAL AHMED AL-FADL, testified during the U.S. trial on the 1998

-82-

embassy bombings in Africa, that the defendant BIN LADEN and at least six operatives of the

defendant AL QAEDA held bank accounts in the defendant AL SHAMAL ISLAMIC BANK

under their real names, including the defendants BIN LADEN, AFAD MAKKEE a/ka MADANI

SIDI AL TAYYIB, ABU RIDA AL SURI a/k/a NIDAL, ABU HAJER AL IRAQI a/k/a

MAMDOUH SALIM, ABU FADHIL, and ABDOUH AL MUKHLAFÏ.

262.    Upon information and belief, operatives of the defendant AL QAEDA received

monthly checks of several hundred dollars from the defendant AL SHAMAL ISLAMIC BANK

accounts and at least $100,000 Dollars was transferred from the defendant AL SHAMAL

ISLAMIC BANK to a representative of the defendant AL QAEDA in Jordan.

263.    Upon information and belief, accounts held at the defendant AL SHAMAL

ISLAMIC BANK were used by the defendant AL QAEDA for terrorist purposes, including the

purchase of an aircraft with funds wired from the bank that was intended to be used for the

delivery of Stinger missiles.

264.    Upon information and belief, intelligence reports issued as a result of the

September 11th Attacks indicated that the defendant AL SHAMAL ISLAMIC BANK continues

to finance terror and that the defendant BIN LADEN remains the leading shareholder of the

defendant bank.

265.    Upon information and belief, officially founded in 1987, the defendant AL-RAJHI

BANKING & INVESTMENT CORPORATION ("AL-RAJHI BANK"), a/k/a AL-RAJHI

BANK, has a network of nearly 400 branch offices throughout Saudi Arabia and manages

seventeen subsidiaries across the world.  The defendant SULAIMAN ABDUL AZIZ AL-RAJHI

("AZIZ AL-RAJHI") is the Managing Director of the defendant AL-RAJHI BANK and the

defendant SALEH ABDUL AZIZ AL-RAJHI is the Chairman.

266.    Upon information and belief, the defendant AL-RAJHI BANK is the primary

bank for a number of charities that serve as front groups for the defendant AL QAEDA.  The

defendants AL-HARAMAIN, the MUSLIM WORLD LEAGUE, and the IIRO all funnel

terrorism financing and support through the banking system of the defendant AL-RAJHI BANK.

One of the hijackers in the September 11th Attacks, the defendant ABDULAZIZ AL-OMARI

who hijacked American Airlines Flight 11, held an account with the defendant AL-RAJHI

BANK.

267.    Upon information and belief, the defendant AZIZ AL-RAJHI has a history of

financially supporting terrorists of the defendant AL QAEDA.  The defendant AZIZ AL-RAJHI

managed the defendant NATIONAL COMMERCIAL BANK budget of the SAUDI JOINT

RELIEF COMMITTEE (SJRC). The al-Rajhi family is the primary financier of the SAAR

NETWORK and, as such, is implicated by the SAAR NETWORK raids for its ties to terrorism

and to the defendant BIN LADEN.

268.    Upon information and belief, co-conspirators, and aiders and abettors of the Al-

Rajhi family include the defendants AZIZ AL-RAJHI, SALEH AL-RAJHI, ABDULLAH

SULAIMAN AL-RAJHI and KHALID SULAIMAN AL-RAJHI.  All of these defendants do

business in, and have significant business presences in the United States through al-Watania

Poultry, one of the world's largest poultry businesses, and through the defendants MAR-JAC

POULTRY, INC., MAR-JAC INVESTMENTS, INC. and PIEDMONT POULTRY in the

United States.

269.    Upon information and belief, the defendant DAR AL MAAL AL ISLAMI

("DMI") a/k/a "House of Islamic Money", is the registered name for DMI Administrative

Services SA. The company is located at avenue Louis-Casai 84, in Cointrin, Switzerland. DMI

Administrative Services SA replaced the defendant DMI on February 5, 2002. DMI activities

started July 29, 1981. Until 1983, the defendant DMI was under the chairmanship of the

defendant M. IRBRAHIM KAMEL. On October 17, 1983, Prince Mohamed al-Faisal al-Saud

became CEO. Under Mohammed al Faisal al Saud's chairmanship, the defendant DMI

developed banking, investment and insurance activities in approximately 20 offices throughout

the world. The defendant DMI operates abroad in Islamic countries and the DMI Trust, whose

slogan is "Allah is the purveyor of success," was founded 20 years ago to foster the spread of

Islamic banking across the Muslim world and its 12-member board of directors includes

HAYDAR MOHAMED BIN LADEN, a half-brother of the defendant BIN LADEN.

270.    Upon information and belief, the defendant DMI is currently chaired by

Abdulkarim Khaled Uusuf Abdulla who replaced Prince Mohamed al-Faisal al-Saud in early

2002. The defendant DMI is involved in financing the defendant AL QAEDA through several

subsidiaries including the defendants ISLAMIC INVESTMENT BANK OF THE GULF,

FAISAL ISLAMIC BANK, TADAMON ISLAMIC BANK, and AL SHAMAL ISLAMIC

BANK.

271.    Upon information and belief, the defendant DMI owns 100% of the defendant

ISLAMIC INVESTMENT COMPANY OF THE GULF. Mohamed al-Faisal al-Saud chairs the

defendant ISLAMIC INVESTMENT COMPANY OF THE GULF. The defendant BIN

LADEN's brother, defendant HAYDAR MOHAMED BIN LADEN, was previously a director of

the company. The defendant ISLAMIC INVESTMENT COMPANY OF THE GULF (Bahrain)

EC is the main shareholder of the defendant FAISAL ISLAMIC BANK OF SUDAN, chaired by Mohamed al-Faisal al-Saud.

272.    Upon information and belief, the defendant FAISAL ISLAMIC BANK subsidiary of the defendant ISLAMIC INVESTMENT COMPANY OF THE GULF (Bahrain) EC, was one of the five main founders of the defendant AL SHAMAL ISLAMIC BANK in April 1984 and became member of the board in July 1988.

273.    Upon information and belief, the defendant FAISAL ISLAMIC BANK was implicated during the 2001 U.S. trial on the 1998 embassy bombings in Africa as holding bank accounts for operatives of the defendant AL QAEDA.

274.    Upon information and belief, in the late 1980s, the leaders of the Muslim Brotherhood formed financial management firms and banks called AL TAQWA ("Fear of God"), dedicated to the overthrow of Western nations and the creation of a worldwide Islamic government.  Headquartered in Lugano, Switzerland with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, AL TAQWA consists of the defendant AL TAQWA BANK, AL TAQWA MANAGEMENT ORGANIZATION, SA, AL TAQWA TRADE, PROPERTY AND INDUSTRY, LTD. and the ASAT TRUST ("AL TAQWA GROUP").

275.    Upon information and belief, the defendant AL TAQWA GROUP has financed and laundered money for Arab and Islamic political and militant groups including, Algerian Armed Islamic Group (GIA), and the Egyptian Gama's al-Islamiya, Islamic terrorist groups with links to the defendant BIN LADEN and the defendant AL QAEDA organization.  Additionally, international investigations indicate that the defendant AL TAQWA GROUP was facilitating the

movement of the defendant BIN LADEN's money around the world in the late 1990s, a task made easier because its complex structure is designed to prevent scrutiny of its operations.

276.    Upon information and belief, the defendant AL TAQWA GROUP was founded by the defendant YOUSEF M. NADA, and other principals including the defendants ALI G. HIMMAT ("HIMMAT"), ALBERT AHMED HUBER ("HUBER") and MOHAMED MANSOUR ("MANSOUR"). The defendants HUBER and MANSOUR are senior members of the Muslim Brotherhood. Shortly after the 1998 Embassy bombings by the defendant AL QAEDA, U.S. intelligence agencies tracked telephone contact between the defendant AL TAQWA GROUP and members of the defendant BIN LADEN's inner circle along with the defendant HUBER, a convert to Islam in the 1960s who has publically expressed support for AL QAEDA. The defendant HUBER has acknowledged the very active funneling of money from oil wealthy Saudi families to the defendant AL TAQWA GROUP. AHMAD I. NASREDDIN a/k/a HADJA AHMED NASREDDIN, AHMED IDRISS NASREDDIN, is also a founding member of the defendant AL TAQWA GROUP and a bank shareholder who helped finance the creation of the defendant ISLAMIC CULTURAL INSTITUTE OF MILAN ("INSTITUTE OF MILAN"), which follows the violent teachings of convicted terrorist Omar Abdel Rahman. The defendant INSTITUTE OF MILAN was frequently visited by known terrorists of the defendant AL-QAEDA. Upon information and belief, the defendant INSTITUTE OF MILAN is known in Western intelligence communities as one of the main stations in Europe and was used to move weapons, men and money around the world.

277.    Upon information and belief, after September 11, 2001, the defendant AL TAQWA changed its name to that of the defendant NADA MANAGEMENT

ORGANIZATION, SA in an attempt to avoid scrutiny. Both defendants, as well as their four

principles, the defendants NADA, HIMMAT, HUBER and MANSOUR, have had their assets

frozen and are believed by the U.S. Department of Justice to be co-conspirators of the defendant

AL QAEDA.

278.    Upon information and belief, U.S. government officials have stated that the

defendant GLOBAL RELIEF FOUNDATION, INC. of Bridgeview, Illinois with offices in

Europe and Pakistan, has collected more than $14 million dollars since 1996 for causes in

Pakistan, Afghanistan, Kasmir and other war-torn regions. Its director, defendant RABIH

HADDAH, has traveled numerous times to Pakistan and Kuwait and has had contact with

defendant BIN LADEN's personal assistant, defendant WADIH E. HAGE. In his travels, the

defendant HADDAH spoke to organizations linked to the defendant AL QAEDA and sold video

tapes with the theme, "martyrdom through jihad" and featuring Abdullah Azzam, the late mentor

of the defendant BIN LADEN.

279.    Upon information and belief, the U.S. Treasury Department has frozen the assets

of the defendant GLOBAL RELIEF FOUNDATION and incarcerated the defendant HADDAD

as a flight risk while he awaits a hearing on charges he violated his immigration status.

280.    Upon information and belief, during an investigation into the defendant GLOBAL

RELIEF FOUNDATION's ties with the defendant AL QAEDA, NATO and U.N. police raided

two of the defendant's offices in Kosova on December 14, 2001, and arrested two Iraqi nationals

working for the defendant GLOBAL RELIEF FOUNDATION.

281.    Upon information and belief, the defendant AL RASHID TRUST ("TRUST") was

established in Pakistan in 1996 at the time the defendant TALIBAN took control in Afghanistan.

-88-

The defendant AL RASHID TRUST was established by defendant MUFTI MOHAMMED RASHID, a/k/a RASHID to carry out welfare projects by fund-raising in the Pakistani Muslim Community.

282.    Upon information and belief, the defendant TRUST provides financial aid to jailed Muslim terrorist around the world, and is closely aligned to the defendant TALIBAN and the defendant BIN LADEN.  The defendant TRUST helped fund radio, newsprint and Madrases (schools that teach a view of Islam that is Anti-Western and endorses violence and martyrdom in the name of Allah).  The defendant TRUST provided money and logistical support to the defendant TALIBAN and the defendant AL QAEDA and has had its assets frozen by the U.S. Treasury.

283.    Upon information and belief, the defendant TRUST conspired with defendant Al QAEDA and Pakistani terrorists to kidnap, torture and murder *Wall Street Journal* reporter Daniel Pearl.

284.    Upon information and belief, the defendant AFGHAN SUPPORT COMMITTEE ("ASC"), a/k/a AHYA UL TURAS, JANIAT AYAT-UR-RHAS AL ISLAMIA; JANIAT IHGA UL TORATH AL ISLAMIA; LAJNAT UL MASA EIDATUL AFGHANIA was established by the defendant BIN LADEN in the 1990s in a small town outside Peshawar, Pakistan with offices in Jalalabad, Afghanistan purporting to raise money for charitable works in Afghanistan and Pakistan.  Upon information and belief, the defendants ABU BAKR AL-JAZIRI ("JAZIRI") and ABD AL-MUSHIN AL-LIBI ("AL-LIBI") are the officers of the defendant ASC who raise money and distribute same to members of the defendant AL QAEDA.  The defendant ASC also provides travel and other logistical support to the defendant AL QAEDA.  The U.S. Treasury has

frozen the assets of the defendants ASC, JAZIRI and AL-LIBI, as they are believed to be co-conspirators of the defendant AL QAEDA.

285.    Upon information and belief, the defendant AL WAFA ORGANIZATION ("WAFA"), a/k/a WAFA HUMANITARIAN ORGANIZATION, a/k/a WAFA AL-IGATHA AL ISLAMIC CHARITY was headed by Saudi Citizen, defendant SHEIKH ABO ABDUL AZIZ NAGI ("NAGI"), a high ranking official with the defendant AL QAEDA who was captured in Afghanistan in December 2001. Upon information and belief, while part of the organization of the defendant WAFA provided money for humanitarian projects, much of the money it collected was diverted to the defendant AL QAEDA. The defendant WAFA was also instrumental in providing the defendant AL QAEDA with arms and logistical support in Afghanistan before and after the September 11th Attacks. The defendants WAFA and NAGI have also been designated as terrorist co-conspirators and have had their assets frozen by the U.S. Treasury.

286.    Upon information and belief, the defendant SHAYKH SAI'ID ("SAI'ID") a/k/a MUSTAFA AHMAD AL-HAWSAWI, a/k/a AHMAD OMAR SHEIKH, a/k/a SHEIKH OMAR, was one of the paymasters for the September 11th hijackers. Documents show that the defendant SAI'ID sent $100,000 from Pakistan to the defendant ATTA in the United States. In September 2001, the defendant ATTA sent $15,000 back to the defendant SAI'ID in the United Arab Emirates that had not spent by the September 11th hijackers prior to their suicide missions. Upon information and belief, the defendant SAI-ID left the United Arab Emirates for Pakistan on September 11, 2001.

287.    Upon information and belief, the defendant SAI'ID's involvement with the defendant BIN LADEN dates back to when the defendant BIN LADEN was operating out of the

city of Khartoum in the defendant SUDAN. The defendant SAI'ID, a London educated economist, controlled many of the defendant BIN LADEN's businesses located in the defendant SUDAN, including the financial network of the defendant TABA INVESTMENTS that was created with a $50 million dollar contribution from the defendant BIN LADEN.

288.    Upon information and belief, the defendant SAI-ID was jailed in 1994 for Islamic based terror operations in Kashmir, but was freed in 1999 in exchange for the release of hostages on a hijacked Indian Airlines flight. The aircraft was commandeered in a manner similar to the way the four September 11th aircraft were hijacked in the United States. A passenger was stabbed and the hijackers seized control of Flight 814 diverting the aircraft to Kandahar, Afghanistan. The defendant TALIBAN was in control of the area, and Afghanistan government authorities did not interfere with the hijacker's actions in Kandahar or make efforts to apprehend them later. The passengers on board the aircraft were held captive for eight days while the release of the defendant SAI'ID and two other Islamic militants was arranged. Upon his release, the defendant SAI'ID and others fled to Pakistan.

289.    Upon information and belief, the defendant SAI'ID has also been charged with the kidnaping and murder of *Wall Street Journal* reporter, Daniel Pearl.

290.    Upon information and belief, the Saudi Arabian-based defendant AL-HARAMAIN ISLAMIC FOUNDATION, INC. ("AL-HARAMAIN") is a private charitable organization that is ostensibly designed to provide a variety of humanitarian services for Muslims worldwide. Established in Riyadh in 1992, the defendant AL-HARAMAIN has quickly developed a vast network of offices and representatives that now spans over fifty countries, including the United States. The defendant AL-HARAMAIN raises most of its funds from Saudi

-91-

Arabia where it oversees the distribution of its resources across the world.

291. Upon information and belief, the defendant AL-HARAMAIN incorporates in many of the countries in which it operates, although these "branches" are still controlled primarily from the defendant AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, defendants AQEEL AL-AQEEL and MANSOUR AL-KADI, both reside in Riyadh, Saudi Arabia where they manage the operations of the defendant AL-HARAMAIN worldwide.

292. Upon information and belief, the defendant AL-HARAMAIN is a Saudi charity front that has exploited and used its non-profit status and provided material and direct support for the benefit of the defendants BIN LADEN and AL QAEDA. In so doing, the defendant AL-HARAMAIN has developed an extensive worldwide network. The United States has designated two branches of the defendant AL-HARAMAIN located in Bosnia and Somalia, as terrorist entities and has frozen the assets of both.

293. Upon information and belief, the leaders of the defendant AL-HARAMAIN have direct links to the defendant AL QAEDA.

294. Upon information and belief, in December of 1999, the defendant AL-HARAMAIN conducted a joint fund-raising event with the defendant IIRO, a known front for the defendant AL QAEDA, and with a suspected front, the defendant WAMY in Riyadh, Saudi Arabia.

295. The defendant AL-HARAMAIN took part in a committee of charitable organizations that formed the defendant SAUDI JOINT RELIEF COMMITTEE ("SJRC"). The defendant SJRC is comprised of the defendants IIRO, WAMY and the MUSLIM WORLD

LEAGUE, among others. The defendant SJRC has been connected to the defendant BIN LADEN and two of his top operatives, defendants WA'EL HAMZA JALAIDAN AND ADEL MUHAMMAD SADIQ BIN KAZEM. The defendant AL-HARAMAIN has been able to continue its cooperation with the defendant AL QAEDA for years in large part due to its ostensible appearance as a humanitarian organization.

296.    Upon information and belief, the defendant AL-HARAMAIN and its co-conspirators also solicit and operate widely in the United States. In the United States, the defendant AL-HARAMAIN has three business entities in Ashland, Oregon, namely, AL-HARAMAIN FOUNDATION, AL-HARAMAIN ISLAMIC FOUNDATION, and AL-HARAMAIN ISLAMIC FOUNDATION, INC. All three of these separately filed businesses are at the same address and under the same management. These three businesses are one and the same as the defendant AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, defendants AQEEL AL-AQEEL and MANSOUR AL-KADI, are the Secretary General and Deputy General, respectively, of the Riyadh office. The branch of the defendant AL-HARAMAIN in Ashland, Oregon, is specifically linked to the defendant AL QAEDA and the branch in Kenya that was banned for national security concerns following the 1998 Embassy Bombings.

297.    The defendant AL-HARAMAIN Ashland states in its year 2000 Form 990 that it operates an Islamic Center in Springfield, Missouri. Corporate records reveal that the defendant AL-HARAMAIN owns the Islamic Center of Springfield located at 2151 E. Division St., Springfield, Missouri.

# CLAIMS

## COUNT ONE
## ANTI-TERRORISM AND EFFECTIVE
## DEATH PENALTY ACT CLAIM
## 28 U.S.C. § 1605 (A)(7)

### DEFENDANT IRAQ AND IRAQI INTELLIGENCE

298.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "297" as if fully set forth herein at length.

299.    The death of plaintiffs' decedents and injuries to the plaintiffs, who were citizens of the United States on September 11, 2001, resulted from acts of extrajudicial killing, torture and aircraft sabotage.

300.    These acts of extrajudicial killing, torture and aircraft sabotage were perpetrated by agents of the defendants BIN LADEN and AL QAEDA, who received material support and resources from the defendants IRAQ, IRAQI INTELLIGENCE and the TALIBAN.

301.    Agents, officials and/or employees of the defendants IRAQ, IRAQI INTELLIGENCE, and the TALIBAN provided material support and resources to the defendants BIN LADEN and AL QAEDA while acting in the scope of their offices, agencies, and/or employment. Similar conduct, if committed by agents, officials or employees of the United States would be sanctionable.

302.    At all relevant times, the defendant IRAQ was and is designated by the U.S. government as a state sponsor of terrorism.

303.    The activities of Islamic Emirate of Afghanistan under the regime of the defendant TALIBAN, as described in this Complaint, were effectively deemed terrorist activities

pursuant to former President Clinton's July 4, 1999 Executive Order No. 13129 and the continuation Order of June 30, 2001, issued by President George W. Bush. In addition, after the terrorist acts on September 11, 2001, President George W. Bush and other senior U.S. officials clearly designated the Islamic Emirate of Afghanistan as having sponsored and supported the terrorists. For example, see President George W. Bush's September 24, 2001 Executive Order on Terrorist Financing (Executive Order No. 13224).

304.    As a direct and proximate result of the foregoing, the heirs and distributees of each decedent's estate, represented by the individual plaintiffs identified above, individually and in their capacity as Administrators, Executors, and/or Personal Representatives, were caused to sustain wrongful death damages, including pecuniary losses, and damages for loss of support, consortium, society, companionship, prospective inheritance, care, love, guidance, training, comfort, education, solatium and services, and damages for grief and mental anguish, moral damages, burial expenses and other damages.

305.    By reason of the foregoing, plaintiffs demand that judgment be entered in favor of plaintiffs individually and as personal representatives of their decedents' estates, and in favor of the personal injury plaintiffs personally and against the defendants IRAQ and IRAQI INTELLIGENCE for an amount in excess of FIFTY MILLION ($50,000,000.00) DOLLARS for each plaintiff, plus interest, costs, punitive damages, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT TWO

## ANTI-TERRORISM AND EFFECTIVE
## DEATH PENALTY ACT CLAIM
## 28 U.S.C. § 1605 (A)(7)

### DEFENDANT SUDAN

306.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "305" as if fully set forth herein at length.

307.    The death of plaintiffs' decedents and injuries to the plaintiffs, who were citizens of the United States on September 11, 2001, resulted from acts of extrajudicial killing, torture and aircraft sabotage.

308.    These acts of extrajudicial killing, torture and aircraft sabotage were perpetrated by agents of the defendants BIN LADEN AND AL QAEDA, who received material support and resources from the defendant SUDAN.

309.    Agents, officials and/or employees of the defendant SUDAN provided material support and resources to the defendants BIN LADEN and AL QAEDA while acting in the scope of their offices, agencies, and/or employment.  Similar conduct, if committed by agents, officials or employees of the United States would be sanctionable.

310.    At all relevant times, the defendant SUDAN was and is designated by the U.S. government as a state sponsor of terrorism.

311.    The activities of Islamic Emirate of Afghanistan under the regime of the defendant TALIBAN, as described in this Complaint, were effectively deemed terrorist activities pursuant to former President Clinton's July 4, 1999 Executive Order No. 13129 and the continuation Order of June 30, 2001, issued by President George W. Bush.  In addition, after the

-96-

terrorist acts on September 11, 2001, President George W. Bush and other senior U.S. officials clearly designated the Islamic Emirate of Afghanistan as having sponsored and supported the terrorists. For example, see President George W. Bush's September 24, 2001 Executive Order on Terrorist Financing (Executive Order No. 13224).

312.    As a direct and proximate result of the foregoing, the heirs and distributees of each decedent's estate, represented by the individual plaintiffs identified above, individually and in their capacity as Administrators, Executors, and/or Personal Representatives, were caused to sustain wrongful death damages, including pecuniary losses, and damages for loss of support, consortium, society, companionship, prospective inheritance, care, love, guidance, training, comfort, education, solatium and services, and damages for grief and mental anguish, moral damages, burial expenses and other damages.

313.    By reason of the foregoing, plaintiffs demand that judgment be entered in favor of plaintiffs individually and as personal representatives of their decedents' estates, and in favor of the personal injury plaintiffs personally and against the defendant SUDAN for an amount in excess of FIFTY MILLION ($50,000,000.00) DOLLARS for each plaintiff, plus interest, costs, punitive damages, attorneys' fees, and such other relief as the Court deems just and proper.

<div align="center">

**COUNT THREE**

**TORTURE VICTIM PROTECTION ACT**
**28 U.S.C. § 1350**

</div>

314.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "313" as if fully set forth herein at length.

315.    The Alien Tort Act, 28 U.S.C. § 1350, also known as the Torture Victim

Protection Act, creates a cause of action in favor of plaintiffs in this action who are not nationals

of the United States, and against the defendants for their violation of international law in

torturing and killing the passengers and crews of the commercial aircraft hijacked on September

11, 2001, and for the victims in the World Trade Center Towers and on the ground.

316.    The Torture Victim Protection Act, 28 U.S.C. § 1350 creates a cause of action for

all plaintiffs in the action against the defendants for the torture and extrajudicial killing of the

decedents and injury to plaintiffs.

317.    As a direct and proximate result of the foregoing, the heirs and distributees of

each decedent's estate, represented by the individual plaintiffs identified above, individually and

in their capacity as Administrators, Executors, and/or Personal Representatives, were caused to

sustain wrongful death damages, including pecuniary losses, and damages for loss of support,

consortium, society, companionship, prospective inheritance, care, love, guidance, training,

education, solatium and services, and damages for grief and mental anguish, moral damages,

burial expenses and other damages, anguish, moral damages, burial expenses and other damages.

318.    By reason of the foregoing, plaintiffs demand that judgment be entered in favor of

plaintiffs individually and as personal representatives of their decedents' estates, and in favor of

the personal injury plaintiffs personally and against the defendants for an amount in excess of

FIFTY MILLION ($50,000,000.00) DOLLARS for each plaintiff, plus interest, costs, punitive

damages, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT FOUR

### WRONGFUL DEATH BASED
### ON INTENTIONAL MURDER

319.     Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "318" as if fully set forth herein at length.

320.     As a direct and proximate result of the defendants' intentional, willful and malicious acts of terrorism on September 11, 2001, the defendants have caused plaintiffs' decedents' family members to suffer severe and permanent injuries, damages and losses, including, but not limited to the following:

(a)     Economic damages, including, but not limited to, the pecuniary losses suffered by plaintiffs and the decedents' survivors as a result of the decedents' deaths, including, but not limited to, loss of support, loss of services, loss of parents care and guidance, and loss of prospective inheritance; and

(b)     Non-Economic damages, including, but not limited to, the loss of consortium, solarium, society, companionship, comfort and love suffered by plaintiffs and decedents' survivors.

321.     By reason of the foregoing, plaintiffs demand that judgment be entered in favor of plaintiffs individually and as personal representatives of their decedents' estates, and in favor of the personal injury plaintiffs personally and against the defendants for an amount in excess of FIFTY MILLION ($50,000,000.00) DOLLARS for each plaintiff, plus interest, costs, punitive damages, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT FIVE

## SURVIVAL DAMAGES BASED
## UPON INTENTIONAL MURDER

322.     Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "321" as if fully set forth herein at length.

323.     As a result of the intentional, malicious, reckless, conspiratorial and negligent acts of defendants as described herein, the plaintiffs' decedents who were killed on September 11, 2001 were forced to endure severe and prolonged extreme apprehension of harmful, offensive bodily contact, injury and assault. The plaintiffs' decedents suffered conscious pain and suffering and fear of their impending deaths, entitling their estates to compensatory damages under governing law.

324.     By reason of the foregoing, the defendants are jointly, severally and/or individually liable to each of the decedents' estates in the sum of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT SIX

## NEGLIGENT AND/OR INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS

325.     Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "324" as if fully set forth herein at length.

326.     The defendants knew or should have known that their actions would lead to the killing of innocent persons; the defendants knew or should have known that the September 11, 2001 suicide hijackings and disaster would intentionally kill or injure innocent people, leaving

devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries.

327.    The actions of the defendants were unconscionable with an intentional, malicious, and willful disregard for the rights and lives of the plaintiffs and all of the survivors of the decedents.

328.    Plaintiffs and the decedents' survivors that each had a close familial relationship to the decedent at the time of the foregoing events and thereafter, learned and witnessed the circumstances resulting in the death of the decedents by viewing the contemporaneous television news media coverage, and/or by being in telephone contact with the decedent.

329.    As a direct and proximate cause of the defendants' intended conduct and reckless disregard for human life, the plaintiffs and the survivors of the decedents have suffered and will continue to suffer severe, permanent psychiatric disorders, emotional distress and anxiety, permanent psychological distress, and permanent mental injury and impairment causing ongoing and long-term expenses for medical services, and counseling and care.

330.    The conduct of the defendants was undertaken in an intentional manner to kill and injure innocent people. These acts and efforts culminated in the murder and maiming of innocent people, causing continuing and permanent emotional and physical suffering of the families and the heirs of the decedents.

331.    The defendants, by engaging in this intentional, unlawful conduct, negligently and/or intentionally inflicted emotional distress upon the plaintiffs and the survivors of the decedents.

332.    By reason of the foregoing, the defendants are jointly, severally and/or

-101-

individually liable to each of the plaintiffs and the survivors of the decedents in the sum of

TWENTY FIVE MILLION ($25,000,000.00) DOLLARS, plus interest, costs, attorneys' fees,

and such other relief as the Court deems just and proper.

## COUNT SEVEN

## CONSPIRACY

333.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in

paragraphs "1" through "332" as if fully set forth herein at length.

334.    As set forth herein, the defendants, unlawfully, willfully and knowingly

combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to

participate in unlawful and tortuous acts pursuant to a common course of conduct, resulting in

the death and injury of plaintiffs and their decedents.

335.    As set forth herein, the defendants conspired with and agreed to provide material

support, funding, sponsorship and/or resources to the defendants AL QAEDA, BIN LADEN and

other sponsors of terror.

336.    As set forth above, the defendants engaged in common, concerted and

conspirational acts, efforts, transactions, and activities designed and intended to cause a terrorist

attack on the United States, its citizens and society, all of which was done pursuant to and

furtherance of this common scheme.

337.    The defendants' concert of action and conspiracy to support and promote the

defendants BIN LADEN and AL QAEDA were a proximate cause of the September 11, 2001

terrorist attacks that killed plaintiffs' decedents.

338.    As a result of defendants' concert of action and conspiracy to further terror, the

plaintiffs have suffered damages as set forth herein.

339.    By reason of the foregoing, the defendants are jointly, severally and/or individually liable to each of the plaintiffs in the sum of ONE TRILLION ($1,000,000,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT EIGHT

## AIDING AND ABETTING

340.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "339" as if fully set forth herein at length.

341.    As set forth above, the defendants knowingly and substantially assisted in the sponsorship of defendants BIN LADEN and AL QAEDA and the September 11th Attacks that killed and injured the plaintiffs and their decedents.

342.    At the time of such aiding and abetting, the defendants knew or should have known that their role was part of an overall and ongoing illegal and/or tortuous activity.

343.    As set forth above, the defendants aided and abetted in concerted efforts, transactions, acts and activities designed to cause the September 11th Attacks on the United States, its citizens, property and freedoms.

344.    The defendants' aiding and abetting of terrorism through material sponsorship was a proximate cause of the September 11th Attacks that killed the plaintiffs' decedents.

345.    As a result of the defendants' aiding and abetting activities, plaintiffs have suffered damages as set forth herein.

346.    By reason of the foregoing, the defendants are jointly, severally and/or

individually liable to each of the plaintiffs in the sum of ONE TRILLION

($1,000,000,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as

the Court deems just and proper.

<div align="center">

**COUNT NINE**

**TREBLE DAMAGES**
**U.S.C. § 2333**

</div>

347.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in

paragraphs "1" through "346" as if fully set forth herein at length.

348.    As set forth above, the defendants, jointly, severally and proximately caused the

deaths and injuries of the plaintiffs' decedents, property and businesses through and by reason of

acts of international terrorism.

349.    As set forth above, the defendants' provision of material support and assistance to

the defendants BIN LADEN and AL QAEDA provided said defendants with the means by which

they carried out terrorist attacks on the United States, including the September 11th Attacks.

350.    As a result of the defendants' acts in furtherance of international terrorism, the

plaintiffs have suffered damages as set forth herein.

351.    Pursuant to 18 U.S.C. §2333, et. seq., the estates, survivors and heirs of the

decedents who are nationals of the United States, as well as any other individual entitled to

recover under the applicable law, are entitled to recover treble damages they have sustained and

the cost of suit, including attorneys' fees.

352.    By reason of the foregoing, the defendants are jointly, severally and/or

individually liable to each of the plaintiffs for treble damages in the sum of THREE TRILLION

<div align="center">

-104-

</div>

($3,000,000,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT TEN

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(a)

353.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "352" as if fully set forth herein at length.

354.    The non-sovereign defendants are each "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

355.    The defendant charities, banks, businesses and terrorists identified herein are each an "enterprise" within the meaning of RICO, the activities of which affect intrastate and foreign commerce.

356.    By virtue of the predicate acts described in this Complaint, including without limitation, engaging in the predicate acts of terrorism, murder, kidnaping, forgery, false use and misuse of passports, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transactions improperly derived from unlawful activity, the use of interstate commerce, interstate transportation of terrorist property, and bringing in and harboring illegal aliens, and aiding and assisting illegal aliens in entering the United States, the defendants transferred, received, and supplied financing and income that was designed, both directly and indirectly, from a pattern of racketeering activity in which each of them participated as a principal, and used and invested, both directly and indirectly, such income and the proceeds of such income, in establishing and operating terrorist enterprises in violation of 18 U.S.C. § 1962(a).

-105-

357.    As a direct and proximate result of the defendants' violation of 18 U.S.C. § 1962(a), the plaintiffs suffered the loss of valuable property, financial services and support, and suffered other pecuniary damages in an amount to be determined at trial.

358.    By reason of the foregoing, the defendants are jointly, severally and/or individually liable to each of the plaintiffs in the sum of ONE TRILLION ($1,000,000,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT ELEVEN

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(c)

359.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "358" as if fully set forth herein at length.

360.    By virtue of the acts described in this Complaint, including without limitation, engaging in the predicate acts of terrorism, murder, kidnaping, forgery, false use and misuse of passports, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transactions improperly derived from unlawful activity, the use of interstate commerce, interstate transportation of terrorist property, bringing in and harboring illegal aliens, and aiding and assisting illegal aliens in entering the United States, the defendants transferred, received and supplied financing and income that was designed, both directly and indirectly from a pattern of racketeering activity in which each of them participated as a principal, and used and invested, both directly and indirectly, such income and the proceeds of such income, in establishing and operating terrorist enterprises, in violation of 18 U.S.C. § 1962(c).

361.    As a direct and proximate result of the defendants' violation of 18 U.S.C. §

1962(c), the plaintiffs suffered the loss of valuable property, financial services and support, and

suffered other pecuniary damages in an amount to be determined at trial.

362.    By reason of the foregoing, the defendants are jointly, severally and/or

individually liable to each of the plaintiffs in the sum of ONE TRILLION

($1,000,000,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as

the Court deems just and proper.

### COUNT TWELVE

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(d)

363.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in

paragraphs "1" through "362" as if fully set forth herein at length.

364.    By virtue of the acts described in this Complaint, including without limitations,

engaging in the predicate acts of terrorism, murder, kidnaping, forgery, false use and misuse of

passports, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary

transactions improperly derived from unlawful activity, the use of interstate commerce facilities

in murder-for-hire, interstate transportation of terrorist property, bringing in and harboring illegal

aliens, and aiding and assisting illegal aliens in entering the United States, the defendants

transferred, received and supplied financing and income that was designed, both directly and

indirectly from a pattern of racketeering activity in which each of them participated as a

principal, and used and invested, both directly and indirectly, such income and the proceeds of

such income, in establishing and operating terrorist enterprises, in violation of 18 U.S.C. §

1962(d).

365.    As a direct and proximate result of the defendants' violation of 18 U.S.C. § 1962(d), plaintiffs suffered the loss of valuable property, financial services and support, and suffered other pecuniary damages in an amount to be determined at trial.

366.    By reason of the foregoing, the defendants are jointly, severally and/or individually liable to each of the plaintiffs in the sum of ONE TRILLION ($1,000,000,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT THIRTEEN

## PUNITIVE DAMAGES

367.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "366" as if fully set forth herein at length.

368.    The actions of the defendants, acting in concert or otherwise conspiring to carry out, aid and abet these unlawful objectives of terror, were intentional, malicious, unconscionable, wanton and in reckless disregard of the rights and safety of the plaintiffs' decedents and the defendants, acting individually, jointly, and/or severally intended to carry out actions that would brutalize or kill the lives of the plaintiffs' decedents.

369.    As a result of their intentional, malicious, outrageous, willful, wanton, reckless conduct, the defendants are individually, jointly, and/or severally liable to the plaintiffs for punitive damages.

370.    By reason of the foregoing, the defendants are jointly, severally and/or individually liable to each of the plaintiffs for punitive damages in the sum of ONE TRILLION

($1,000,000,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT FOURTEEN

### PUNITIVE DAMAGES – AGENCIES AND INSTRUMENTALITIES OF THE FOREIGN STATE DEFENDANTS

371.    Plaintiffs repeat, reiterate, reallege each and every allegation contained in paragraphs "1" through "370" as if fully set forth herein at length.

372.    The foreign state defendants IRAQ and SUDAN and their agencies and instrumentalities, directly or indirectly caused, contributed to, supported, conspired to cause, aided and abetted the commission of the terrorist acts that resulted in the deaths and injuries as described above.

373.    The actions of the agencies and instrumentalities of the foreign state defendants IRAQ and SUDAN, acting individually and/or in concert to carry out their unlawful objectives, were malicious, outrageous, and in willful, wanton, and reckless disregard of the rights of the plaintiffs and their decedents, and said agencies and instrumentalities acting individually and/or jointly, specifically intended to engage in or otherwise sponsor terrorism.

374.    Pursuant to 28 U.S.C.A. §1606, which specifically authorizes a claim for punitive damages arising from state sponsored terrorist acts actionable under 28 U.S.C. § 1605 (a)(7), and for the reasons stated herein, the agencies and instrumentalities of the defendants IRAQ and SUDAN are jointly, severally and/or individually liable to the plaintiffs for punitive damages.

375.    Pursuant to Pub.L. 104-208, Div. A, Title I, §101(c), 110 Stat. 3009-172

(reprinted at 28 U.S.C. § 1605 note (West Supp.), all defendants who are officials, employees or agents of the foreign state defendants IRAQ and SUDAN, and their agencies and instrumentalities are also liable to plaintiffs for punitive damages caused by the acts and conduct which resulted in the deaths and injuries of the plaintiffs' decedents.

376.    By reason of the foregoing, the defendants are jointly, severally and/or individually liable to each of the plaintiffs for punitive damages in the sum of ONE TRILLION ($1,000,000,000,000.00) DOLLARS, plus interest, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## JURY DEMAND

WHEREFORE, plaintiffs and each of the decedents' estates demand judgment against the defendants on Count One - Anti-Terrorism and Effective Death Penalty Act Claim against the defendants IRAQ and IRAQI INTELLIGENCE, the sum of FIFTY MILLION DOLLARS ($50,000,000.00) for each plaintiff; on Count Two - Anti-Terrorism and Effective Death Penalty Act Claim against the defendant SUDAN, the sum of FIFTY MILLION DOLLARS ($50,000,000.00) for each plaintiff; on Count Three - Torture Victim Protection Act, the sum of FIFTY MILLION DOLLARS ($50,000,000.00) for each plaintiff; on Count Four - Wrongful Death Based on Intentional Murder, the sum of FIFTY MILLION DOLLARS ($50,000,000.00) for each wrongful death plaintiff; on Count Five - Survival Damages Based on Intentional Murder, the sum of TWENTY-FIVE MILLION DOLLARS ($25,000,000.00) for each wrongful death plaintiff; on Count Six - Negligent and/or Intentional Infliction of Emotional Distress, the sum of TWENTY-FIVE MILLION DOLLARS ($25,000,000.00) for each plaintiff and survivor of each decedent; on Count Seven - Conspiracy, the sum of ONE TRILLION DOLLARS

-110-

($1,000,000,000,000.00) for the plaintiffs; on Count Eight - Aiding and Abetting, the sum of

ONE TRILLION DOLLARS ($1,000,000,000,000.00) for the plaintiffs; on Count Nine - Treble

Damages, the sum of THREE TRILLION DOLLARS ($3,000,000,000,000.00) for the plaintiffs;

on Count Ten - Violation of the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §

1962(a), the sum of ONE TRILLION DOLLARS ($1,000,000,000,000.00) for the plaintiffs; on

Count Eleven - Violation of the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §

1962(c), the sum of ONE TRILLION DOLLARS ($1,000,000,000,000.00) for the plaintiffs; on

Count Twelve - Violation of the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C.

§ 1962(d), the sum of ONE TRILLION DOLLARS ($1,000,000,000,000.00) for the plaintiffs;

on Count Thirteen - Punitive Damages, the sum of ONE TRILLION DOLLARS

($1,000,000,000,000.00) for the plaintiffs; and on County Fourteen - Punitive Damages -

Agencies and Instrumentalities of the Foreign State Defendants, the sum of ONE TRILLION

DOLLARS ($1,000,000,000,000.00) for the plaintiffs, plus interest, costs and attorneys' fees.

Dated: New York, New York
        September 10, 2002

                            Respectfully submitted,

                            BAUMEISTER & SAMUELS, P.C.
                            Attorneys for Plaintiffs

                            By: _____
                            Michel F. Baumeister (MB 1896)
                            Dorothea M. Capone (DC 8582)
                            Douglas A. Latto (DL 3649)

                            One Exchange Plaza
                            New York, New York 10006
                            (212) 363-1200
                            (212) 36301346